## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | Case No.:17-04156 (ESL) |
| BETTEROADS ASPHALT, LLC | Involuntary Chapter 11 |
| Debtor | |

| | |
|---|---|
| IN RE: | Case No.: 17-04157 (ESL) |
| BETTERECYCLING CORPORATION | Involuntary Chapter 11 |
| Debtor | |

### EMERGENCY MOTION REQUESTING THE ENTRY OF AN ORDER APPOINTING AN INTERIM CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, APPOINTING AN EXAMINER, AND FOR RELATED RELIEF

**COMES NOW** Firstbank Puerto Rico ("Firstbank"), Banco Santander de Puerto Rico ("Banco Santander"), the Economic Development Bank for Puerto Rico ("EDB"), and Banco Popular de Puerto Rico ("Banco Popular" or the "Administrative Agent", and collectively with EDB, Firstbank and Banco Santander, the "Lenders") through the undersigned counsel and submit this Emergency Motion Requesting the Entry of an Order Appointing an Interim Chapter 11 Trustee and for Other Relief (the "Motion").

### Preliminary Statement

Betteroads Asphalt, LLC ("Betteroads") and Betterecycling Corporation ("Betterecycling", collectively with Betteroads, the "Debtors" or the "Borrowers") have been engaged in the design, building, and maintenance of roadways, runways, and road surfaces throughout Puerto Rico (each, a "Project"). As part of these operations, the Debtors own asphalt

and asphalt recycling plants throughout Puerto Rico (collectively, the "Plants") and own and operate an asphalt terminal and pier in Guayanilla (the "Terminal").

The Lenders have filed this Motion and joined in the commencement of these involuntary bankruptcy cases and proceedings against the Debtors in order to stop the depletion of the Debtors' assets, stop transfers of property out of the Debtors' estates for little or no consideration, and to otherwise preserve and recover the Debtors' assets for the benefit of their creditors including the Lenders.  By this Motion, the Lenders respectfully request that the Court enter an order (i) appointing an interim chapter 11 trustee to administer the Debtors' estates or, in the alternative, appointing an examiner to analyze and report upon the Debtors' and their insiders' pre-filing transactions, conduct, and acts, and (ii) pursuant to Bankruptcy Code section 303(f), restricting - during the gap period between the filing of the involuntary petitions and the entry of orders for relief granting the petitions (the "Gap Period") – the unfettered ability of the Debtors and their insiders to operate and improperly dispose of the Debtors' property and assets.  In short, the Lenders seek to prevent the continued dissipation of the Debtors' assets and property; avoid and recover numerous pre-filing transfers of property and assets of the Debtors to insiders, related companies and third parties; and provide for an orderly and open process to resolve claims against the Debtors' estates and maximize value for the benefit of creditors including, without limitation, the Lenders.

As of the date hereof, the Debtors' outstanding obligations to the Lenders under the existing credit facilities approximates $80 million.  Previously, the Lenders restructured and re-financed the original loans for the acquisition of the Debtors' assets and provided credit facilities for working capital and the operation of the Debtors' businesses.  To secure these obligations, the Debtors granted to the Lenders perfected, first priority liens over substantially all of the

Debtors' assets, including real estate properties, the Plants and the Terminal as well as over their personal property, including equipment, inventory, accounts receivable, and contracts (including those relating to any Project), among other assets pledged as collateral.

Since the beginning of 2016, the Debtors have defaulted under their various credit facilities with the Lenders. The Lenders attempted numerous good faith efforts to restructure and resolve the Debtors' obligations to the Lenders and outstanding defaults consensually; however, such efforts were unsuccessful and starting in June 2016 the Lenders were forced to exercise their remedies under the Credit Agreement (as defined below). Other creditors also exercised their own remedies against the Debtors. Within the past year, dozens of suppliers and creditors have commenced collection actions against the Debtors in the local and federal courts.

The Lenders have learned that the Debtors[1], during the months prior to the filing of the involuntary petitions, engaged in a series of transactions – apparently intended to shield themselves from the claims of their creditors – that transferred or otherwise disposed of their income producing operations and a substantial amount of their assets, to the detriment of the Debtors' creditors. For instance, beginning at least as early as September 2016, the Debtors apparently and improperly transferred to an entity named Puerto Rico Asphalt, LLC - an entity apparently owned and operated by the son of the Debtors' principal ("PR Asphalt") - the majority of their income producing operations, assets, contracts for Projects, their licenses, and their corresponding ability to generate revenue from those Projects. Through these transactions, a substantial portion of the Debtors' revenues and assets have been diverted and transferred to PR Asphalt, thereby prejudicing the Debtors' creditors including the Lenders.

---

[1] The factual section included below details the transfers that the Lenders have discovered to date, by Debtor.

As detailed below, the Debtors also transferred several of their Plants to third parties through putative "lease agreements" pursuant to which third parties have been granted rights to operate the Plants and manage and control the Debtors' operations, and the machinery and equipment in their Plants.  The Debtors have also assigned to third parties contracts for Projects and revenues derived from such contracts.  The foregoing transactions have depleted and diminished the assets of the Debtors to the detriment of their creditors, and most particularly the Lenders, because the assets transferred are collateral of the Lenders.

The Lenders have only started to uncover the full scope and breadth of the Debtors' improper transfers and related misconduct by the Debtors and their insiders.  The Debtors and their insiders have obstructed and blocked the Lenders' rights to access information concerning the Lenders' collateral and the Debtors' books and records.  Accordingly, the Lenders intend to seek authorization to undertake Bankruptcy Rule 2004 examinations and discovery of the Debtors, their insiders, their assets and financial condition, and all the transactions whereby the Debtors and their insiders may have dissipated and transferred to third parties the Debtors' assets to the detriment of their creditors including the Lenders.  The Lenders reserve their rights - and intend - to amend and supplement this Motion with additional information obtained through further investigations, discovery and examinations.

## **Jurisdiction and Venue**

The Court has jurisdiction over this matter under 28 U.S.C. §§157 and 1334. This is a core proceeding under 28 U.S.C. §157(b).  Venue is proper in this district under 28 U.S.C. §§1408 and 1409.  The statutory predicate for the relief requested herein are Sections 105(a), 303(f), 303(g), 363, 1104(a) and 1104(c) of the Bankruptcy Code.

## Factual Background

**A.    Overview of Debtors' Business**

1.    The Debtors have been engaged in the business of building, paving and providing maintenance services to roadways, runways, highways and road surfaces for over the past sixty (60) years.  Their business expanded within Puerto Rico and the U.S. Virgin Islands, and Betteroads allegedly owns the largest asphalt terminal and pier in the Caribbean.[2]

2.    The Debtors are owners of the asphalt Plants, the machinery and equipment, as well as the real estate properties in which they operate.  Regarding their real estate properties where the Plants are located, Betteroads is the owner of eleven properties, while its subsidiary, Betterecycling, owns another five properties.  Below is a list of the real estate and Plants that Betteroads and Betterecycling own:

| Betteroads' facilities | Betterecycling's facilities |
|---|---|
| Arecibo | Aguada |
| Barranquitas | Carolina |
| Bayamón | Humacao |
| Cabo Rojo | Ponce |
| Caguas | Salinas |
| Ceiba | |
| Cupey | |
| Guayanilla | |
| Terminal | |
| Manatí | |
| St. Thomas, USVI | |

3.    As part of their businesses, the Debtors regularly enter into contracts for Projects with private construction companies as well as with a number of municipalities in Puerto Rico. The revenues derived from these contracts, together with the revenues that the asphalt plants generate, compose most, if not all, of the Debtors' revenues.

---

[2] http://www.emdi.net/asphalt_terminal.html.

B.      **The Credit Facilities**[3]

4.      On June 24, 2014, the Lenders and the Debtors entered into an Amended and Restated Credit Agreement (the "Credit Agreement"), whereby the Lenders agreed to restructure the Original Loans (as defined therein), exceeding $84,000,000 in total, into the various facilities set forth in the Credit Agreement.  *See* **Exhibit 1**, Complaint, *BPPR vs Betteroads Asphalt LLC, Betterecycling Corporation, et al.*, Case No. K CD2016-1870, at ¶¶ 13 - 17.

5.      The credit facilities set forth in the Credit Agreement were provided by individual and separate commitments from each Lender as set forth in the Credit Agreement and managed as part of a syndicate, with BPPR serving as lender and as administrative agent.  *See* **Exhibit 1**, *supra*.

6.      To secure the obligations under the credit facilities set forth in the Credit Agreement, Betteroads and Betterecycling granted to the Lenders a first priority perfected security interest over, among other assets, the Debtors' real estate, account receivables, inventory, equipment, general intangibles, contracts accounts, and personal property. *See* **Exhibit 1**, *supra*, at ¶¶ 54-79.

7.      Less than a year and a half after the Lenders and the Borrowers entered into the Credit Agreement, the Borrowers defaulted with their obligations to the Lenders. Accordingly, on February 25, 2016, the Lenders sent a first notice and declaration of default whereby the Borrowers were informed of the specific events of default incurred under the Credit Agreement. Subsequent notices of default were sent on June 13 and September 14, 2016 (collectively the "Notices of Default").  *See* **Exhibit 1**, *supra*, at ¶¶ 81 - 86.

---

[3] The credit facilities, collateral, and loan documents among the Lenders and the Debtors are set forth in detail in the Complaint filed by the Lenders and attached as **Exhibit 1**, *infra*, the "Complaint". The Lenders incorporate the allegations set forth in the Complaint as if set forth in full herein, and include below a summary of such credit facilities, collateral and loan documents.

8.      Even after the Notices of Default were sent, the Lenders engaged in numerous efforts in an attempt to remedy the various defaults incurred; however, the Borrowers failed to take any appropriate action to cure the outstanding defaults under the Credit Agreement. Eventually, the Lenders had no other option but to exercise part of their remedies pursuant to the Credit Agreement and loan documents.

9.      Therefore, the Lenders, pursuant to the rights granted under the Credit Agreement, loan documents, and applicable law, issued notices on June 15, 2016 and thereafter to the account debtors of the Borrowers requiring these entities to remit any payments then or in the future due to the Debtors to the Lenders.  *See* 19 L.P.R.A. §2202; <u>In re AA 10000 Corp.</u>, 07-06601(ESL), 2007 WL 9624555, at *4 (Bankr. D.P.R. Dec. 11, 2007) (ESL) (holding that similar notification constituted a foreclosure over the debtors' accounts receivables).  *See* **Exhibit 1**, *supra*, at ¶¶ 83 and 84.

10.      Further, on September 21, 2016, BPPR, as administrative agent and for the ratable benefit of the Lenders, filed a Complaint for collection of monies and foreclosure action before the San Juan Court of First Instance, against the Borrowers and the guarantors, under Civil Case Number K CD2016-1870.  *See* **Exhibit 1**, *supra*.

**C.      <u>Debtors' Transfers of Assets</u>**

11.      Since the Lenders (and other creditors, as detailed below) commenced exercising their rights as a result of the Borrowers' various defaults, the Borrowers have engaged in acts to divert, transfer, lease, and/or otherwise dispose of their respective assets (which are part of the Lenders' collateral) in an effort apparently aimed at frustrating the Lenders and other creditors' ability to collect.

12.     Specifically, the Lenders have discovered what appears to be a systemized effort to transfer a substantial portion of the Debtors' operations to PR Asphalt and to transfer piecemeal equipment, machinery, and asphalt Plants to third parties. These transfers have resulted in diverting to third parties the Borrowers' revenue streams that could have been used to repay their creditors, including the Lenders.  The transfers of the Lenders' collateral have been made, and continue to be made, without authorization or consent from the Lenders and without any indication that such collateral is being maintained or preserved.  Through these transfers, the Borrowers have diminished and depleted their assets in prejudice of the Lenders, all creditors and the Debtors' estates.

### i.       Transfer of Assets and Operations to Puerto Rico Asphalt, LLC

13.     Betteroads, to conduct its business and operations, needs a byproduct material license issued by the U.S. Nuclear Regulatory Commission (the "NRC").  With this license, Betteroads is authorized to possess and use byproduct material for the purpose of operating gauging devices to measure physical properties of materials at their facilities, which is all regulated by this Federal Agency.

14.     On December 12, 2016, the NRC received from the Debtors a letter announcing a "change in control" and sale of Betteroads' assets, operations and licenses to PR Asphalt.[4]  The letter was signed by Mr. Jorge Luis Díaz Irizarry and Jorge Arturo Díaz Mayoral, the latter in his capacity as President of PR Asphalt.  In pertinent part, the letter states:

> Betteroads Asphalt Corporation will no longer be own [*sic*] or operate [*sic*] by Jorge Luis Diaz Irizarry.  The laboratory equipment, nuclear gauges and license will be transfer [*sic*] and operated by Puerto Rico Asphalt and the owner will be Jorge Arturo Díaz Mayoral. There will be no change in license number 52-19845-01

---

[4] The NRC's records are public records and are available at www.nrc.gov.

*See* **Exhibit 2**, Letter dated December 12, 2016, signed by Mr. Jorge Luis Díaz Irizarry and Mr. Jorge Arturo Díaz Mayoral, at Page No. 1, item No. 1, ¶ 2.

15.     Through the letter, Betteroads and PR Asphalt also state that "[…] ***this transaction is a direct sale of assets***, including survey instrumentation, equipment, and radioactive sealed sources, and that the license name will change to Puerto Rico Asphalt". (Emphasis Added). *See* **Exhibit 2,** *supra*, at Page No. 4, item No. 2, ¶ 2.

16.     Additional correspondence was exchanged between the NRC and Betteroads, pursuant to which Mr. Jorge Arturo Díaz Irizarry confirmed that the sale of Betteroads took place on September 23, 2016, without first requesting and obtaining the NRC's prior written approval as required under 10 CFR 30.34(b) and Section 184 of the Atomic Energy Act of 1954, as amended.[5] *See* **Exhibits 3**, Safety Evaluation Report dated March 8, 2017, issued by the NRC, at Page No. 1, ¶ 1.

17.     Following the apparent "sale" of Betteroads' assets and operations to PR Asphalt, LLC, PR Asphalt communicated with the NRC as if it were the owner of these assets and operations.  For example, PR Asphalt informed the NRC that it had changed the location of the facility where the gauges are stored, and thus requested that the NRC remove from such license the facility located at Rio Piedras, in order to allow for the "unrestricted use" of the facility.  *See* **Exhibit 4**, Letter dated March 8, 2017, issued by the NRC to Mr. Jorge Arturo Díaz Mayoral, as owner of Puerto Rico Asphalt LLC, at Page No. 1, ¶¶ 3 to 5.  Further, PR Asphalt subsequently

---

[5]  Specifically, the NRC stated: "All assets and facilities associated with licensed operations were transferred to Puerto Rico Asphalt, LLC as a change in ownership.  Betteroads Asphalt Corporation and Puerto Rico Asphalt, LLC completed this transaction without first requesting and obtaining the NRC's prior written approval as required by 10 CFR 30.34(b) and section 184 of the Atomic Energy Act of 1954, as amended […]".  *See* **Exhibit 3**, *supra*, at Page No. 1, ¶ 2, lines 8 to 12.

requested that the NRC include three (3) additional facilities within the NRC's license. Specifically, it requested that the Caguas, Ponce and Salinas facilities be incorporated.[6] *Id.*

18.    In sum, Betteroads transferred its operations, rights, and licenses to PR Asphalt, thereby divesting Betteroads of the revenue streams previously obtained in the course of its regular business operations.  Betteroads has not disclosed whether any consideration was given for this transfer.  Moreover, based on Betteroads own filings, PR Asphalt – the recipient of the improper transfers – is owned and operated by Jorge Arturo Díaz Mayoral, the son of Debtors' principal.

ii.    **Transfer of Asphalt Plants and Real Estate Properties to Third Parties**

19.    After the Borrowers defaulted under their obligations with the Lenders, the Lenders discovered that the Borrowers had transferred collateral of the Lenders such as equipment, inventory, machinery and Plants to third parties, in direct violation of the Credit Agreement.

20.    On September 27, 2016, after the Lenders  learned that the Debtors were leasing their assets to third parties, the Administrative Agent sent a communication to the Debtors reminding the Debtors that the lease of their equipment and inventory to third parties constituted an additional 'Event of Default' pursuant to Section 6.3 of the Credit Agreement, which specifically prohibits the selling, transferring, leasing, or otherwise disposing of all or any part of their respective assets and properties, including, without limitation, the inventory, machinery and equipment.

---

[6] Further, the Caguas, Ponce and Salinas real estate properties, together with the machinery and equipment contained in each of these facilities, including the Plants, are also an integral part of the Lenders' collateral pursuant to the Credit Agreement and the corresponding Loan Documents.

21.     In light of these developments, the Administrative Agent conducted over a dozen site inspections of its collateral, which took place on October 19 and 20, 2016 (collectively referred to as the "Inspections").   *See* **Exhibit 5**, Affidavit issued by Mrs. Rosimari León Castañer, in her capacity of Commercial Relations Officer of BPPR; *See also* **Exhibit 6**, Affidavit issued by Mr. Juan C. De Jesús Estrada in his capacity of Appraisal Review Supervisor of BPPR.

22.     The Lenders performed site inspections on the facilities located at Aguada, Arecibo, Barranquitas, Caguas, Carolina, Humacao, Manatí, Salinas, and San Juan (Cupey Ward). *See* **Exhibits 5 and 6**, *supra*.  At the site visits, the Lenders were able to confirm that the Debtors had leased the operation of their facilities, including their equipment and inventory, to third parties.  That is, at the time that the Inspections were conducted, these third parties were using as part of their daily operations the Debtors' machinery and equipment that is subject to the Lenders' collateral.  During these site inspections, the employees at the Plants confirmed that they were being retained by a third party who was operating the facility.  *Id.*

23.     Specifically, during Inspections at the Aguada, Arecibo, Manatí, and Salinas sites, the Lenders discovered that these sites were being leased by the Debtors to a company named "Transporte Rodriguez", and that this party was responsible for the operations of these four (4) facilities. *See* **Exhibit 5,** *supra,* at ¶¶ 8 and 10.

24.     At the Inspection of the Barranquitas and Caguas sites, the Lenders were informed by on-site employees that these sites were being operated and leased by Mr. Carlos Ortíz.[7]  Particularly, at the Caguas site, the Lenders witnessed that machinery and equipment

---

[7] Following the Inspections, BPPR's representatives contacted Mr. Carlos Ortíz, who admitted that he was leasing the facilities located in Barranquitas and Caguas and that he is currently in charge of the operations of these premises. *See* **Exhibit 5**, *supra*, at ¶14.

labeled and identified as property of Betteroads and/or Betterecycling was being operated by Mr. Carlos Ortíz's personnel. *See* **Exhibit 5**, *supra*, at ¶¶ 10 and 11.

25.     Through the Inspection of the Carolina site, the Lenders confirmed that these operations were being leased and operated by an individual identified as "Engineer Burgos". *See* **Exhibit 5**, *supra*, at ¶12. With respect to the Humacao site inspection, the Debtors had previously informed the Lenders that this facility was supposedly closed. However, upon arriving for inspection, the Lenders' representatives learned that the site was being leased by "Mr. Harry Meléndez Pacheco" and, despite Debtor's assertions, the site was indeed operating. *See* **Exhibit 5**, *supra*, at ¶11.

26.     In essence, through the Inspections, the Lenders confirmed that specific equipment and machinery subject to the Lenders' perfected security interests under the Credit Agreement has been improperly transferred to, and is being used in the daily operations of, the current tenants of the Debtors' facilities without the authorization, consent or prior knowledge of the Lenders. *See* **Exhibit 5**, *supra*, at ¶¶ 6 and 13.

27.     After the Inspections were conducted, the Lenders held a meeting with Mr. Jorge Díaz Irizarry, as the Borrowers' authorized representative.  Upon the Lenders' inquiry, Mr. Díaz-Irizarry specifically admitted that the Borrowers' facilities were in fact being leased to third parties.

28.     The Lenders have requested copies of these lease and/or third party agreements between the Borrowers and Mr. Carlos Ortíz and the other third parties to these contracts. However, no physical or digital copies of such contracts have been produced or delivered to the Lenders as requested.  Additionally, the Lenders also sent letters to these known tenants to request that payment under the lease agreements be delivered directly to the Lenders, by virtue of

the Credit Agreement and Debtors' Events of Default thereunder. Notwithstanding these requests, the tenants have not submitted payment to the Lenders. *See* **Exhibit 5**, *supra*, at ¶¶ 14 and 16.

### iii.   Transfer of Contracts

29.     Betteroads and Betterecycling generally execute contracts with a considerable number of municipalities in Puerto Rico as well as contracts with private construction companies for Projects.

30.     Through PR Asphalt, the Debtors have diverted revenues that they would have derived from a number of contracts to PR Asphalt and, through such actions, depleted the Debtors and their estates.

### a.   Municipality of Juncos and Betterecycling

31.     On July 5, 2016, after a governmental auction was held by the Municipality of Juncos, the same was adjudicated to Betterecycling.  Shortly thereafter, on July 13, 2016, the parties executed Contract No. 2017-000128, pursuant to which Betterecycling would provide services to the Municipality of Juncos.  According to the terms and conditions agreed under the contract, Betterecycling was expressly prohibited from sub-contracting its services to another party.  *See* **Exhibit 7**, Letter dated September 19, 2016 sent to Municipality of Juncos.

32.     Notwithstanding the contractual prohibition, on September 19, 2016, Betterecycling sent a letter to the Municipality of Juncos, informing that it "had entered into an agreement with PR Asphalt, LLC" pursuant to which PR Asphalt would provide the services agreed under Contract No. 2017-000128 (referenced above), and further requesting that all future purchase orders and payments under the contract be directed to PR Asphalt.  *See* **Exhibit 7**, *supra*.

33.     In view of Betterecycling's request, the Municipality of Juncos granted Betterecyling five (5) days to inform whether the services subject to the contract would be in fact rendered by Betterecycling or by PR Asphalt.  In the communications, the Municipality of Juncos advised that in the event that Betterecycling was not able to continue rendering services pursuant to the contract, the contract would be terminated. Apparently, no response was provided and, as a result, on October 11, 2016 Betterecycling was notified of the termination of the contract and further informed that a related bond would be seized.  *See* **Exhibit 7**, *supra*.

### b.     Municipality of Florida and Betterecycling

34.     On October 26, 2016, the Municipality of Florida and PR Asphalt executed a services contract pursuant to which the latter would provide the Municipality of Florida certain paving services.  However, in this case, and likely in light of the previous experience with the Municipality of Juncos, Betterecycling specifically identified itself as "*P.R. Asphalt (formerly known as Betterecycling Corp.)*".  *See* **Exhibit 8**, Contract No. 2017-00041, executed between Municipality of Florida and PR Asphalt, duly stamped as approved by the Puerto Rico Comptroller's Office ("Oficina del Contralor de P.R.").

## D.     Litigation Claims

35.     Since the Debtors commenced the various transfers detailed above, they have accumulated a substantial amount of litigation related to claims from suppliers and other entities. To date, dozens of pending legal actions have been commenced against Betteroads and Betterecycling before the Puerto Rico Court of First Instance, as well as before the U.S. District Court for the District of Puerto Rico. *See* **Exhibit 9**, Litigation commenced against Betteroads; *See also* **Exhibit 10**, Litigation commenced against Betterecycling.

E.    **Filing of the Instant Involuntary Bankruptcy Petition**

36.    As a result of the significant pre-filing transfers of assets that both Debtors have engaged in, among other reasons, the Lenders and the Petitioning Creditors have been forced to commence the instant involuntary bankruptcy proceeding.

37.    Accordingly, on June 9, 2017, St. James Security Inc., Sargeant Marine, Inc., Sargeant Trading, Ltd., Facsimil Paper Connection Corp., Banco Popular, Banco Santander, Firstbank, the Economic Development Bank of PR filed an involuntary bankruptcy petition against Betteroads Asphalt, LLC.  See Docket No. 1.

38.    Simultaneously, St. James Security, Inc., Control Force Corporation, Champion Petroleum, Inc., Banco Popular, Banco Santander, Firstbank, the Economic Development Bank of PR filed an involuntary bankruptcy petition against Betterecycling Corporation.   See Docket No. 1.

39.    Today, the Lenders are filing the instant Motion requesting the appointment of an interim chapter 11 trustee to administer Debtors' estates.  In the alternative, the Lenders request the appointment of an examiner to analyze and report upon the Debtors' and their insiders' transactions and conduct.  The Lenders also request that, pursuant to Section 303(f) of the Bankruptcy Code, that the Debtors are restricted of improperly disposing of their property and assets in detriment of all of their creditors.  Further, the Lenders intend to seek authorization to undertake an Examination under Rule 2004 to perform discovery over the Debtors' transfers which have caused the continuous dissipation of their estates in detriment of their creditors.

40.    Through the filing of the involuntary petitions, the Petitioning Creditors seek to ultimately preserve the Debtors' estates, maximize their value and the recoveries of the various creditor classes, and to avoid and recover the improper pre-filing transfers.

**Relief Requested and the Basis Thereof**

41.     In consideration of the evidence that has been obtained to date and the additional evidence that may be obtained through a Rule 2004 examination, the Lenders request the appointment of a trustee in order to preserve the Debtors' estates and avoid the continued depletion of their assets.  The appointment of a trustee will maximize creditor recoveries and allow for a proper investigation and analysis of the Debtors' pre-filing transactions that might be avoided for the benefit of all creditors and the Debtors' estates.

42.     In the alternative, the Lenders request appointment of an examiner, pursuant to Bankruptcy Code section 1104, tasked with conducting an analysis of the Debtors' pre-filing transactions and evaluating potential historical and/or ongoing fraud and mismanagement by the Debtors and their principals.

43.     Finally, the Lenders also request that during the Gap Period the Court limit the Debtors' authority to operate its business and dispose of its assets pursuant to Section 303(f) of the Bankruptcy Code.  In the absence of such an order, Section 303(f) would allow the Debtors to continue to dispose of their assets without any limitations, thereby exposing the Lenders and the Debtors' other creditors to additional improper diminution of the Debtors' estates. Accordingly, the Lenders request that the Court require the Debtors to seek prior Court approval and authorization for any proposed transfer of the Debtors' assets or entry into transactions or agreements outside of the ordinary course of business.

I.     **The Court Should Appoint An Interim Chapter 11 Trustee Or, in the Alternative, Appoint an Examiner**

A.     **Appointment of a Trustee pursuant to Section 1104 of the Bankruptcy Code**

44.     Section 303(g) of the Bankruptcy Code provides for the appointment of an interim trustee during the "gap period," or the period between the date of an involuntary case's commencement and the entry of an order for relief.  Specifically, Section 303(g) provides that "[…] the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate may order the United States Trustee to appoint an interim trustee under Section 701 of this title to take possession of the property of the estate and to operate any business of the debtor." 11 USC §303(g). *See* In re James Plaza Joint Venture, 62 BR 959, 961 (Bankr. S.D. Tex. 1986) (appointing an interim trustee in an involuntary Chapter 7 petition under Section 303(g) standard); In re Alpine Lumber & Nursery, 13 B.R. 977, 979 (Bankr. D. Cal. 1981) (finding appointment of interim trustee warranted in an involuntary chapter 11 petition under Section 303(g)); In re Professional Accountants Referral Services, Inc. 142 B.R. 424 (Bankr. D. Colo. 1992) (also holding appointment of interim trustee under Section 303(g) in involuntary chapter 11 filing).

45.     In addition to Section 303(g), Section 1104(a) also authorizes the appointment of a trustee during the gap period of an involuntary bankruptcy proceeding where such appointment is necessary to preserve property of the estate or prevent loss to the estate. 11 USC §§ 303(g) and 1104(a). *See* In re Professional Accountants Referral Services, Inc., 142 B.R. at 424, 429. ("This Court finds that the appointment of a trustee during the gap period –before an order for relief is entered– is authorized and proper under 11 U.S.C. §§1104(a)(1), 105 and, by analogy, 303(g).")

46.    Specifically, Section 1104(a) provides, in relevant part:

(a)    **At any time after the commencement of the case** but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1)    **for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause**, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, […]

*See* 11 U.S.C. §1104(a)(1)

47.    Although Section 1104(a)(1) does not define "cause," it does provide a non-exhaustive list of grounds that may each establish cause to appoint a trustee: fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, and "similar cause."   11 U.S.C. §1104(a)(1).

48.    In determining whether "cause" exists, the court must consider "the cumulative or collective impact of the alleged problems or issues in making its decision." *See* Lopez-Muñoz, 553 B.R. 179 (B.A.P. 1st Cir. 2016). That is, the court must make a fact-intensive determination on a case-by-case basis and determine, whether based the totality of the circumstances, there is cause for the appointment of a trustee under Section 1104(a). *See* Lopez-Muñoz, 553 B.R. at 191; *see also* In re Costa Bonita Beach Resort, Inc. 479 B.R. 14, 44 (Bankr. D. P.R. 2012) (*citing* Tradex Corp. v. Morse, 339 B.R. 823, 825-826 (D. Mass. 2006)).

49.    When determining whether a specific set of circumstances establishes "cause" under §1104(a)(1), the courts have considered a variety of factors, including:

(1)    Materiality of the misconduct;

(2)    Evenhandedness or lack of such in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;

    (3)  The existence of pre-petition voidable preferences or fraudulent transfers;

    (4)  Unwillingness or inability of management to pursue estate causes of action;

    (5)  Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties owed to the debtor; and

    (6)  Self-dealings by management or waste or squandering of corporate assets.

*See* Lopez-Muñoz, 553 B.R. at 190 (internal citation and quotation marks omitted); *see also* In re Veblen West Dairy LLP, 434 B.R. 550, 553 (Bankr. D. S.D. 2010) (considering similar factors for a § 1104(a)(1) analysis); In re Nartron Corp., 330 B.R. at 592 (same).

50.    Ultimately, these factors must be viewed in light of the purpose a trustee serves to the bankruptcy process: "[T]he appointment of a trustee is a power which is critical for the court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interest of all creditors is served."  *See* Lopez-Muñoz, 553 B.R. at 189, *citing* In re Nartron Corp., 330 B.R. at 591-592.

51.    An appointment of a trustee is warranted in this case.  With only the information the Lenders have gathered thus far, "cause" plainly exists under Sections 303(g) and 1104(a)(1) because, among other things, the Debtors have transferred numerous assets, operations, and revenues to third parties and insiders.  *See* In re Sharon Steel Corp., 871 F2d 1717 at 1227 (systematic siphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee); In re Professional Accountants Referral Svcs, Inc. 142 BR 424, 428 (Bankr. D. Colo. 1992) (diversion of corporate assets for professional use constitutes dishonesty or gross mismanagement which required the appointment of a trustee); In re Colby Constr. Corp., 51 BR 113, 116 (Bankr.S.D.N.Y. 1985) (majority shareholder's deliberate and unabashed conversion of corporate assets to acquire another company in his own

name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section).  As detailed above, the Debtors have transferred the control of their operations and of their business in favor of another entity wholly controlled by related officials.

52.    As admitted by Betteroads in its communications exchanged with the NRC, Betteroads transferred all of its assets to PR Asphalt – without the authorization of the Lenders – despite the fact that these assets are fully encumbered in favor of the Lenders.  Moreover, Betteroads has been leasing its asphalt Plants, machinery, equipment and real estate properties, for the benefit of third parties, without the Lenders' consent, despite acknowledging the Lenders' have liens on all of this real and personal property.  *See* In re TP, Inc., 455 B.R. 455, 457-59 (Bankr. E.D.N.C. 2011) (holding that cause existed under Section 1104 to appoint a chapter 11 trustee where debtor's principal leased collateral of a secured lender without authorization, collected the rents for his personal use and failed to comply with court order to turn over funds, among others acts.)

53.    Regarding Betterecycling, this entity has specifically alleged to third parties, such as the Municipality of Juncos, that PR Asphalt is the "successor" of Bettercycling so that PR Asphalt can continue to benefit from and obtain the proceeds from its contracts.  Further, Betterecycling has been leasing its asphalt Plants, machinery, equipment and real estate properties, for the benefit of third parties, without the Lenders' consent, despite acknowledging the Lenders' have liens on all of this real and personal property. Such conduct significantly harms creditors of the Debtors' estates, and courts have held that the diversion of funds and misuse of corporate assets constitutes cause sufficient to warrant the appointment of a trustee

under Section 1104(a)(1).  In re PRS Ins. Grp., Inc., 274 B.R. 381, 385 (Bankr. D. Del. 2001); In re Bonded Mailings, Inc., 20 B.R. 781 (Bankr. E.D.N.Y. 1982).

54.     Furthermore, considering the conflicts of interest implicated by the relationships among the Debtors and PR Asphalt and their principals, it is highly unlikely that the Debtors will adequately review, challenge, and seek to recover the improper transfers that were made to an entity owned by the son of the Debtors' principal.  *See* In re Marvel Entertainment Group, Inc. 140 F.3d 463, 472 (3rd Cir. 1998) (highlighting that when the debtor's interest conflict with those of its creditors to such an extent that "the appointment of a trustee may be the only effective way to pursue reorganization"); s*ee also* In re Tel-Net Hawaii, Inc.105 B.R. 594, 595 (Bankr. D. Hawaii 1989).  These conflicts of interest alone are reason enough to appoint a chapter 11 trustee.  As the court noted in In re Intercat, Inc., 247 B.R. 911, 923 (S.D. Ga. 2000):

> [The president of the debtor] has not suggested that he is or will be capable of pursuing the aggressive, independent investigation of all the transactions in issue, or that he will prosecute litigation to recover assets, or sue for the damages sustained by the debtor. Indeed, since he, his family, or his closely-held corporations are all potential targets of any such litigation, it is impossible to believe that he would do so in the manner that a disinterested person would. (Citations omitted.)

55.     As the foregoing shows, the appointment of an interim trustee is eminently appropriate under the circumstances to avoid the further depletion of estate assets, which would most certainly result in irreparable harm all of the Debtors' stakeholders.

56.     Further, the confluence of acts detailed above is indicative of fraud, which also constitutes cause to appoint a trustee.  As the First Circuit Court of Appeals has recognized:

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer […].

> The presence of a single badge of fraud may spur mere suspicion, the confluence
> of several can constitute conclusive evidence of an actual intent to defraud, absent
> "significantly clear" evidence of a legitimate supervening purpose.

In re Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991)

(citations omitted); *See also* In re Cushman Bakery, 526 F.2d 23, 33 (1st Cir.1975); In re

Indrescom Sec. Tech. Inc., 559 B.R. 305, 317–18 (Bankr. D.P.R. 2016) ("To determine whether

fraudulent intent existed, courts consider the list referred to as the 'badges of fraud.' Not all or

even a majority of the badges of fraud need to be found to raise an inference of fraudulent

intent.").

57.     As detailed above, the various transfers made by the Debtors contain a number of

the badges of fraud recognized in this Circuit.  The transfers were made once and after the

Debtors had actual or threatened litigation by the Lenders and other creditors, the transfers are of

a substantial amount of the Debtors' assets and were made to third parties, including an entity

owned by the son of the Debtors' principal.  Accordingly, the Lenders' submit that cause exists

to appoint an interim trustee under Section 303(g).

58.     Cause also exists under Section §1104(a)(2) to appoint an interim trustee.

Section 1104(a)(2) of the Code provides that, on request of a party in interest, and after notice

and a hearing, the court shall order the appointment of a trustee, "***if such appointment is in the***

***best interest of creditors, any equity security holders, and other interests of the estate*** [...]" *See*

11 U.S.C. §1104(a)(2) (Emphasis Added).

59.     Upon a request for the appointment of a trustee under Section 1104(a)(2) the

courts have delineated several factors to consider.  These factors are:

    i.   the **trustworthiness of the debtor**;

    ii.   the **debtor's past and present performance and prospects for the debtor's rehabilitation**;

    iii.   confidence, or lack thereof, of the business community and creditors in its management; and

    iv.   whether the benefits of appointing a trustee outweigh the associated costs of such appointment.

*See* In re Keeley & Grabanski Land P'ship, 455 B.R. 153, 164–65 (B.A.P. 8th Cir. 2011) *citing* In re Ionosphere Clubs, Inc. 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *see also* In re Colorado-Ute Elec. Ass'n Inc., 120 B.R. 164, 176 (Bankr. D. Colo. 1990)

60.    Under Section 1104(a)(2), the Court may use its broad equity powers to determine that the appointment of a trustee would be in the best interest of the estate if the appointment would also be in the best interest of creditors, equity security holders and other stakeholders. *See* In re L.S. Good & Co., 8 BR 312 (Bankr. N.D. W. Va. 1980); *See also* In re Keeley & Grabanski Land P'ship, 455 B.R. 153, 164–65 (B.A.P. 8th Cir. 2011) (holding that a bankruptcy court has particularly wide discretion to appoint a trustee under the flexible standard of §1104(a)(2), even if it has determined that no cause exists under §1104(a)(1)).

61.    For the reasons cited above, the interests of creditors and the estates warrant the appointment of an interim trustee under §1104(a)(2). Here, the Lenders have a clear lack of confidence on the Debtors' management group and officers on account of their pre-filing actions including the improper transfer and disposal of the Debtors' assets to insiders and third parties, resulting in a diminution of the value of the Debtors' estates and significantly hindering the prospects of any possible reorganization or rehabilitation of the Debtors.

**B.      In the Alternative, Appointment Of An Examiner under Section 1104(c) Of**

**The Bankruptcy Code Is Appropriate**

62.      If the Court determines that sufficient cause does not exist for the appointment of

an interim trustee pursuant to Section 1104(a) or (b), then, alternatively, the Lenders request the

appointment of an examiner pursuant to Section 1104(c) to investigate, among other things, the

Debtors' pre-filing acts including transfers and disposition of assets, as well as the relationships

among the Debtors, PR Asphalt and other insiders and third parties who received or caused

transfers of the Debtors' assets.

63.      Specifically, Section 1104(c) of the Bankruptcy Code provides for an examiner to

be appointed to conduct an investigation of the Debtors.  To this effect, §1104(c) provides as

follows:

> (c) If the court does not order the appointment of a trustee under this
> section, then at any time before the confirmation of a plan, on request of
> a party in interest or the United States trustee, and after notice and a
> hearing, **the court shall order the appointment of an examiner to**
> **conduct such an investigation of the debtor as is appropriate,**
> **including an investigation of any allegations of fraud, dishonesty,**
> **incompetence, misconduct, mismanagement, or irregularity in the**
> **management of the affairs of the debtor** of or by current or former
> management of the debtor, **if—**
>> (1) **such appointment is in the interests of creditors, any equity**
>> **security holders, and other interests of the estate; or**
>> (2) **the debtor's fixed, liquidated, unsecured debts, other than**
>> **debts for goods, services, or taxes, or owing to an insider,**
>> **exceed $5,000,000.**

*See* 11 USC §1104(c)

64.      Section 1104(c)(2) specifically mandates for the appointment of an examiner

when the $5,000,000 debt threshold is met.  *See* In re Costa Bonita Beach Resort, Inc., 479 B.R.

14, 45 (Bankr. D.P.R. 2012) (ESL) (finding that if the $5,000,000 threshold is met, the

appointment is "mandatory"); *See also* In re Revco, D.S., Inc., 898 F.2d 498, 501 (6th Cir. 1990)

(if the debt amounts provided in section 1104(c)(2) are satisfied and a creditor requests an examiner, the Court has no discretion in the appointment of an examiner.) Walton v. Cornerstone Ministries Inv., Inc. 398 B.R. 77, 83 (N.D.Ga. 2008); In re UAL Corp., 307 B.R. 80, 85 (Bankr. N.D. Ill. 2004).

65.     Even though the standard under section 1104(c)(1) is similar to that of section 1104(a)(2) discussed above, the standard may be applied slightly differently due to the fact that in the context of an examiner appointment, the standard is lower than the requirements for the appointment of a trustee. *See* Collier ¶ 1104.03[3][1] at pp. 1104-39-40; *See also*  In re Landscaping Services, Inc., 39 B.R. 588 (Bankr.E.D.N.C.1984); In re Gilman Servs., Inc. 46 B.R. 322 (Bankr. D. Mass. 1985); In re Florida Peach Corp. of America, Int'l., 63 B.R. 833 (Bankr. M.D. Fla. 1986).

66.     Finally, it must be noted that, independent of the above-mentioned debt threshold of $5 million dollars, courts have generally held that "[a] court may also order the appointment *sua sponte* under its broad powers of Section 105(a)." *See* Collier ¶ 1104.03[2][1] at p. 1104-35. *See also* In re Landscaping Services, Inc. 39 B.R. 588 (Bankr.E.D.N.C.1984).

67.     The Lenders' submit that these estates satisfy the $5 Million threshold, and that the appointment of an examiner is critical to preservation of the Debtors' estates and the proper investigation of the Debtors' pre-petition transfers, conduct, and acts as detailed above.

## II.    The Court Should Impose Limitations On The Debtors Pursuant To Section 303(f) During The Gap Period

68.     The Lenders also request that during the Gap Period the Court limit the Debtors' authority to operate its business and dispose of its assets pursuant to Section 303(f) of the Bankruptcy Code.  In the absence of such an order, Section 303(f) would allow the Debtors to

continue to dispose of their assets without any limitations, thereby exposing the Lenders and the Debtors' other creditors to additional improper diminution of the Debtors' estates.  Thus, the Lenders request that the Court require the Debtors to seek prior Court approval and authorization for any proposed transfer of the Debtors' assets or entry into transactions or agreements outside of the ordinary course of business.

69.    Section 303(f) provides that "[n]otwithstanding section 363 of this title, **except to the extent that the court orders otherwise**, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced". (Emphasis added). *See* 11 USC §303(f).

70.    As detailed above, the Lenders have learned of a series of improper transactions and transfers of value made by the Debtors during the months prior to this filing, even while the Debtors have obstructed the Lenders' access to information, and without the Lenders having had the opportunity to conduct any formal discovery.  In the absence of an order restricting the Debtors' ability to transfer and dispose of their assets during the Gap Period, there is considerable risk that the Debtors will continue to deplete their estates before the entry of an order for relief.  Accordingly, the Lenders submit that it is critical to the preservation of the estates that the Debtors be required during the Gap Period to seek prior Court approval and authorization for any proposed transfer of the Debtors' assets or entry into transactions or agreements outside of the ordinary course of business, so that creditors and all other parties-in-interest have notice of any such proposed transaction and an opportunity to object to the same.

71.    Section 303(f) does not specify the "cause" sufficient to give rise to relief thereunder or the nature of the relief available.  However, as commented by Collier, "[a]n order

imposing restrictions on the operations of the business may conform to the restrictions mentioned in section 363." 2 Lawrence P. King, Collier on Bankruptcy, ¶ 303.35[2], at p. 303-121 (15th ed. 1992).  Further, the legislative history behind section 303(f) states that relief is appropriate when the debtor "may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle his business, all to the detriment of [its] creditors." *See* H.R. Rep. 95-595, 95th Cong., 1st Sess. 323 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 33 (1978).

72.     Consistent with these principles, courts have, under appropriate circumstances, restricted the debtor's powers to operate under section 303(f) as requested herein. *See e.g.*, In re Hodes, 402 F.3d 1005 (10th Cir. 2005) (court may prevent debtor from controlling assets during the gap period); In re Texas Rangers Baseball Partners, 434 B.R. 393 (Bankr. N.D. Tex. 2010) (requiring debtor to manage assets as if they were a trustee to the creditors).

Accordingly, the Lenders request that the Court require the Debtors, during the Gap Period, to seek prior Court approval and authorization for any proposed transfer of the Debtors' assets or entry into transactions or agreements outside of the ordinary course of business.

**WHEREFORE**, the Lenders' respectfully request that this Court enter an order: (a) appointing an interim chapter 11 trustee to administer the Debtors' estates or, in the alternative, appointing an examiner to investigate and report upon the Debtors' pre-filing transactions, conduct, and acts, (b) pursuant to Bankruptcy Code section 363(f), restricting during the Gap Period the Debtors' ability to operate and dispose of their property and assets, and (c) providing the Lenders such other relief as the Court may deem appropriate.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 12th day of June, 2017.

**WE HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.  Further, on this same date, we sent a copy of this Motion, by first class certified mail, to the Debtors and their counsel of record, and to the US Trustee.

**O'NEILL & BORGES, LLC**
*Attorneys for Banco Popular de Puerto Rico,*
*Banco, Firstbank Puerto Rico, Banco*
*Santander Puerto Rico, and the Economic*
*Development Bank for Puerto Rico*
250 Muñoz Rivera Ave., Ste. 800
San Juan, PR  00918-1813
Telephone: 787-764-8181
Fax: 787-753-8944

*/S/ Luis C. Marini Biaggi*
Luis C. Marini Biaggi
USDC No. 222301
luis.marini@oneillborges.com

*/S/ Martha L. Acevedo-Peñuela*
Martha L. Acevedo-Peñuela
USDC No. 300150
martha.acevedo@oneillborges.com