### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **IN RE:** | * | |
| | * | |
| **BETTEROADS ASPHALT, LLC** | * | **CASE NO. 17-04156 ESL** |
| | * | |
| | * | **INVOLUNTARY CHAPTER 11** |
| **ALLEGED DEBTOR** | * | |

**********************************************

| | | |
|---|---|---|
| **IN RE:** | * | |
| | * | |
| **BETTERECYCLING CORPORATION** | * | **CASE NO. 17-04157 ESL** |
| | * | |
| | * | **INVOLUNTARY CHAPTER 11** |
| **ALLEGED DEBTOR** | * | |

**********************************************

### ANSWERING BRIEF OF ALLEGED DEBTOR BETTEROADS ASPHALT LLC, & BETTERECYCLING CORPORATION

### OPPOSITION TO THE EMERGENCY MOTION FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF (I) A CHAPTER 11 TRUSTEE, OR (II) AN EXAMINER

**TO THE HONORABLE COURT:**

COMES NOW, Betteroads Asphalt, LLC & Betterecycling Corporation, as alleged debtors in these cases and through the undersigned attorneys who respectfully state and pray relief as follows:

### I.       PROCEDURAL BACKGROUND

1.      On June 9, 2017, several allegedly qualified petitioners filed an involuntary bankruptcy case against Betteroads Asphalt, LLC (hereafter "Betteroads Asphalt"). (Docket No. 1) On the same date an involuntary petition was filed against Betterecycling Corporation (hereafter "Betterecycling") (together the "companies").

2.      On June 12, 2017, Firstbank Puerto Rico ("Firstbank"), Banco Santander de Puerto Rico; ("Banco Santander"); the Economic Development Bank for Puerto Rico ("EDB"); and Banco Popular de Puerto Rico ("Banco Popular") filed what appears to be a joint Emergency Motion requesting the appointment of an interim Chapter 11 Trustee or an

examiner. (Docket No. 14) However, Banco Popular has failed to submit a copy

of the instrument providing them authorization to represent these purported creditors as

required by Federal Rule of Bankruptcy Procedure 2019(c)(4). (Docket No. 28)

3.      This unwarranted request for the appointment of a Chapter 11 Trustee is allegedly

premised in the unfounded necessity of stopping the alleged depletion of the companies

assets, stop transfers of property out of the company's estate for little or no consideration,

and to otherwise preserve and recover the company's assets for the benefit of their creditors

including the movants. (Docket No. 14 page 2 ¶2)

4.      Within their motion, the movants allege that the have been forced to commence the

instant involuntary bankruptcy proceeding as a result of the significant pre-filing transfers

of assets that both Debtors have engaged.  (Docket No. 14 page 15 ¶36) Movants provide

a generalized argument that the Petitioning Creditors seek to ultimately preserve

companies' estate, maximize their value and the recoveries of the various creditor classes,

and to avoid and recover the improper pre-filing transfers. (Docket No. 14 page 15 ¶40)

5.      Notwithstanding, as will be discussed thoroughly below, movants' alleged altruistic

motivations for filing the involuntary petition and the emergency motion are only a pretext

and a hoax to circumvent the jurisdiction of the State Court and to use the bankruptcy

forum as a litigation tactic to obtain remedies to which they haven't been able to obtain in

the State Court proceeding already commenced by themselves.

## II.      INITIAL ARGUMENT

6.      The contested petitioning creditors ("movants") have filed an *Emergency* Motion

for the Appointment of an Interim Chapter 11 Trustee or an examiner. As will be seen,

there is no evidentiary or factual basis whatsoever for the movants to have filed an

*Emergency* Motion for the Appointment of an Interim Trustee in this case. On the

contrary, the limited events narrated by the movants were presented to the Court out of

context, in an inflammatory fashion as an attempt to tailor the narrative towards

achieving their fixated goal of disrupting this corporation's endeavors and seek the

transfer of all of its assets to its components which also appear as alleged petitioners.

7.      The evidence will show that there is no danger, much less imminent danger that will occur prior to the hearing on the motion to dismiss to be pursued, and that the Alleged Debtors are in extraordinarily competent hands which have been able to preserve their reputation, the integrity of the assets and protect the interest of the creditors.

8.      Most importantly, it will be patently clear that the contents of the Emergency Motion as well as the motives behind the involuntary petition, are a rehash of the same allegations and remedies which are already pending at the State Court. Regrettably, the movants intend to use this bankruptcy forum to promote the remedies that they haven't been able to obtain at the State Court. The Emergency Motion, like the original Petition, was filed in bad faith.

9.      Specifically, after addressing the allegations raised by the movants it will be clear that:

   i.      The events that movants label as transfer in prejudice of creditors, are being misconstrued by the movants and their description of such events is misleading;

   ii.     All changes in the operations or nature of the business of the companies were prompted by the movants;

   iii.    Far from attempting to protect other creditors' interests, which is movants' current altruism slogan in this involuntary petition, the practical implications of the actions and remedies sought by the movants at the State Court, absent the proactive response of the companies, would have had a direct detrimental effect on other creditors, parties in interest, including governmental entities;

   iv.     Absent the proactive response of the companies, the practical implications of the actions and remedies sought by the movants at the State Court would had implied a substantial and unjustificated increase in the companies' debts;

   v.      As has been their explicit plan even before bankruptcy, movants intend to obtain benefits in this bankruptcy proceedings to achieve a liquidation of the companies' assets in benefit of its competitors;

vi.    The actions, strategies and reorganization of the business made by the companies'

management were aimed to (1) enhanced the preservation, care and security of all

the assets; (2) promote the completion of pending projects avoiding the non-

performance lawsuits from sureties and (3) create an operational continuity to

companies while defending itself from the contested claims of the movants and their

attempts of depriving them from a well stablished business.

10.    The movants motion seeks to obtain a bad faith and unjustified litigation advantage

over the companies by removing the key stockholders and officers who have a (1) valid and

truth worthy interest in preserving this corporation's going concern in benefit of all the

creditors; (2) who are paramount to carry out the counterclaims pending at the State Court

which seeks to invalidate these movants contested claims and (3) who have resisted to the

movants' constants attempts to dispose of the companies' assets to its competitors.

### III.    BACKGROUND LEADING TO THIS ACTION

11.    Betteroads initiates in 1947 when Arturo Díaz Jr opened his first asphalt plant under

Arturo Díaz, Inc and in 1954 the name was changed to Betteroads Asphalt Corporation.

12.    Since then, this corporation emerge to become a beacon in the construction industry

and an example of what could be achieved by a domestic and privately-owned corporation

immerse in endeavors related to the global asphalt and petroleum market.

13.    In 1983 Betteroads Asphalt purchased a tank farm and terminal located in

Guayanilla. Betteroads began importing its own liquid asphalt and became the largest

importer in Puerto Rico.

14.    In 1997, Betterecycling was formed ad continued to research and innovate in the

reuse of recycled materials in road construction. By 2009 Betterecycling had recycled more

than 4 million tons of pavement.

15.    In 2012 Betteroads and Betterecycling together had over 500 direct employees and

over to 2,000 indirect employees. In its long trajectory, Betteroads Asphalt has been a

major player and active participant in the development of Puerto Rico's infrastructure

which aided in the development of the PR2 major processway; major portions of PR-22, the Baldorioty de Castro; Major portions of Las Americas Expressway and Muñoz Rivera Avenue in San Juan, the PR-66 and related toll plazas; among others.

16.    As stated by movants, Betteroads Asphalt has been engaged in the business of building, paving and providing maintenance services to roadways, runways, highways and road surfaces for over the past sixty (60) years. Their business expanded within Puerto Rico and the U.S. Virgin Islands, and Betteroads owns the largest asphalt terminal and pier in the Caribbean. (Docket No. 14 page 5 ¶1)

17.    The companies are owners of the asphalt Plants, the machinery and equipment, as well as the real estate properties in which they historically operated. Regarding their real estate properties where the Plants are located, Betteroads is the owner of eleven properties, while its subsidiary, Betterecycling, owns another four properties.

Below is a list of the real estate and Plants that Betteroads and Betterecycling own:

| Betteroads' facilities | Betterecycling's facilities |
| --- | --- |
| Arecibo | Aguada |
| Barranquitas | Carolina |
| Bayamón | Humacao |
| Cabo Rojo | Salinas |
| Caguas | |
| Ceiba | |
| Cupey | |
| Guayanilla Terminal | |
| Manatí | |
| St. Thomas, USVI | |

18.    Up to the date of an ill-founded attachment by the movants of the Companies' operating cash and trade receivables, the companies were conducting their affairs in a manner consistent within the established ordinary course of business with its lenders and suppliers.

19.    On June of 2016, the movants exercised their alleged rights over currently contested guaranty documents and performed an unwarranted extrajudicial foreclosure of over $45 million in accounts receivables, purportedly to satisfy their contested claim of $75 million.

20.    Also, the movants unlawfully seized funds amassed over $2 million from the companies' operational accounts. It should be outlined that within said seized funds, the movants appropriated themselves of funds destined for the payment of taxes, employees' salaries, employees' benefits and, they repayment of suppliers' raw material.

21.    By these unwarranted actions, in all practical terms, the movants assured themselves to obstruct the companies' capabilities of continue its operations and providing direct services to any client inasmuch, any and all funds that would have been received for the repayment of suppliers' raw materials, employess salary and any capital reserved required by the sureties, would had been again illegally seized by them.

22.    By these actions, the movants not only bolstered the companies default with its employees and suppliers, but also put them in a position of imminent default and made it impossible for them to comply with all pending contracts and clients which exposed them, to substantial law suits with the surety companies guaranteeing each contract.

23.    Notwithstanding their unfettered and illegal actions of seizing over $45 million in accounts receivables, the movants practically abandoned these accounts and didn't perform appropriate collection efforts with clear disregard of irreparable harm they were causing to the companies.

24.    As such, the companies normal operations, as formerly known, were severally impaired due to the illegal actions of the movants. Upon its inability to operate, in order to promote the continuing operation of each plant, assure that proper care and maintenance would be given to all the assets and machinery, and the completion of pending contracts no longer able to comply with, the plants were leased to third parties for them to continue to operate the same. No transfer of any production plan, machinery or terminal was made to any insider as suggested by the movants.

25.    It should be outlined that upon the own contested documents that the movants seek to foreclose, the movants are precluded from transferring or selling the contested notes or alleged credit facilities. Interestingly enough, within all settlement efforts during the past

years, and until today, the movants unwaveringly requested and demanded for the

companies to sell their assets to one of its competitors.

26.     As such, on September 22, 2016, BPPR, by itself and as agent for Firstbank, Banco

Santander, and Banco de Desarrollo Económico filed suit for the collection of the alleged

debt of $79,025,152.74, foreclosure of mortgage and other collateral against Betteroads and

Betterecycling as debtors, and others as guarantors in the case docketed as civil case no. D

CD2016-2076 before the First Instance Court, Subsection of Bayamon. (Refer to

**Complaint** attached as **Exhibit 1 at Docket 14**)

27.     On the outset, the companies could identify, that although the movants had illegally

foreclosed on over $45 million in account receivables and over $2 million in cash, they

presented an unsupported claim in the alleged full amount without considering the assets

already seized from the companies. The same fraud is being attempted in the case at bar.

28.     Further, on April 11, 2017, the companies answered the complaint and filed a

counterclaim. Among the allegations raised in the counterclaim, the companies stated that

the 2012 Credit Agreement was null and that BPPR had foreclosed on the companies'

accounts payable but had not given them credit for said asset, among other defenses. On the

counterclaim, the companies alleged that BPPR acted in bad faith and implemented a

"workout" scheme, to eventually take ownership over the collateral and sell it to the

companies' competitor, PUMA Energy, a more lucrative client to BPPR.  The companies

sought a $931,586,784.00 compensation. Refer to *Answer to Complaint and Counterclaim*

*attached herein as **Exhibit 1**.*

29.     As can be evidenced, it is undisputed that all disputed claims of the movants are

before a competent State Court with jurisdiction over the matter. Further, it appears to be

clear that within said proceeding, movants all available remedies to address their purported

concerns regarding the alleged transfer of assets, access to discoverable information

regarding the affairs of the companies and even the appropriate cause of actions within the

State Court to state a claim for alleged transfers in fraud of creditors. As such, they seem to

have all available remedies readily available to them or his, except one, to get rid of the

current stockholders through the appointment of a Trustee.

30.     Specifically, on November 14, 2016, movants sent a letter to the companies in

which it notified of their intention to foreclose on the companies' stocks. This would

allowed the movants to obtain control of the companies and get rid of the current

stockholders and management.

31.     On March 29, 2017, the Court denied the companies' motions.  On the same date,

the Court denied BPPR's motion for preventive garnishment. Refer to Order attached

herein as **Exhibit 2.**

32.     On June 12, 2017, BPPR filed a motion to stay the proceedings due to the

involuntary bankruptcy petition.

33.     It is the companies' position that in this involuntary petition orchestrated by

movants, they seek a second turn at the bat to achieve the same unsuccessful strategy to get

rid of the companies' stockholders and management. Now, instead of seeking a

garnishment of the company stocks, they seek the appointment of a Chapter 11 Trustee.

The ultimate goal of the movants it's to circumvent the current transfer prohibition,

hopefully through a consensual settlement with a Trustee or, put forth a stoking horse, to

promote a sale of the assets of the companies. None of which they have been able to

achieve at the State Court.

34.     These movants clearly seek a litigation advantage and seeks to circumvent the

jurisdiction of a State Court which has jurisdiction over this matter upon the own request of

the movants. If the seek the appointment of a Trustee, they should do it in State Court.

### IV.     SPECIFIC ALLEGED TRANSFERS

35.     The most relevant issue that has to be outlined, is that movants have already

presented these generalized allegations of purported transfers to the State Court and

attempted to move the Court into granting them provisional remedies of garnishments and

attachment in the pending State Court proceeding in the civil case no. D CD2016-2076.

Notwithstanding, on March 29, 2017, the State Court denied the movant the request for provisional remedies and specifically stated that *"[i]n the instant case the plaintiff hasn't provided any evidence whatsoever that may prove that the assets of the defendants which guarantee the repayments of the loans are being depleted or hidden. Certainly, more than mere allegations are needed for the Court to intervene with their proprietary constitutional right."* (our translation). **Exhibit 2.**

36.     It is patently clear that the contents of the Emergency Motion as well as the motives behind the involuntary petition, are a rehash of the same allegations and remedies which they haven't been able to obtain at the State Court. The movants are simply trying to circumvent the jurisdiction of the State Court.

37.     The Emergency Motion, like the original Petition, was filed in bad faith.

### i.     Transfer of Assets and Operations to Puerto Rico Asphalt, LLC

38.     The movants's main allegation relates to Betteroads Asphalt's alledge unwarranted transfer of assets. These allegations, as presented by the movants are misleading and faulted.

39.     Notwithstanding, as it will be evidenced, all actions performed by Betteroads Asphalt firstly were prompted by the illegal intervention of the movants which has destroyed a long-stablished operation. Further, Betteroads Asphalt's actions have been the result of sound administrative decision aimed to preserve the company and its reputation until the counterclaim against the movants its finally resolved.

40.     Movants alleged that on December 12, 2016, Betteroads Asphalt, LLC transferred its operations, rights, and licenses to PR Asphalt, thereby divesting Betteroads of the revenue streams previously obtained in the course of its regular business operations. (Refer to Docket No. 14 page 8 through 10, subsection (i)).

41.     As evidence for this alleged transfer of "assets" the movants include a letter addressed to the U.S. Nuclear Regulatory Commission (the "NRC") where Betteroads

informed that the laboratory equipment, nuclear gauges and license will be transfer [*sic*]
and operated by Puerto Rico Asphalt. (Refer to Exhibit 2 at Docket No. 14).

42.    Upon these letters and/or communincations the movants were drawn to suggest to
this Court that, in sum, Betteroads transferred its operations, rights, and licenses to PR
Asphalt, thereby divesting Betteroads of the revenue streams previously obtained in the
course of its regular business operations.

43.    First, it should be outlined that upon the movants unwarranted actions, included
within the counterclaim which is subject to the final adjudication of the State Court,
movants had already divested all income streams obtained in the business operations of
Betteroads.

44.    Further, the transfer to which the movants are referring or, to what the letter to the
NRC is referring, relates to sixteen nuclear gauges previously owned by Betteroads
Asphalt.

45.    Upon the disruption of its operations, Betteroads Asphalt had to review all
necessary operational expenses that could be avoided. Among those expenses were the
preservation and maintenance of the nuclear gauges. For some examples of related cost
refer to **Exhibit 3.**

46.    To put into context the nature and alleged magnitude of this equipment, we
include a photograph of a model. Refer to **Exhibit 4.** These gauges measure soil, asphalt
and concrete density and soil and rooftop moisture. The gauges have a source rod that
lowers into the ground to measure wet density and another stationary source contained in
the base of the gauge that measures moisture. A radioactive source that measures density is
located at the base of the source rod. Radiation is **<u>always</u>** being emitted from the gauge.
Taking this into consideration, users have to comply with the *U.S. Nuclear Regulatory
Commission Regulations: Title 10, Code of Federal Regulations (CFR) Part 30.*

47.    In order to be in full compliance, the user has to comply with several requirements
and expenses which include maintenance, repair, calibration, radiation safety inspection,

leak testing, certification consistent personnel and storage specific preservation requirements.

48.     Betteroads Asphalt consulted with an expert whom stated that since CPN upgraded their products the gauges we are using became obsolete and currently there is no market for them. As to the possibility of disposing of these equipment, he mentioned that the current price for decommission of the gauges is $1,200.00 per gauge.

49.     Under these considerations, Betteroads Asphalt perform transfer of the U.S. NRC license and the nuclear gauges from Betteroads, LLC to Puerto Rico Asphalt, LLC, which was willing to assume the operational responsibility and costs of preserving and using them.

50.     Under Betteroads Asphalt's managerial and operational analysis, to keep this equipment exposed them to penalties that may go from simple violations fees, license suspension or even most severe penalties such as criminal charges, as described in *U.S. Nuclear Regulatory Commission Regulations: Title 10, Code of Federal Regulations (CFR) Part 30* sections 63 and 64.

51.     Further, by their disposition and/or transfer no creditor was deprived of any realizable value as alleged by the movants.

52.     This alleged prejudicial transfer was made after a sound and consulted managerial and business determination, as could have been made by any Trustee with experience in the industry, if any.

**ii.**     <u>**Transfer of Asphalt Plants and Real Estate Properties to Third Parties**</u>

53.     The movants allege that they have discovered that the Borrowers had transferred collateral of the Lenders such as equipment, inventory, machinery and Plants to third parties, in direct violation of the Credit Agreement. (Refer to Docket No. 14 page 10 through 13, subsection (ii)).

54.     The movants further detail that they performed several site inspections of their collateral and were able to confirm that the facilities were being operated by third parties

which in addition had retained the current employees of the companies.

55.     The movants have unilaterally concluded that their alleged perfected security interests under the contested Credit Agreement has been improperly transferred.

56.     As has been stated before, through their unwarranted actions the movants assured themselves to obstruct the companies' capabilities of continuing its operations and providing direct services to any client inasmuch, any and all funds that would have been received for the repayment of suppliers' raw materials, employees' salary would had been again illegally seized by them.

57.     Instead of being still and remain idle as intended by the movants, the companies' made efforts aimed to enhanced the preservation, care and security of all the assets and adapt to its operational reality until the counterclaim were resolved at the State Court. As such, unable to directly operate and provide services, the companies began to lease its plants to third parties which are in turn providing maintenance, preservation and security to such properties and machineries. This even benefits the purported creditors which instead of having an abandoned alleged collateral, the same is still operational and well preserved.

58.     What can be outlined, is that upon movants own admissions, they have been given access to inspect each site inasmuch they detail that they performed several site inspections of their alleged collateral and were able to confirm which parties were operating the facilities, in addition to the benefit that certain former employees of the companies had been retained. (Refer to Docket No. 14 page 10 through 13, subsection (ii)).

59.     Nowhere in their allegations the movants state or provide any evidentiary document to support that any of the (1) assets are being mistreated; (2) That their value is declining; (3) that title of the land or machinery has been transferred; (4) that any of the assets or facilities have been disappeared; (5) that the facilities are being operated against the law.

60.      Movants allege that they haven't had access to copies of these leases and/or third party agreements. Notwithstanding, we have reviewed the State Court docket, and our impression is that movants haven't perform any formal discovery in the State Court case. These parties have available remedies at the State Court case to obtain any discoverable information pursuant to Puerto Rico Rules of Civil Procedure.

61.      The generalized allegation of the movants that the leasing is purportedly prohibited by the contested loan documents, is a controversy pending at the State Court and which will have to be adjudicated pursuant State case law and equity principles.

62.      Furthermore, it is the companies' position that even pursuant to the contested loan documents, it was allowed to lease property in the ordinary course of business which, due to the unwarranted actions of the movants, currently is the leasing of real property and equipment.

### iii.      <u>Transfer of Contracts</u>

63.      The movants assert that Betteroads and/or Betterecycling has diverted revenues that they would have derived from a number of contracts to PR Asphalt and, through such actions, depleted the Debtors and their estates. (Refer to Docket No. 14 page 13 through 14, subsection (iii)).

64.      First, we have to outline that the movants provide no evidence as to a contract of Betteroads Asphalt and as such, the emergency motion is barren from any evidence to support such allegation against the appearing party.

65.      Notwithstanding, we address this matter to point out the underlying bad faith reasoning within movants arguments.

66.      Movants assured themselves to obstruct the companies' capabilities of continuing its operations and providing direct services to any client inasmuch, any and all funds that would have been received for the repayment of suppliers' raw materials, employees salary and any capital reserved required by the sureties, would had been again illegally seized by them.

67.     Upon the illegal garnishment of the account receivables and cash, movants appropriated themselves of funds destined for the payment of employees' salaries and benefits and suppliers and, they repayment of suppliers' raw material. By doing so, the bolstered a default by the companies upon employees and suppliers, concluding in the companies' inability to retain neither.

68.     As simply stated before, upon the actions of the movants, the comapanies' operations had no new production operation nor income to transfer. Upon the movants unwarranted actions, included within the counterclaim which is subject to the final adjudication of the State Court.

69.     At one end, movants efforts and questionable actions were aimed towards disrupting the going concern of the companies, and at the other end, they pretend to suggest to this Court that companies have diverted all its income to be received from former clients, to other entities. This should not be allowed.

70.     The fact that a pending contract were assumed by any given tenant of the companies does not imply a transfer in detriment of creditors, not even movants. This further motivates these tenants to operate and preserve the facilities of the companies and avoids a default in any pending contract.

71.     The only alternative would had been for a contract to be assumed by a competitor which likely would exposed the company to a claim from a surety company for a price variation and no benefit would had been received by creditors.

72.     In contrast with the movants apparent interest of protecting other creditors, they appear to have preferred that the company had remain idle and allow a default in any pending contract.

73.     It should be kept in mind, that upon the companies' inability to perform in any pending contract, the supplier, the client and surety were sure to suffer a substantial impairment inasmuch any pending supply or project would have been disrupted. This would have exposed companies to substantial claims by the surety of any pending

contract and severally impaired this company's reputation in the industry, which appears to be movants main goal.

74.     Upon the lease of the plants to third parties, any willing client was able to satisfy their product demand through this parties.

75.     This is evidence by Betterecycling request to the Municipality of Juncos, if this client accepted said modification in supplier. Upon their rejection, the contract was terminated. Refer to Exhibit 7 at Docket No. 14)

76.     Movants fail to explain how companies were to operate its business and generate income without being able to pay its suppliers and employees due to movants actions.

### iv.     **Litigation Claims**

77.     Movants allege that since the company commenced the various transfers detailed above, they have accumulated a substantial amount of litigation related to claims from suppliers and other entities. They assert that dozens of pending legal actions have been commenced against Betteroads and Betterecycling before the Puerto Rico Court of First Instance, as well as before the U.S. District Court for the District of Puerto Rico. (Refer to Docket No. 14 page 14 subsection (D))

78.     First, movants fail to address why this allegation should be considered as support for the appointment of a Chapter 11 Trustee or an examiner.

79.     After a review in the aggregate of the recent complaints which may have been filed from 2016 forward we can observe a tendency and identify a common trigger to their filing, which is movants intromission with the operations of the companies.

80.     Of the list provided by the movants, aside from the contested claims of the movants, we identify only seventeen complaints which may be related to the business and which were presented at the State Court since 2016. (Refer to **Exhibit 9** & **Exhibit 10** at Docket No. 14)

81.     Of those seventeen (17), fifteen (15) were presented after the movants seized all property and funds disrupting the companies ability to pay its debts. This is the common

trigger which bolstered the company's default with creditors. It is undisputed that movants created a crisis between the companies and their creditor. Now they want to use that as support for the removal of the owners and management. This should not be allowed.

## V. GENERAL STATEMENT

82. The Petitioners simply want *a change* in management. They have no proof whatsoever of fraud, dishonesty, or gross mismanagement because there was none. Thus, the true purpose of the Emergency Motion is not to save the Company from *current* management, it is simply to oust it.

83. The Petitioners' briefs, are replete with false statements of fact, material misleading statements of fact and material omissions regarding matters that are currently pending for State Court adjudication.

84. The Petition is supposed to be a bonafide *creditors'* action, not a litigation tactic to replace the companies' Board of Directors with a Trustee.

85. There can be no fear here that a debtor is rapidly depleting any resources available to pay creditors. There can be no concern here about any dilapidation of money since all bank accounts and outstanding receivables due to the company were seized by Banco Popular de Puerto Rico more than one year ago. Moreover, those assets that require preservation or legal protection are duly maintain by the Company on alternate business means caused principally by movants actions.

86. The filing of an involuntary petition does absolutely nothing to preserve the assets of the Company. On the contrary, this petition is based on greed, specifically on movants' reiterated endeavors to derail the Company in order to acquire control of its operations to then transfer its assets in a distressed scenario to other players in the asphalt industry in Puerto Rico.

## VI.    THE LEGAL STANDARD

87.    "The party moving for appointment of a trustee ... must prove the need for a trustee…by clear and convincing evidence." In re Marvel Entertainment Group, Inc., 140 F.3d 463, 473 (3rd Cir. 1998). *See also* In re G-I Holdings, Inc., 385 F.3d 313, 314 (3rd Cir. 2004) (citing *Marvel*). These Third Circuit decisions arose in the context of a motion brought pursuant to 11 U.S.C. §1104, in Chapter 11 cases. In a Chapter 11 case, the appointment of a trustee is considered an extraordinary remedy and there is a strong presumption that the debtor should be permitted to remain in possession. In re G-I Holdings, Inc., 385 F.3d at 318. Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3rd Cir. 2003).

88.    Even were the Court to distinguish those cases because they are Chapter 11 cases, movants' burden remains substantial. On a motion for an interim trustee in an involuntary petition under 11 U.S.C. §303(g), "[t]he request for interim trustee should not be granted in [the] absence of an exceptionally strong need for doing so." In re Levin, 2011 WL 1469004 at *3 (Bankr. S.D. Fla. Apr. 15, 2011) (denying motion for an interim trustee as there was not "any danger, of **imminent** loss to the estate in respect of the Alleged Debtors' bankruptcy estate," emphasis in original). Accord In re Rush, 10 B.R. 518, 523-24 (N.D. Ala. 1980) ("In a case in which the contested bankruptcy petition is to be heard and determined within a short time after the hearing on a motion that an interim trustee be appointed, the request for the trustee should not be granted in the absence of an exceptionally strong need for doing so"). As shown below, the movants do not come close to meeting this standard.

89.    An involuntary petition is an "extreme remedy with serious consequences to the alleged debtor."[1] As such, a court should not lightly enter an order for relief. An even more extreme remedy-the appointment of an interim trustee-is permitted by

---

[1] *In re Forever Green Athletic Fields, Inc.,* 2015 WL 6080665, at *5 (3d Cir. Oct. 16, 2015)

section 303(g) of the United States Bankruptcy Code, if necessary to preserve the property of the estate or to prevent loss to the estate."[2] An interim trustee takes possession of property of the estate and operates the debtor's business.

90.     There is limited case law applying section 303(g), no doubt because the request for such relief is rare. The case law that does exist counsels that a request for an interim trustee should be denied in "the absence of an exceptionally strong need for doing so"[3] or "where no facts are alleged showing a necessity for the appointment."[4] In order to appoint a trustee, a movant must show "a substantial risk of loss to the estate."[5] Further, in order to avoid the appointment of an interim trustee in an involuntary case that may be dismissed, the court must determine, as a preliminary matter, that there is a reasonable likelihood that an order for relief will be entered.[6]

### i.   The Likelihood that an Order for Relief will be Issued

91.     Section 303(b)(l) provides that an involuntary case may be commenced by "three  or more entities" each  of which holds  a claim  that "is  not contingent  as to liability  or the subject  of a bona fide dispute as to liability or to amount ... if such claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims ...."[7]  Further,  section 303(h) provides that if a petition is timely controverted, the court  shall enter an order  for relief only  if "the debtor  is generally  not paying  such debtor's  debt as such debts  become  due unless  such debts  are the subject of a bona fide dispute as to liability or  amount."[8]   Read together, if an involuntary petition filed by three  or more  petitioning  creditors  is contested, the Court  must determine whether: (i) the petitioning creditors' claims are not contingent as to liability

---

[2] 11 U.S.C. § 303(g)
[3] *In re Levin,* 2011 WL 1469004, at *2 (Bankr. S.D. Fla. Apr. 15, 2011) (citing *In re R.S. Grist Co.,* 16 B.R. 872, 873 (Bankr. Fla. 1982))
[4] *Id.* (citing *In re Reed,* 11 B.R. 755, 757 (Bankr. S.D.W. Va. 1981)
[5] *In re Barkats,* 2014 WL 6461884, at *2 (Bankr. D.D.C. Nov. 17, 2014)
[6] *In re The Centre for Management and Technology, Inc.,* 2007 WL 3197221, at *3 (Bankr. D. Md. Oct. 26, 2007) (citing *In re Professionals Accountants Referral Services, Inc.,* 142 B.R. 424 (Bankr. D. Colo. 1992))
[7] 11 U.S.C. § 303(b)(l)
[8] 11 U.S.C. § 303(h)

or subject to *bona fide* dispute as to liability or amount; (ii) the petitioning creditors' claims are unsecured or undersecured by at least $15,325; and (iii) the alleged debtor is generally not paying its debts as they come due, unless such debts are subject to a *bona fide* dispute as to liability or amount.[9]

92.     The Third Circuit recently held that bad faith provides an independent basis for dismissing an involuntary petition. As enunciated in *Forever Green:* "creditors are presumed to have acted in good faith. To dismiss the petition, the debtor must show by a preponderance of the evidence that the creditors acted in bad faith."[10] The standard to use in determining bad faith is the "totality of the circumstances," a fact intensive review.[11]   To aid in the analysis, the Third Circuit provided a non-exhaustive list of factors a court may consider in conducting its review, including whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt- collection procedures; and the filing had suspicious timing.[12]

### ii.     The appointment of an Examiner

93.     Within their motion, the movants seek that in the alternative, an examiner be appointed pursuant Section § 1104. Within their motion movants appear to suggest that such remedy is mandatory. (Docket No. 14)

94.     Section 1104(c)(2) requires the court to order the appointment of an examiner if a request for such appointment is made by a party in interest or the United States trustee and the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes

---

[9] *In re AMC Investors, LLC,* 406 B.R. 478,483 (Bankr. D. Del. 2009)
[10] *Forever Green,* 2015 WL 6080665, at *5 (internal citations omitted)
[11] *Id.*
[12] *Id.* at *6

or debts owing to an insider, exceed $5 million. *Jones v. Dewey & LeBoeuf*, 68 C.B.C.2d 660,

478 B.R. 627, 636-39 (Bankr. S.D.N.Y. 2012); Morgenstern v. Revco D.S., Inc. (*In re*

Revco D.S., Inc.), 898 F.2d 498, 22 C.B.C.2d 841 (6th Cir. 1990)

95.     Notwithstanding the mandatory language of section 1104(c), some courts have

denied the appointment of an examiner even when the debtor's fixed, liquidated, unsecured

debts, other than debts for goods, services or taxes, or debts owing to an insider, exceed $5

million. In re GHR Companies, Inc., 11 C.B.C.2d 604, 43 B.R. 165 (Bankr. D. Mass. 1984)

; In re Shelter Resources Corp., 35 B.R. 304 (Bankr. N.D. Ohio 1983) . These courts

typically find that such an appointment would constitute an unnecessary expense. A court

may believe that the creditors' committee can investigate adequately issues about the case

or the debtor's operations. Similarly, a court may find that appointment of an examiner will

interfere with the expeditious resolution of the case.

96.     First, in their emergency motion movants fail to outline that pursuant their

allegations at the State Court all their purported claims are allegedly fully secured. Further,

all their claims are contested, disputed and unliquidated.

97.     Movants fail to put the Court in position to evaluate this alleged mandatory remedy.

Even more, the movants fail to effectively identify what is the fraud or mismanagement to

be investigated.

98.     Interestingly enough, since September 2016 at the State Court case, the movants

have at their disposal all the discovery tools provided by the Puerto Rico Rules of Civil

Procedure. However, they have used none of those available discovery alternatives to

obtain any discoverable documents that may interest them.

99.     Further, even in its emergency motion, the movants unequivocally announce their

intention to perform a thorough 2004 examination. The question that remains is, for what

reason the movants wish to duplicate the discovery efforts and costs.

100.    It appears that movants are willing to employ any available tool to burden the

operational continuity of the company and attempts to incorporate any external element that

101.    Consistent with this, they have managed to bring to the case the two major
competitors of the company, they wish to substitute the stockholders and managers with a
Trustee, and wish to bring an third party to allegedly investigate the company, when
clearly, they intend to perform an investigation of their own.

102.    The appearing party states that within the allegations and the remedies promoted by
movants there is an underlying bad faith.

### VII.    THE APPOINTMENT OF AN INTERIM TRUSTEE IN THIS PARTICULAR CASE WOULD SERVE NO PURPOSE

103.    Finally, as this Court knows too well, a fire sale of the Property will destroy its
value to the detriment of both the creditors and stockholders. *See In re Dunbar*, 234 B.R.
895, 897 (Bankr. E.D. Tenn. 1999) (liquidation value has been described as the price one
would get at a fire sale). The Petitioners have already caused a diminution in the value of
the Property by simply filing this action which makes no sense when themselves had filed
a State Court complaint.

104.    A potential attempt of fire sale, transfer or liquidation of the companies' assets is
not speculative, specially under the special circumstances of this case. As evidence in the
Answer to Complaint and Counterclaim, for a long time, it has been Banco Popular
interest for the companies to transfer all of its assets to one of its competitors to wit,
PUMA.

105.    Now, Banco Popular as alleged agent, has arranged and managed to also bring
Sergeant Marine Inc. to the ballpark, which the other major competitor of the companies in
Puerto Rico.

106.    As such, the movants have arranged this involuntary petition so the two major
expanding companies in the industry of asphalt and pavement in Puerto Rico form part of
their effort to deprive companies' of their assets.

107.    The only way to preserve the value of the Property and undo the harm that has
already been done, is for this Court to make it clear to that subset of viable parties that this

Property is not going on the auction block any time soon and if they want anything to do

with it, they are welcome to contact the Company.

108.     The movants in this case have intentionally and seriously wounded this Company.


## VIII.   IF A TRUSTEE IS APPOINTED
## A SUBSTANTIAL BOND MUST BE POSTED.

### i.     *Appointment of an Interim Trustee*

109.     Notwithstanding the foregoing, if the Court determines that an interim trustee must

be appointed pending resolution of the motion to dismiss, a substantial bond is necessary

to protect the Company from the harm such a disruption would cause.

110.     "An interim trustee may not be appointed under this rule unless the movant

furnishes a bond in an amount approved by the court, conditioned to indemnify the debtor

for costs, attorney's fees, expenses, and damages allowable under §303(i) of the Code."

Fed. R. Bankr. P. 2001(b).  The bond requirement under Rule 2001(b) is mandatory, not

discretionary.  *In re The Centre for Management and Technology, Inc.*, 2007 WL 3197221

at *7 (Bankr. D. Md. Oct. 26, 2007). "A bond can have a sobering effect in a case that is

off to a shaky start and that is fraught with controversy about the bona fides of the

petitioners. In appropriate circumstances, a bond can even be required of those who join in

the petition."  *In re Kidwell*, 148 B.R. 203, 218 (Bank. E.D. Cal. 1993).

111.     The purpose of the mandatory bond is to ensure that such motions are considered

carefully <u>before</u>, not after, they have been filed and decided, due to the relative ease with

which they may be filed and the irreparable harm such motions may have on the business

of the alleged Debtor.  The case at bar is the epitome of one in which the bond is not only

required, but should be substantial.

112.     As will be shown at the evidentiary hearing, the costs involved here are substantial

and especially burdensome for this particular company. They include not only the

attorneys' fees incurred in defending both the improper petition and motion for the

appointment of a trustee, but also the costs incurred in connection with disruption of the

business of the Company, lost opportunity costs including the inability to reinitiate its
business while this matter is pending, and the costs and expenses of a Trustee in the event
the Court deems fit to appoint one.

## CONCLUSION

WHEREFORE, the Company respectfully requests that the Court denies the
Emergency Motion for the Appointment of a Trustee or an Examiner and grant such other
and further relief consistent with those detailed in this Motion.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY:** That on same date, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF System which will send notification of such
filing to **MONSITA LECAROZ ARRIBAS** ustpregion21.hr.ecf@usdoj.gov; **ISRAEL O
ALICEA LUCIANO, ESQ.,** (Attorney for St. James Security) at
israel_alicea@yahoo.com; **PAUL JAMES HAMMER, ESQ.,** (Attorney for Puma Energy
Caribe LLC) at phammer@estrellallc.com; **LUIS C MARINI BIAGI, ESQ.,** (Attorney for
BPPR; BSPR; Firstbank & Economic Development Bank) at
luis.marini@oneillborges.com; **MARTHA L ACEVEDO PENUELA, ESQ.,** (Attorney
for BPPR; BSPR; Firstbank & Economic Development Bank) at
martha.acevedo@oneillborges.com; **LUIS M NOLLA VIL, ESQ**., (Attorney for Bituven
Puerto Rico LLC) at lnolla@nvalawpr.com; **JORGE I PEIRATS, ESQ.,** (Attorney for
Acrecent Financial Corporation) at jpeirats@pmalaw.com; **MICHELLE MARIE VEGA
RIVERA, ESQ.,** (Attorney for Total Petroleum Puerto Rico Corp) at mvega@vega-
rivera.com; **EDGAR ALBERTO VEGA RIVERA, ESQ.,** (Attorney for Popular Auto) at
edvega@bppr.com; **JUAN MANUEL SUAREZ COBO, ESQ.,** (Attorney for Todtly
Group, Inc.,) at pennyrose@legalpartnerspr.com; **CAMILLE N. SOMOZA, ESQ.,**
(Attorney for Sargeant Marine, Inc. & Sargeant Trading Limited) at
csomoza@ferraiuoli.com; **GUSTAVO A CHICO BARRIS, ESQ.,** (Attorney for Sargeant
Marine, Inc. & Sargeant Trading Limited) at gchico@ferraiuoli.com; **SONIA COLON**

**COLON, ESQ.,** (Attorney for Sargeant Marine, Inc. & Sargeant Trading Limited) at scolon@ferraiuoli.com; **JORDI GUSO, ESQ.,** (Attorney for Sargeant Marine, Inc. & Sargeant Trading Limited) at jguso@bergersingerman.com; **JAIRO MELLADO VILLARREAL, ESQ.,** (Attorney for NG Solutions LLC) at jmellado@mellado.com; **TESSIE LEAL GARABIS, ESQ.,** (Attorney for NG Solutions LLC) at tleal@mellado.com; **FAUSTO DAVID GODREAU ZAYAS, ESQ.,** (Attorney for Firstbank Puerto Rico) at dg@g-glawpr.com; and to the participants appearing in said record.

      **I FURTHER CERTIFY:** That on this same date I have mailed copy of this motion without the exhibit to **Rafael Figueroa Sosa** (Representative of Champion Petroleum Corp.) at PO Box 1989, Carolina, P.R. 00984; **Manuel Porro Vizacarra, Esq.** (Attorney for Champion Petroleum Corp.) at MPV Law Offices, 382 Escorial Avenue, Urb Caparra Heights, San Juan, P.R. 00920; **Nicolas Lopez Diaz** (Representative of Control Force Corporation) at Albizu Campos Avenue, k.m 0.9, Urb La Arboleda, Salinas, P.R. 00751; **Roberto Bolorin, Esq.** (Attorney for Control Force Corporation) at PO Box 2406, Guayama, P.R. 00785.

      **RESPECTFULLY SUBMITTED.**

      In Guaynabo, Puerto Rico, this 27th day of June of 2017.

*Lugo Mender Group, LLC*
Attorney for Betteroads Asphalt, LLC
100 Carr. 165 Suite 501
Guaynabo, P.R. 00968-8052
Tel.: (787) 707-0404
Fax: (787) 707-0412

*/S/ Wigberto Lugo Mender*
Wigberto Lugo Mender
USDC-PR 212304
wlugo@lugomender.com

*/S/ Alexis A. Betancourt Vincenty*
Alexis A. Betancourt Vincenty
USDC-PR 301304
a_betancourt@lugomender.com
