IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

BETTEROADS ASPHALT LLC.

Debtor

CASE NO.17-04156 (ESL)

CHAPTER 11

IN RE:

BETTERCYCLING CORPORATION

Debtor

CASE NO. 17-04157 (ESL)

CHAPTER 11

OPINION AND ORDER

The matter before the court in the above captioned involuntary chapter 11 petitions is whether the Petitioning Creditors, composed of Firstbank Puerto Rico ("Firstbank"), Banco Santander de Puerto Rico ("Banco Santander"), the Economic Development Bank for Puerto Rico ("EDB"), and Banco Popular de Puerto Rico ("Banco Popular" or the "Administrative Agent", and collectively with Firstbank, Banco Santander and EDB, the "Lenders"), Sargeant Marine, Inc. and Sargeant Trading LTD (collectively "Sargeant"), Facsimil Paper Connection, Inc. ("Facsimil"), Champion Petroleum, Inc. ("Champion"), Control Force, Corp., ("Control Force") and St. James Security, Inc. ("St. James" and together with the Lenders, Sargeant, Champion, Control Force and Facsimil, the "Petitioning Creditors") filed the involuntary petitions in bad faith. The critical legal issue before the court, that bad faith is an independent cause for the dismissal of an involuntary petition under section 303(b), 11 U.S.C. § 303(b), even when the petitioning creditors satisfied the three-prong requirement for filing an involuntary petition, was determined in this court's opinion and order entered on November 30, 2018. In re Betteroads Asphalt,LLC and In re Bettercycling Corporation, 594 B.R. 516 (Bankr. D. P. R.

-1-

2018). Because bad faith is a fact intensive issue, an evidentiary hearing was scheduled and heard.

EVIDENTIARY HEARING

A detailed exposition of the events and the evidence presented at the hearings is found in this court's minutes (docket numbers 480, 493, 494 and 497), which are attached and made a part of this opinion and order as an exhibit.

The burden to prove that the petitioning creditors filed an involuntary petition whether or not the involuntary petitions were filed " in bad faith, that is, for an improper purpose that constitutes an abuse of the bankruptcy process" lies on the alleged debtors. In re Betteroads Asphalt,LLC and In re Bettercycling Corporation, 594 B.R. 561, 564. During the evidentiary hearing the court emphasized that key to the alleged debtors prevailing in their allegations of bad faith was to establish pursuant to the totality of the circumstances that the involuntary petitions were filed for an improper bankruptcy purpose.

The evidence presented by the involuntary debtors established that the decision by the petitioning creditors to file the involuntary petitions was made upon consultation with legal counsel for the petitioning financial institutions.

Banco Popular de Puerto Rico and the involuntary debtors engaged in extensive negotiations and discussions after the involuntary debtors defaulted on their loan payments. As part of the negotiations Banco Popular unsuccessfully tried to renegotiate the terms of the loans which restricted the potential sale of the loans. Banco Popular initiated state court actions for collection of monies. Banco Popular as agent for a syndicate of lenders contracted and provided legal advice on the filing of the involuntary petitions.

Mr. Jorge L. Díaz, president of the involuntary debtors, testified and recounted the institutional history of the corporations and the events leading to the loan with Banco Popular. Mr. Díaz described the operations of the corporations before and after the filing of the involuntary petitions. He related the pressures placed by Banco Popular upon the corporations to make payment of the loans and how their ability to make checks and disbursements was

restricted. Mr. Díaz gave as an example of undue pressure the signing of a forbearance agreement, as a condition to provide a moratorium or an extension of time to make payments, which would change the loan terms which restricted the banks from selling assets of the corporation without consultation and authorization from the involuntary debtors. As a result, Banco Popular foreclosed accounts receivable and restricted access to income, which led to the closing of the corporations.

Ms. Marisel Rivera Torres, former Vice President of Finance of the involuntary debtors, testified regarding her return after the corporations ceased to operate upon Mr. Díaz request in order to assist on the accounting and financial affairs of the corporations. She found the facilities in a critical situation as there were no systems working that could provide reliable date regarding the accounting records. Although the systems were restored and they moved to another facility, there was substantial accounting information missing. Thus, the financial information that could be produced to the financial institutions was limited.

The alleged debtors presented Mr. Francisco J. Pericás Alfaro as a witness. Mr. Pericás has worked for Banco Popular since 1999. He was the director of the special loan division from March 2013 to October 2013. He was then transferred to the corporate banking division as director and vice president of Banco Popular. He testified to be familiar with the involuntary debtors' credit facilities with Banco Popular, although there were other officers directly working with the credit facilities, particularly the syndicated credit facility, in which other banks participated. Banco Popular was the agent for the syndicate loan.

Prior to the filing of the involuntary petitions the banks that formed the syndicate (Banco Popular, Banco Santander de Puerto Rico, Firstbank, and the Economic Development Bank) met in order to discuss what steps to take in relation to the involuntary debtors' loan. One action taken was the filing of two actions against the involuntary debtors around September 2015. The discussions concerning the filing of the state court actions and the filing of the involuntary petitions were not directly related. The considerations and analysis of the filing of the involuntary petitions were made by counsel for the syndicate banks.

However, Mr. Pericás gave a detailed explanation of the reasons that triggered the filing of the involuntary petitions. The same are found in the minutes of the hearing held on July 17, 2019 (dkt. #494, pages 10 – 16). The court highlights below the same in part.

Mr. Peric[á]s proceeded to explain the reasons that triggered the filing of the bankruptcy petitions. He testified that around September 2016, after a year (365 days) of the bank not receiving payment for the principal or interest on the loans, which is important for banks under local banking law because after a year lapses without receiving payment, banks have to charge the full amount of the loan, regardless of the value of the collateral. Thus, the banks sat down to assess the situation, they did not want to charge the full amount of the loan but there was no progress on the sale of the terminal. Even though there were parties that were interested, and they had capital to support the transaction. There was the case of Sargeant Marine which had the writ of attachment and they did not know if there could be more cases like these. Therefore, they decided to exercise the remedies under the contract. He stated that they tried to agree on a foreclosure agreement, but that did not prosper, thus the banks went ahead and filed a collection claim around September 2016. Shortly thereafter, the banks learned through a member of the bank syndicate that some of the plants were being leased to third parties. Banco Popular was not aware of that situation. Mr. Peric[á]s testified that they requested the borrower to allow the banks to visit some of the plants. He stated that around October 2016, a group of officers from the bank syndicate visited nine (9) plants and they learned that four (4) of the plants; Aguada; Arecibo, Manatí and Salinas were leased to a company named Transporte Rodriguez. Two of the plants in Barranquitas and Caguas were leased to Carlos Ortiz. A bank officer from Banco Popular noticed that the equipment at Caguas labeled as property of Betteroads and Betterecycling. The Carolina plant was leased to someone identified as Engineer [Purros?]. The Humacao plant, which the bank understood was not operating based on conversations with the borrower, was being leased and operated to Javi Melendez. The banks were not aware that the assets that were the banks' collateral were being leased to third parties. Their counsel at the same time wanted to know whether Betteroads and Betterecycling was doing business with the municipalities so they were looking at the Registry of the Puerto Rico Comptroller's office (Oficina del Contralor de Puerto Rico). They identified two (2) contracts that seemed to be projects awarded to Betteroads and Betterecycling and there was an attempt to transfer those contracts to a company under the name of Puerto Rico Asphalt. Around the same time, through a random google search they learned that a license under the nuclear regulatory commission that was under Betteroads' name was transferred to Puerto Rico Asphalt.

He further stated that once the accounts receivables were foreclosed, they attempted to collect payments and there was a significant discrepancy between the balance of accounts receivables as reported by the borrower to the banks and the amounts the municipalities recognized as the balance of those accounts receivables. The difference was significant. In some cases, the municipality was

-4-

recognizing about 10% of the amount reported by the borrower. In addition, they were also following the local state court website to find out if there was additional litigation being filed against the borrower because that would be a concern because it could put the assets at risk in case of an adverse decision in local court. Thus, from a totality of the circumstances perspective they thought that the stay prohibition that could be obtained through bankruptcy would be beneficial because it would allow the banks and the borrower to protect itself from the potential results of liquidation.

Mr. Peric[á]s testified that they noticed that the assets were being used by third parties. He testified that they felt that there was a lack of transparency because most of the information regarding the licenses, the contracts, the plants, and the accounts receivables was received from third parties, not from the borrowers. The assets were being transferred and the value of the banks' collateral was being depleted because the assets were being used without the banks' knowledge and the banks were not receiving any benefit and were losing value of collateral. Mr. Peric[á]s testified that he thought it would be beneficial and could not be obtained through the local courts to attain some type of orderly liquidation and equitable distribution of assets in a transparent process and allow for either a refinancing or restructuring of the syndicate credit facilities or the liquidation of assets under the existing credit facilities.

Mr. Peric[á]s testified that before filing the involuntary petitions they tried unsuccessfully to consensually attain forbearance agreements with the borrower. He stated that they discussed with their attorneys who at the time were O'Neill and Borges and the restructuring law practice of Skadden and Arps in Delaware. The recommendation was to proceed with the involuntary bankruptcies.

He stated that there was a loan agreement that provided for the sale of assets that was executed in the year 2014. Mr. Peric[á]s testified that this document is the original credit agreement that created the syndicated loan (Exhibit 1- Docket No. 415-1). He stated that in this agreement there was no clause for selling equipment or assets. He testified that he is familiar with section 9.11 (Assignments or Participations of Loans) of Exhibit 1. He testified that section 9.11(c) provided some conditions on who could acquire participation under the loan agreement. Mr. Peric[á]s stated that section 9.11 of the Amended and Restated Credit Agreement is pretty much same, except some minor details (Exhibit 5- Docket No. 415-5) when compared with section 9.11 of the original credit agreement. He testified that section 25 (Assignment) of the Amended and Restated Ratification of Stock Pledge and Security Agreement provided some limitations in the assignment of the stock of the companies in case there was a transfer (Exhibit 6- Docket No. 415-6).

Mr. Peric[á]s testified that he knows José Santiago and that he was the officer responsible for the credit facility starting in the year 2013. He stated that José Santiago's statement is accurate regarding that these two (2) sections were barely ever included as part of the loan documents executed by Banco Popular. He testified that he does not remember any other case in which there was a restriction as to the transferability of the loan.

He explained that the reason Banco Popular entered into these two credit facilities in the year 2014 was to refinance a loan. He stated that the condition that

the terminal was to be sold by February 28, 2015 was negotiated with the borrower. It was not imposed by the bank. The agreement was signed on June 24, 2014 and the alleged Debtor had to sell the terminal by February 28, 2015. That is about eight months. These terms were discussed and agreed with the borrower, Mr. Jorge Díaz. Mr. Peric[á]s testified that these terms were probably negotiated with José Santiago and Mr. Jorge Díaz.

Mr. Peric[á]s stated that he knows Jorge Aldarondo. Mr. Aldarondo used to manage the credit facilities of Betteroads. He is the senior vice president and director of the corporate credit division. That division was responsible for the credit of Betteroads before being transferred to special loans. He testified that he is not aware whether Jorge Aldarondo brought Puma as a potential investor on the Guayanilla terminal. He further testified that he does not recall who brought Puma to the table, but he does recall that Mr. Jorge Díaz shared with the bank some letters of intent regarding the acquisition of a portion of the terminal. The transaction did not come through because they were unable to reach an agreement. Banco Popular did not have any participation in that negotiation. The borrower would occasionally share documents with the bank and that is how they became aware of conversations between the borrower and interested parties. The bank was not participating in any negotiations. Mr. Peric[á]s testified that he recalls that Blue Roads is a company that does business with natural gas and somehow they met Jorge Díaz and discussed the terms of the transaction which he does not recall, but it was related to use or acquisition of the terminal to store natural gas. He stated that he met three (3) managers from the company in Dallas, Texas for probably one or two days. After that, as the conversations with Jorge Díaz and the Blue Roads team progressed they came to Puerto Rico and visited the bank with Jorge Díaz at least one time. Mr. Peric[á]s testified that he does not recall the reason the transaction did not mature. He recalls that there was an interested party that required a non-disturbance agreement. It might have been Blue Roads. The non-disturbance agreement was not accepted by Banco Popular. Mr. Peric[á]s explained that non-disturbance agreements are seldom granted by a bank because it restricts the bank's capacity to man[a]ge the assets if they need to foreclose and sell the assets. It is a limitation. He recalls that BTB had a terminal which they wanted to sell or have an agreement around that terminal with Betteroads. It was a transaction related to Betteroads it did not have to do with the sale of the terminal.

Mr. Peric[á]s stated that Mr. Jorge Díaz approached the bank and he shared with Elí Sepúlveda and himself what he was proposing as to the transaction. He does not believe that Mr. Díaz and Elí Sepúlveda proposed a financing for that transaction. He explained that this was a transaction between Betteroads and BTB. Betteroads wanted to acquire some of the assets from BTB. Mr. Jorge Díaz presented to the bank, a memorandum of understanding and a letter of intent. An acquisition requires funds for purchase, and he shared it for the bank to see the transaction. However, the bank never proposed the financing for that transaction.

Mr. Peric[á]s testified that Banco Popular learned of the Sargeant Marine judgment shortly before the foreclosure of the account receivables. Does not recall exact date. He stated that this is an e-mail from Francisco Pascual sent to

-6-

Eric López, José Santiago (Exhibit 10, Docket No. 415-10). He explained that Francisco Pascual is the officer responsible for the loan at FirstBank. At the time he sent the e-mail, FirstBank was concerned that the financial situation of Betteroads was deteriorating and if the borrower filed for bankruptcy, there could be an issue regarding the perfection of their interests in the account receivables. Mr. Peric[á]s further testified that Mr. Pascual suggested another topic for discussion which is the modification of the loan documents to allow for the sale of the loan. He explained that the loans could be sold. There were restrictions in terms of who the loan could be sold to. It is unusual for loans to have restrictions on who can acquire or participate in the loan. Not having that restriction provides the banks more options in terms of resolution of the credit.

Mr. Peric[á]s stated that he has seen the carve out and settlement agreement before (Docket No. 419-5, Exhibit 63). He testified that he does not know from which funds Sargeant Marine collected the $140,026 as indicated on page 2 of the agreement. He stated that he was not aware that Sargeant was able to attach certain monies on a project regarding government accounts served by Betterecycling.

He testified that once the syndicate foreclosed on the accounts receivables, they sent notices to all the parties, including the municipalities and the government agencies amongst others. They requested from the clients of Betteroads the payment of the accounts and we also requested confirmation of the amount of the receivables. The information that was provided by the clients of Betteroads to the banks regarding the amounts of the receivables was significantly different from the amount that Betteroads had previously reported to the bank.

Mr. Peric[á]s testified that Banco Popular sent the notices on the foreclosure of the accounts receivables around June 2016. He stated that he does not recall until when Betteroads operated. He stated that the last time Banco Popular deposited funds in the marginal account of the debtor was around August 2016. There were no other funds made available to the debtors thereafter. Mr. Peric[á]s testified that Banco Popular tried to collect several times on the accounts receivables after the same were foreclosed. He does no[t] recall exact dates. He testified that notices were sent at least once.

Mr. Peric[á]s explained that their concern was more than the interest that a third party could have regarding the accounts receivables, it was more of a concern of transparency because the information that they had was significantly different from the one being confirmed by the municipalities and the government agencies. He stated that he does not recall the exact date until which Mr. José Santiago was in charge of this credit relationship. Mr. Peric[á]s explained that once the loan was transferred to late stage of special loans, Lynnette Bigio was the manager and Rosimari León was the officer. Rosimari is peer with José Santiago. He stated that Mr. Santiago on a regular basis would be the first contact and the one to review the requests for monies made by Betteroads and Betterecycling. Sometimes José would discuss disbursements with him, other times he would not. Mr. Peric[á]s stated that he would not review all of the disbursements requested by the borrower, only some of them. He explained that there were no limits regarding the amount of disbursements Mr. Santiago could approve or himself. It was more a matter of judgment discussion José had with

-7-

him. José also had a manger, Eric López, he could talk to. Sometimes they would also talk with him. Eric López was the manager supervising José Santiago.

Mr. Peric[á]s explained that by transparency, in terms of the account receivables, he means having accurate information. He stated that at least from the discrepancy in the information from the municipalities and Betteroads. Also, they learned from a third party as to the judgment received from Sargeant. In addition, the information regarding the leases of the different plants was provided by a third party and it was confirmed upon the site inspections and visits. As to the licenses under the nuclear regulatory commission they understand that it was understood that it was an important asset. He testified that he learned about the transfer of the licenses not through the borrower, but through a random google search. Lastly, the contracts of the municipalities of Juncos and Florida that were intended to be transferred from Betteroads to Puerto Rico Asphalt we learned about through research conducted by our attorneys at the office of the Puerto Rico comptroller, not because the borrower disclosed these transfers.

The above statements were substantially corroborated by Mr. Pericás during his testimony at the hearing held on July 18, 2019 (dkt. #497, pages 1 – 7).

The involuntary debtors rested after the presentation of the above witnesses. The petitioning creditors moved for the denial of the involuntary debtors' request to dismiss the petition pursuant to Rule 7052 of the Fed. R. Bankr. P., on the grounds of having filed the same in bad faith as the evidence presented did not discharge the initial burden which the involuntary debtors had to meet.

MOTION FOR JUDGMENT

Fed. R. Bankr. P. 9014(c) makes applicable Fed. R. Bankr. P. 7052 to contested matters. Rule 52(c) of the Fed. R. Civ. P., made applicable to bankruptcy proceedings, provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

As stated in In re Stewart, 2012 WL 5189048 (B.A.P. 1st Cir. October 18, 2012):

> A court should, therefore, enter a judgment under Rule 52(c) "[w]hen a party has finished presenting evidence and that evidence is deemed by the [judge] insufficient to sustain the party's position." Morales Feliciano v. Rullán, 378 F.3d

-8-

42, 59 (1st Cir.2004). "A motion for judgment on partial findings should be granted, 'where the plaintiff fails to make out a prima facie case, or despite a prima facie case, the court determines that the preponderance of evidence goes against the plaintiff's claim.' " Giza v. Amcap Mortg., Inc. (In re Giza), 458 B.R. 16, 24 (Bankr.D.Mass.2011) (quoting Mosher v. Evergreen Mgmt., Inc. (In re Mosher), 432 B.R. 472, 475 (Bankr.D.N.H.2010)); see also In re Marine Risks, Inc., 441 B.R. 181, 199 (Bankr.E.D.N.Y.2010) (citations omitted) (holding that court may allow Rule 52(c) motion if plaintiff has failed to make out prima facie case). The court is not required to " 'draw any special inferences in the nonmovant's favor or consider the evidence in the light most favorable to the nonmoving party. Instead, the court must [weigh] the evidence, resolv[e] any conflicts, and decid[e] where the preponderance lies.' " In re Giza, 458 B.R. at 24 (quoting Mosher, 432 B.R. at 475).

The court, when considering a motion under Rule 52(c), is not required to "consider the evidence in the light most favorable to the non-moving party or draw any special inferences in the non-movant's favor." In re Taberna Preferred Funding IV, LTD., 594 B.R. 576, 585 (Bkrtcy. S.D.N.Y. 2018).

An involuntary petition has a presumption of good faith, and it is the burden of the debtor to prove under the totality of the circumstances that the filing was in bad faith. In re Forever Green Athletic Fields, Inc., 804 F.3d 328 (3d Cir. 2015). This court agrees that there are several non-exclusive factors which may be considered but have no particular importance or weight. In re General Aeronautics Corp., 594 B.R. 442, 481 (Bkrtcy. D. Utah 2018). The factors are weighed to determine if the involuntary petition was filed for an improper bankruptcy purpose, such as ill will or malice, intent to harass or embarrass the debtor, or use the bankruptcy court as a substitute for customary collection procedures. In re Basil Street Partners, LLC, 477 B.R. 846, 852 – 854 (Bkrtcy. M.D. Fla. 2012).

DISCUSSION

After a careful review of the evidence presented by the involuntary debtors, the court finds that the same does not establish that the petitions were filed for an improper bankruptcy purpose. Seeking that other creditors join in filing an involuntary petition in order to pursue

debt collection in the bankruptcy court is not an improper bankruptcy purpose. In re Basil Street Partners, LLC, 477 B.R. 853. The evidence presented showed that the involuntary debtors had defaulted on their loan payments and, that the lenders had engaged in active collection actions. The discussions by and between the lenders, including the syndicate lenders, and the advice provided by their legal counsel show that the decision to file the involuntary petitions was more in the nature of a studied business decision that an action to harass or merely seek an alternate collection forum.

CONCLUSION

In view of the foregoing, the court determines that the involuntary petitions were not filed in bad faith. An order for relief under chapter 11 will be entered forthwith.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 10th day of October 2019.

Enrique S. Lamoutte
United States Bankruptcy Judge

-10-

**Minute Entry**

*<u>Hearing Information</u>:*

Debtors: Betteroads Asphalt, LLC. (17-04156) and Betterecycling Corporation (17-04157)

Date/Time/Room: 06/27/2019/09:45:03 am
Bankruptcy Judge: Enrique S. Lamoutte
Deputy Clerk: Darhma Zayas
Reporter/ECR: Carlos Aponte

*<u>Matters:</u>*

Evidentiary hearing on the on the alleged debtor's motion to dismiss on the grounds of bad faith.

*<u>Appearances:</u>*

Wigberto Lugo Mender, on behalf of both alleged debtors
Luis Marini and Carolina Velaz, on behalf of Banco Popular, Banco Santander, First Bank and the Economic Development Bank
Alejandro Febres, In House Counsel of Banco Popular
Myrna Ruiz Olmos, on behalf of Puerto Rico Asphalt
Rafael Gonzalez Valiente, on behalf of First Bank as an independent creditor of the syndicated loans
Sonia Colon, on behalf of Sargeant Marine Inc. and Sargeant Trading LTD
Jordi Guso, co-counsel on behalf of Sargeant Marine Inc. and Sargeant Trading LTD
Alexis Fuentes Hernandez, on behalf of petitioning creditors Facsimile Paper, Champion Petroleum and Control Force Corp.

*<u>Proceedings:</u>*

The court commences the evidentiary hearing on the merits of a motion to dismiss filed by the involuntary debtors on June 27, 2019. Attorney Lugo begins with the pending motions. The Attorney clarifies that although there are two separate cases, most of the arguments have been raised jointly for both cases but that this may not be the case throughout the rest of the case. However, there will be a single transcript of the proceedings. The court clarifies that the cases are administratively consolidated. The court has also reviewed the motions and pretrial reports and the positions of the parties are similar as to both involuntary debtors, therefore, the court will hold one evidentiary hearing and, if differences should be made, the parties should point it out. The court notes that there are pending motions as to continuances and limiting witnesses.

Attorney Lugo references Docket no. 73, and docket no. 51, Motion for Protective Order limiting the scope of discovery filed by the petitioning creditors, and states that the court has not ruled upon said motions. The court states that it believed that the motions were mooted by the court's determination that the petitioning creditors had complied with the requirements to file the petition and that the issue remaining was if the involuntary petition was filed in bad faith or for an improper

purpose, order entered on November 30, 2018 at Docket No. 271. Therefore, the order also disposes on the oppositions to the protective orders filed by the alleged debtors (Docket No. 92 and 73).

Attorney Lugo references docket no. 404 and no. 274, Motions for Imposition of Bond pursuant to section 303(e) and docket no. 433, the objection of petitioning creditors. Attorney Lugo requests time to reply to the position of the petitioning creditors and requests the court to dispose on said motion the last day of the evidentiary hearing, to be discussed after the factual evidence has been presented. The court asks the petitioning creditors if they have an opposition to hold in abeyance the issue of bond until after the evidence is presented. Attorney Marini states that the request be made in writing to be able to respond. However, he states that the petitioning creditors' position is that the request, on its face, doesn't even comply with the requirement of the imposition of the bond, and that, therefore, the motion should be denied without a hearing. Attorney Marini states that he has no opposition for the Debtor to have time to file any reply to their answer.

The court clarifies the request of the alleged debtors, that is, to hold the motions requesting bond and the objections in abeyance until after the alleged debtors present the evidence as to the bad faith issue. The court makes a distinction based upon the request. The issue of posting a bond may have two routes. One is posting a bond before the court decides as to whether the involuntary petition was properly filed, and, if dismissed, the issue of bad faith for the award of damages and costs comes into play.

However, at this juncture the court determined that, in addition to the statutory requirements that the petitioning creditors need in order to file an involuntary petition, the factor of bad faith can be considered to determine if a case shall be dismissed or not, and base upon that, the alleged debtor is requesting that a bond be posted. The court explains that although the court's intention was to have all pending matters addressed with an order by the date of the hearing, due to time limitations, it was not possible. The court summarizes its preliminary position: after considering the motion and the opposition filed yesterday by the petitioning creditors, the key section governing the posting of a bond is section 303(e) which states that, after notice and a hearing and for cause, an emphasize on "for cause", "the court may require the petitioning creditors under this section to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section." Section 303(i) states that if the court dismisses an involuntary petition other than on the consent of all the involuntary petitioning creditors and the alleged debtor, and if the alleged debtor does not waive the right to judgment, the court may grant (1) against the petitioners and in favor of the debtor (A) costs; or (B) reasonable attorney's fees (2) against any petitioner that filed the petition in bad faith for damages proximately caused by such filing". The bond is to cover the potential award of damages. There is one decision, which the court finds close in the fact pattern to what is presented for its consideration, In Re Ransome Group Investors I, LP, 2009 WL 5852725 from bankruptcy court of the M.D. of Florida, a decision by Judge Glenn. The court mentions some excerpts relevant to the facts of this case: the provisions about posting of a bond is intended to discourage frivolous petitions as well as the more dangerous spike of petitions based on a desire to embarrass the debtor or to put the debtor out of business without good cause. The bankruptcy code does not impose a mandatory bond requirement, so petitioning creditors do not post a bond when an involuntary petition is filed. Section 303(e) provides that the court may require a petitioning creditor or creditors to post a bond upon finding of cause and it is a discretionary

2

finding by the court, and it requires cause to be established. There is a presumption of good faith on the part of the petitioning creditors, so it is debtors' burden to show there is bad faith, as is acknowledge in the respective pretrial reports. The alleged debtors must establish a prima facie case of bad faith for petitioning creditor to be required to post a bond. This is congruent to the alleged debtors request to wait until the evidence is presented for the court to determine is the petitioning creditors should post a bond to guarantee the payment of damages that may be awarded. However, at this juncture, the debtors have yet to establish a prima facie case of fraud or bad faith. Therefore, the court denies the motion, without prejudice to the debtors presenting the request again after the presentation of the evidence, and that the evidence that was presented to the court does establish a *prima facie* case for fraud. In addition, there are two additional factors that the court considers to deny the motion for the posting of a bond: (1) is that this court already entered an order indicating that the basic statutory grounds for the filing of an involuntary petition were met and that the only issue pending is the issue of bad faith and (2) examining the list of the petitioning creditors and the alleged amounts owed they total approximately 98 million dollars. Considering the amount of the debt in light of the amount of the bond requested, which is approximately 11 million dollars, it appears that the debt far exceeds the requested bond. For that reason, the court denies without prejudice the posting of a bond, noting that, and to fit in with the alleged debtors' request, it is without prejudice of presenting it to the court again when the alleged debtor rests on its initial presentation of the case.

The court also advances that the next hearing is on July 15, 2019, and considering some of the allegations made, the court must balance Bankruptcy Rule 1013 which indicates that the procedure regarding a determination of an involuntary petition must be expedited. These involuntary petitions were filed on June 9, 2017, generating two years of litigation, as the issues involved are complex and the amounts are significant. The court does not imply that any of the parties has intentionally delayed the proceedings, but the fact is that two years have passed and that the court must follow the bankruptcy rule that orders an expedited resolution. The court also considers Rule 9014(c), which makes applicable Rule 26, but not in all its provisions, it does not incorporate the time limitations which apply to a regular adversary proceeding or civil proceeding. With those two rules in mind is that the court attempts to commence the presentation of the evidence as promptly as possible.

Attorney Lugo addresses the issue of additional discovery, referencing the order of the court which authorizes additional discovery to the extent it is directed to an individual that has knowledge of the events leading to the filing of the involuntary petition for each of the petitioning creditors, without altering the evidentiary hearing scheduled at docket no. 436. The attorney stated that at the time he prepared the notes, he had not received the confidentiality log, which was received during the night and, therefore, it had not been reviewed. He states that, to move forward, the alleged debtors will require two additional factual witnesses, namely, the deposition of Francisco Pascual who is the authorized representative for First Bank Puerto Rico. Also pending is the deposition of the corporate representative of Sargeant Marine and Sargeant Trading. The scope of the discovery was reiterated in the orders entered yesterday afternoon regarding the different pending matters on these motions. The alleged debtors wish to set the record clear on the realleged position that there is no practical or feasible way that any meaningful discovery be completed in such a tight schedule. On the timing constrains detailed in the motions, the alleged debtors have had barely 60 days to conclude discovery and hold a final trial and, to their regret, this is not

reasonable to complete and present a case of this size, specially when the burden is on the alleged debtors to prove on the evidence, which mainly resides on the other part and which is controlled principally by that other part. The prejudice of this scheduling order was briefed in their motions for reconsideration which were denied. In any event, the principal risk to the alleged debtors, now, is that two of the principal witnesses, specially Mr. Pascual, who on the information that has been gathered to this date from other evidence, other witnesses and other documents was an active participant in most dealings regarding the filing, may not be deposed. The witness for the one of the principal petitioning creditors, which is Sargeant, may neither be deposed. As important as these two witnesses, the alleged debtors may not have any able to offer any expert testimony on a case on which the alleged justification for the filing has to do with the existence of transfers. Absent the participation of an expert, the alleged debtors only chance for presenting counter evidence will be with their two factual witnesses. Now, to the extent that the court has decided to continue with the scheduling, the alleged debtors request the specific times and dates to complete this discovery if it is going to be allowed.

Attorney Gonzalez Valiente states that the alleged debtors requested the deposition for the representative of First Bank but neglected to notify counsel, so the deposition could not be taken. First Bank has no objection on the taking of the deposition, but the delay is not on First Bank's part. The court acknowledges that the clarification is consistent with the information stated by the alleged debtors' counsels at a chamber's meeting held with the attorneys of the petitioning creditors and the alleged debtors. However, Attorney Lugo had emphasized on the importance of the deposition. Attorney Marini states that the date for the deposition of the representative of First Bank can be arranged. Attorney Marini also states that they sent the privilege log to attorney Lugo yesterday afternoon and points for the record that, as part of the ongoing discovery conference that the parties have had, the parties agreed to exchange privilege logs at the same time. As recently as June 4 the privileged log was requested to the Debtors, but they haven't sent it.

Attorney Guso states that the corporate representative was made available to the alleged debtors on mid-March but, unfortunately, the parties could not agree on the scope of the examination, and that the representative is available Monday afternoon or Tuesday, at the convenience of the alleged debtors.

The court emphasizes that the orders were terse but direct and that one of the reasons the court addressed the balancing on rule 1013 and rule 9014 was specifically for those reasons. After hearing the alleged debtors' requests and the proffers made by the attorneys of the petitioning creditors, the court concludes that it is just a matter of the parties coordinating whatever discovery is pending and noting that the court has no intention, at this juncture, to further continue the schedules of the hearings.

Attorney Lugo moves to discuss the motion *in limine* for the expert report. Attorney Marini states that the motion filed seeking to exclude the report by the lenders proposed expert relies on allegations that they failed to comply with Rule 26(a)(2), which do not apply to the contested matter, as discussed by the court previously, and references a case from the BAP of the First Circuit In Re Colon, where the court states that Rule 1017 applies, which refers to Rule 9014, which excludes rule 26(a)(2) from the contested matter. The court states that, to the extent that the motion to exclude the testimony may be pending, based upon what the court already stated about the need

4

for expediency and the applicability of Rule 26 as to contested matters, the court denies it without prejudice as the presentation of the report has not yet come to the attention of the court by the petitioning creditor. Attorney Lugo states that they plan to work on the same schedule to present an expert report.

Attorney Ruiz Olmos, on behalf of Puerto Rico Asphalt, states that they also filed a motion to suppress evidence and brings to the consideration of the court the matter of the expert report. The Attorney brings to the court's attention that the expert report must also comply with Rule 26(b)(4). The lenders have submitted a draft and not a final expert report and the report is not signed. Attorney Ruiz also states that the right to depose an expert is triggered when the report is provided, and the report was provided on June 20, 2019. Therefore, she requests the expert report to be suppressed because it is a draft, it is not signed, and that the parties have a right to depose, interrogate or cross prior to the hearing. The court inquires the attorney as to what is the standing of Puerto Rico Asphalt in this contested matter, that being the motion to dismiss filed by the involuntary debtors. The court notes that in one of the motions PR Asphalt indicated that it needed to be joined as a party. The petitioning creditors did not file an involuntary petition against PR Asphalt. Based on the allegations on the pretrial reports and motions before the court, PR Asphalt has been the subject of discovery on the pending issue of bad faith and it has been advanced that transfers from the involuntary debtors to PR Asphalts (the court noting that it does not know if it is true or will prevail) and that that is one of the reasons which led the petitioning creditors to file. But to join PR Asphalt as an involuntary debtor is a decision that must be made by the petitioning creditors. If the petitioning creditors prevail, and the order for relief is entered, it appears that PR Asphalt may be a Defendant or a respondent on a future action which is not before the court. The court expresses its concerns, irrespective of agreeing or not in relation to the applicability of Rule 26(a)(4), of what is PR Asphalt's standing at this juncture. The court sees PR Asphalt as an entity subject to discovery in order to prove the petitions were filed in good faith.

Attorney Ruiz states that as of May 13, 2016, PR Asphalt was only a party against whom the lenders had tendered a subpoena and was deposed. However, as of June 20, 2019, when the lenders filed the pretrial, PR Asphalt sees that most of the allegations raised by lenders and which are intended to be presented today to the court for determination, in fact, have to do with PRA's interest because their allegation is that the alleged debtors made purported transfers to PRA. PRA is not requesting to be joined as an alleged debtor. The definition that has been raised to the court is that PRA is a necessary party in so far as this court needs to make determinations or rulings regarding PRA's interests in property, in contracts. PRA's interests will be hindered or affected potentially by the court's ruling. So, by definition, PRA is a necessary part to the action. PRA does not mean to say that it is a necessary debtor, it may be a request for relief under an adversary proceeding. PRA is stating that, as of June 20, 2019, some allegations were raised to this court whereas PRA's interests are being affected and PRA has not been brought to this action and has not been notified of the discovery proceedings where PRA needed to be part of, because it needs to interrogate, cross examine and conduct discovery in order to defend itself from the allegations and potential ruling that the court will be making. Attorney Ruiz continues to state that the allegations against PRA have just been put in the docket, and, therefore, the court has two options, either suppress all the evidence against PRA or that stem from the discovery where PRA was not invited to, or the court can extend the discovery so that PRA can be a part of it. PRA believes that notice should've been given to PRA and it should've been part of the discovery as it has the right

5

to defend itself from the allegations from the lenders, which affect directly PRA's interest. PRA's standing is predicated in Rule 19 and the pure definition of necessary party just because the court will be making a ruling affecting PRA's rights and interests.

Attorney Marini responds to Attorney Ruiz. He states that Rule 19 does not apply on contested matters. Bankruptcy Rule 9014(c) specifically excludes Rule 19. The attorney further states that what PRA is saying today is completely contradictory to what it has stated before, first, the allegation that they discovered on June 20 that the lenders are alleging that assets were transferred to PR Asphalt is misleading and false. The lenders have consistently stated, as early as the date when the petition was filed, and filed a motion to appoint a trustee, that assets were transferred to PR Asphalt, that PR Asphalt is an insider, they have detailed throughout the litigation information that they had and have supplemented it to the court and when PRA came in before the court two months ago after a subpoena was served for a deposition to PR Asphalt, they appear in court and argue a motion to quash and stated that PR Asphalt was not a party and stated that the information that the lenders were requesting from PR Asphalt was not relevant to the bankruptcy cases much less to the contested matter, the lenders bad faith filing, especially if it is requested for the May 20, 2019 evidentiary hearing (Motion to Quash, Docket No. 299). They also argued that Rule 26 did not apply to them and as they were not a party, and that they were subject to Rule 45. The argument of PRA has no basis in law. The Attorney requests the court to focus on the filing. Why do PRA, two years after the cases were filed and they new about the allegations of the transfers, why do they come 48 hours before the hearing and request that depositions be taken again, that they be allowed to participate, and, suddenly, now they want to be involved on the case. If it was a legitimate concern, which the attorney submits it isn't, they should've raised it months ago, years ago. Attorney Marini concludes that the request has no basis in law.

The court refuses to further discuss the matter. The court states that to the extent in which PR Asphalt's requests the court to reconsider its orders regarding discovery, the request is denied for the reasons stated before regarding the applicability of Rule 26 to contested matters and additionally, at this juncture, for reasons of standing. The court further states that, as to the allegations regarding the statement that it was only recently that it was notified of the potential contested matters against PR Asphalt, as pointed out by Attorney Marini, and after a review of the motion in docket no. 14 in case no. 4156 filed on June 12, 2017, the motion to appoint a trustee or examiner, the disclosure of the alleged improper transfers was clearly made.

Attorney Ruiz points out that Rule 2018 gives this court the flexibility to direct that other rules of part 7 be applied. The court states that it is fully conscious but that it didn't and do not have the intention in doing so, when it balances the requirements of 9014 and applicability of rules for having expedited procedures in matters regarding involuntary petitions.

Attorney Ruiz states, to preserve the record, that as of the date that lenders are referring to, that was two months ago when the subpoena was served, the discovery was way underway and almost concluded, as of the discovery that had been held to date. PRA was never notified of the depositions and the rules don't require a third party that is not in the case to know what is going on with discovery and appear and request to be notified. PRA's assertion is that the depositions, and the discovery by alleged debtors as by lenders was never notified to PRA, so PRA could never be part of the discovery process because it was never brought to the action. The court notes PRA's

6

concern but states that its concern may be premature because the court has no pending issue as to that matter.

As per Attorney Ruiz' requests, the court clarifies that the ruling is that its oral request as to the reconsideration of the order already entered by the court is denied. As to the issues of the pending expert report, the court ruled on that issue at the request of Mr. Lugo and the ruling remains the same. Additionally, the court rules that PRA has no standing, at this, juncture on the pending contested matter.

Attorney Lugo commences with an opening statement, explaining the roadmap of the hearing. The court interrupts Attorney Lugo, and states that the opening statement restates what was submitted by the parties in their pretrial reports, and that the court wants to know what is the evidence that support the allegations, to make the finding of facts and then apply the law. The court informs its interest to start hearing the evidence.

Attorney Lugo states that counsel Alexis Betancourt will commence with the witnesses. The court asks what the order of the witnesses will be. Attorney Lugo explains that, for today, they are going to present the five (5) witnesses for the small claims. The court requests the names of the witnesses. Attorney Betancourt states that the witnesses are for certain joining petitioners. The attorney requests the court time to stipulate the evidence with the attorneys to expedite authentication. The court asks it they are going to make a proffer of what are the uncontested facts. Attorney Betancourt states that they are going to make proffers of the testimony they gave to the lenders and the testimony they gave to the alleged debtors, and that will provide the direct first questioning of each party and they will reserve the right to cross-examine. The court clarifies the proposition made by the attorney: (1) they will identify the witnesses; (2) they are going to make a proffer of what the direct testimony will be and (3) the witness will be subject to cross examination. The court restates its request as to how many witnesses are going to be presented.

Attorney Betancourt states that they are also going to discuss the stipulation of evidence and states that Attorney Fuentes will provide the name of the specific witnesses. Attorney Fuentes addresses the court. First, the attorney understands that there are two statements made under penalty of perjury provided by his clients, representatives of four petitioning creditors. They were suggesting that those two statements under penalty of perjury be admitted and that will be the proffer to basically substitute their testimony, so they will not have to be questioned. The court asks again who the witnesses are. As to Champion Petroleum the witness is Luis Marrero. Attorney Velaz states that the sworn statements are marked as exhibits PC 33, 34, 35 and 36. Exhibit 33 was submitted by Facsimile Paper Connection Corp. and signed by Mr. Angel Soler as President and authorized representative dated June 24. Exhibit 34 was signed by St. James Security and it was signed by Mr. Marcos Rivera as President and authorized representative dated June 20, 2019. Exhibit 35 was signed by Control Force Corp. by its authorized representative Mr. Nicolas Lopez and was signed on June 24. Exhibit 36 submitted by Champion Petroleum by Mr. Luis Marrero Caballero who is the General Manager and authorized representative dated June 26. Attorney Fuentes states that there are other four statements that are included in the alleged debtors pretrial report. Attorney Betancourt mentions AD Exhibit 45 by St. James Security. The attorney clarifies that St. James and Facsimile are creditors for Betteroads, the others to 17-04157, except that St. James is creditor to both cases. Attorney Betancourt continues to state that AD Exhibit 45 is St.

James sworn statement, which is different, by Mr. Marcos Rivera, representative of St James. Facsimile Paper declaration in the case of Betteroad is AD Exhibit 50 executed and signed by President and authorized representative Angel Soler. AD Exhibit 56 from Champion Petroleum executed by officer Rafael Figueroa Sosa and, also, by the counsel of the petitioning creditor on the petition date Manuel Porro Vizcarra, as an attorney. Aditionally, AD exhibit 61 by Control Force executed by officer Nicolas Lopez Diaz. Attorney Betancourt restates that the agreement is to, in a moment, estipulate exhibits from 42 of the AD pretrial report to 61. The attempt is to expedite the authentication and admissibility of the documents, regarding these witnesses and expediting interrogation by making a proffer on each parties' declaration. Attorney Betancourt requests 5 to 10 minutes to attempt the stipulations. Attorney Marini has no objection to the recess however states that the court requested the attorney for the alleged debtors to state the order of the evidence to be submitted, as the statement had not been made and requests the alleged debtors to announce what witnesses they intent to call at trial. The court allows the recess and requests that the alleged debtors provide the information related to the next witnesses. Attorney Lugo clarifies that it depends in the coordination of the depositions previously announced.

The court recess until 11:30 a.m.

Attorney Betancourt states that the sworn declarations are going to be submitted as proffers, but that they are going to call the witnesses to the stand. The court clarifies the exhibits that are stipulated to be admitted into evidence: PC exhibits 33, 34, 35 and 36 and AD exhibits 45, 50, 56 and 61. Attorney Fuentes proffers that the statements submitted into evidence would be what is in the direct and the cross. Any additional information is covered by the attorney-client privilege because these creditors relied in the information provided by their attorneys, who made the analysis in order to recommend them to sign the petition and, therefore, that their testimony would not be necessary. The court states that the ruling would be made upon the evidence submitted to the court and is up to the parties to interrogate the witnesses.

Attorney Betancourt calls the first witness, from Champion Petroleum, Mr. Luis Marrero. The interpreter is sworn in. Attorney Porro Vizcarra, attorney for Champion Petroleum as of the petition date, states that Mr. Marrero will testify as to any preliminary matter without the need of an interpreter and if he needs any translation, he will request it to the interpreter.

The witness name is Mr. Luis Marrero Caballero, who is the General Manager for the company. He has been in the position since March 2017. He acknowledges he is there as a designated representative of the company and can talk about the events leading to the filing of the involuntary petition. He was an officer before the filing of the petition. He had no participation in the planning of the filing. All communications were made between the parties and the legal representative. The witness issued a sworn declaration on June 26, 2019. Another declaration, by another officer, was issued on March 8, 2019. The witness has reviewed both declarations. The witness is aware that Champion Petroleum executed an agreement with the banks for the filing of the petition. The witness declares he did not sign any agreement. The witness states that Rafael Figueroa is the vice-president and owner of the company. The witness has not examined the agreement and states that all the communications with the banks were made through their counselor. Attorney Betancourt shows the witness a subpoena that was issued to Champion Petroleum. The witness states the document is the one received stating that he needed to appear in court. Attorney Betancourt

references page 4, were it states, "testimony at trial and designation". Attorney Porro interrupts to state, for the record, that the document they received did not include the "testimony at trial" request. Attorney Betancourt states that he served that document to all attorneys. The designated officer should be able to testify about the events surrounding and which led to the filing of the petition.

Mr. Porro reads the sworn declaration admitted as exhibit 36 and states that said declaration states that all communications related to the lenders in anticipation of the filing of the involuntary petition were exchanged verbally through counsels of Champion and Lenders. AD Exhibit 54 is shown to the witness, the carveout agreement. In the last page, the witness identifies the name of Rafael Figueroa but cannot testify if that it is his signature because he has not seen his signature in a long time. The witness states he has not seen that document before. He states that on paragraph ten of his declaration he stated that all the information exchanged between parties was using their counselor Mr. Porro. He declares that Mr. Figueroa is not a counselor and is an officer of the corporation. Attorney Betancourt points out that then the signature is from an officer of the corporation, not a counselor. Attorney Porro states that he will stipulate that it is the signature of Rafael Figueroa. Exhibit AD 54 of the alleged debtors is admitted. The witness testifies that the sworn statement was signed on June 26, 2019, at counselor's office. Attorney Betancourt shows to the witness exhibit PC 36. Attorney Betancourt references paragraph 7 of the sworn statement. The witness restates that the communications were through counselor and the information was transmitted to Champion through counselor. The witness declares that he has no knowledge of the conversations held between counselors. The witness declares that he does not know if there were any documents of the alleged transfers. Mr. Porro intervenes and states that the sworn statements establish that Champion Petroleum did not receive any document or analysis, at paragraph 15 of exhibit 56. Attorney Betancourt clarifies that now there is a new declaration and he wants to know if something has changed and if there is a document that supports what is told in the declaration. The witness reinstates that every information Champion received was through counsel, so he has not read or seen any document and he has not sustained any meeting with any other party other than the counsel. As per the witness testimony, Champion did not make an independent documented analysis.

Attorney Fuentes states that this testimony and interrogatory will apply to the other three petitioning creditors as the sworn statements are identical and state that they did not make any independent analysis and relied on counsel. Attorney Marini places an objection based on Rule 403 of evidence to prevent the presentation of cumulative evidence. The court states that the proffer approved by the court was that the sworn statements were the direct statement of the creditors and that the parties may call the witnesses for purpose of impeachment. Therefore, going over the statement already submitted would be duplicative and a waste of time.

Recess until 2:00 P.M.

Attorney Betancourt informs that the parties have agreed to stipulate the admissibility of AD exhibits 42 through 61 excluding 44, 47, 52, 55, 57 and 58. As stated by Attorney Fuentes and Marini, the stipulation was made considering that the rest of the small petitioning creditors will not testify.

Attorney Ruiz Olmos reinstates the need to preserve PRA's objections included in its motion at docket no. 428 referring to the objections to witness testimonies, evidence submitted and testimony that may come out of it. Attorney Marini arguments that he sustains the same objections stated in the morning.

Attorney Lugo calls the next witness, Mr. José Santiago Ramos. The court clarifies that the examination of the witnesses that submitted the sworn statements has concluded. Attorney Marini poses an objection as to the relevance and scope of Mr. Santiago's testimony. As detailed in the transcript for Mr. Santiago's deposition, he left Banco Popular at least four months before the commencement of the involuntary petition and had no duties with this case since the filing of the complaint in state court on September 2016. He did not participate or had any knowledge related to the filing of the petition. The court denied the objection without prejudice to rephrasing the objection again depending on the questions and answers that are provided by Mr. Santiago Ramos.

The witness Mr. José Santiago Ramos is sworn in. Attorney Lugo conducts the direct questioning. The witness states that he is currently the Chief Restructuring Officer for the Government Development Bank of Puerto Rico and the Deputy Executive Director for the Puerto Rico Fiscal Agency and Financial Advisory or AAFAF, as it is commonly known. He worked for Banco Popular de Puerto Rico since September 2007 until February 2017. He started in the bank as a Financial Analyst in the corporate division, then in 2009 was transferred in what was known as the workout division as a financial analyst and in 2010 he was promoted to relationship officer and stayed in that position until he left the bank. He was the relationship officer of the involuntary debtors when the account was transferred to the early stage division on early 2013, approximately. He worked as a relationship officer for Banco Popular until the account was transferred to the late stage division on 2016, to his best recollection. Therefore, he was the relationship officer of the involuntary debtors through the period of 2013 to 2016.

Attorney Lugo shows Exhibit 84 to the witness. The exhibit is the transcript of the witness' deposition which was taken in May 2nd, 2019. The witness states that he received copy of the deposition several weeks after it was taken, and he review it in preparation of the hearing. He declares that he was represented by attorney Luis Marini during the deposition and that Banco Popular is paying for said representation. He is testifying as a former officer of Banco Popular. The witness is instructed to refer to Exhibit 2 of the deposition, which is Exhibit 84. The witness recognizes the document as part of his duties on Banco Popular and as part of the deposition. The document is an obiter risk rating assessment tool, commonly known as ORRAT, it is an internal risk rating for a specific borrower. The document was prepared by Rebecca Collazo, who was a peer, and reviewed by Lisa Lúgaro. Explaining what the document signifies, the witness states that they input some quantitative and qualitative information and is a way to measure the risk that the borrowers present at the time. Apart from the input prepared by the relationship officer and verified by Lisa Lúgaro, the document was reviewed by the decision officer, José Luis Cotto, who works on the risk management division of the bank. Attorney Lugo moves for the admission of the document. Attorney Marini objects on hearsay grounds as the witness testified that he did not prepared the document. The objection is overruled by the court. The witness explains that in the "general comments" box in the document they include the relationship officer's rational for the information that was input into the tool.

Attorney Lugo requests the witness to turn to exhibit no. 3. The witness explains that he prepared the document. The document is a presentation to the Special Loan Credit Committee recommending a restructuring of the borrowers' facilities. The document is very different from the other document reviewed. Exhibit no. 2 is a tool used by the bank regardless of it being restructure or not, it is something that happens on the day to day administration of the portfolio. This other document is a specific restructuring or transaction that is being recommended to the bank's credit committee. They are mutually exclusive. The witness agrees that all the explanations and notes included in the document are an assessment of the loan at the time of the evaluation. Referencing the first paragraph of the page which reads "credit facility 9007", he explains that the Coco Beach residential project refers to land or project which development was closely related to Betteroads and Betterecycling. The witness explains that Banco Popular did not participate in that loan, it was part of the syndicated structure but the loan was 100% Santander. When the witness refers to syndicated loans, he refers to the structure that was already in place where several facilities were participating not only by one bank but by several banks, in this case, four banks. Each had a different participation within a facility. To this one, it was Banco Popular, Santander, First Bank of Puerto Rico and the Economic Development Bank of Puerto Rico. Attorney Lugo moves for the admission of the document as evidence.

The court clarifies that this is an exhibit to the transcript of the deposition, which was admitted as AD exhibit 84. Attorney Lugo clarifies that exhibit 84 is the whole document, the transcript of the deposition with exhibits to the transcripts. Attorney Marini clarifies, that exhibit 84 has not been admitted into evidence, and only exhibit 2 to the transcript has been admitted into evidence. Attorney Lugo states that his intention is to submit the whole transcript to be admitted. The court clarifies that it understood that the offer was of exhibit 84 and that the exhibit included some exhibits to the transcript, so when the court admitted 84 it admitted the whole document. Attorney Marini raises an objection and states that he believed the only exhibit admitted was exhibit 2 and argues that there are several exhibits in the deposition, 32 exhibits in total. Attorney Lugo states that he does not intends to use them all. Therefore, the court determines that they should be admitted one by one and that the admitted exhibit would be exhibit 84.2. As to exhibit 84.3, Attorney Marini objects based on relevance and the court overrules the objection.

Attorney Lugo references the paragraph below the Coco Beach paragraph, related to a transfer of a loan to the special loans' division. The witness explains the process to transfer the loan from relationship to special loans. He states that, once the bank identifies that it was in a deteriorating financial condition his department refers it to the late stage division, more like an internal transfer. Prior to the transfer, the facilities were in the corporate lending division specifically the asset-based lending which is part of the corporate banking division. He states that, in reference to exhibit 84.2, Lisa Lúgaro is the team leader of the asset-based lending group. The witness reviews the documents and explains the reason to the change of classification of the syndicate loans from March 2012 to the end of fiscal year 2013. He states that it was the beginning of a new electoral cycle and the lenders had 80% or more on government contracts and, usually, that cycle starts during 2013. Attorney Lugo references the page that states "collateral valuation", and which mentions certain property in Guayanilla. The witness explains that the property in Guayanilla referenced in the document is a tank holding facility, where the borrowers store their primary product which is liquid asphalt. The witness is referred to the part that states "…we arrive at the conclusion that Borrower must sell, sell and leaseback, or lease the excess capacity in the terminal"

and explains that the instruction was part of an analysis or the due diligence that the bank makes and, in this case, it was one of the assets with more value, and part of the structure was to try to deleverage the borrower. He explains that "to deleverage" means to reduce their debt burden. The deleverage can be done in any number of ways, first, it means you pay down your loans. In this case revenues, when they did the analysis, weren't enough to bring down the normal amortization so the next specific step is what kind of assets can we monetize so that the debt can be reduced. The witness states that Banco Popular's determination to sell and enter on these transactions, as detailed in the paragraph, was part of the recommendation the witness did and it was an agreement between the bank, the borrower and the syndicate banks, to that specific structure of monetizing.

Attorney Lugo references exhibit 84.5. The witness testifies that he prepared the document. Attorney Lugo moves for the admission of the document, a Status Meeting Report, a summary report. Attorney Marini objects due to relevance. The court asks if the status report is an update of the report 84.3. Attorney Lugo states that that is the question. The court sustained the objection because the relevance of the document has not been established. The witness explains that he does not recall the date, and that it was prepared a little after the restructuring took place as a status update and does not recall if it was presented to the syndicate banks or if it was an internal presentation. The document is not submitted into evidence.

Attorney Lugo references exhibit 84.6. The witness states that he prepared the document on December 10, 2014. He explains that there were two transactions for approval, one was a renewal of the revolving line of credit for an additional six months, which was the standard maximum amount at the time, facility 1002813-4001/4002 for $25,000,000.00; and then there was a change in corporate structure Betteroads Asphalt Corp. was been changed to Betteroads LLC, and they were asking approval for that change. Attorney Lugo moves for the admission of the document, which is objected by Attorney Marini due to relevance. The court states, to clarify what the document is, it is a report prepared by Mr. Santiago concerning the renewal of the revolving line of credit of the alleged debtors, which was for $25,000,000.00. Attorney Lugo clarifies that once he can complete the document, he will show other evidence to state its relevance, specifically as to the intent of how this developed and the witness is the individual that can explain how everything started and leading to 2016, when the closing of the operations occurred. Attorney Marini raises the same objection. The court questions Attorney Lugo in relation to the statement made and requests to clarify if the alleged debtors are operating. Attorney Lugo clarifies that they are operating. The court states that it understood that the attorney just stated that the two corporations ceased operation in 2016 and that is important. The attorney clarifies that it shut down their regular operation of paving and asphalt, which are the ones that are now being referred as "transfers", amongst other allegations made to sustain the involuntary petitions. The court inquires about what operations were shutdown on 2016, and notes that the exhibit was made in 2014. Attorney Lugo states that in exhibit 84.2 there is a full description, in the general comment section, that states what Betteroads is about. "It is principally engaged in the manufacturing of asphalt plant mix and asphalt paving and was established in 1954". Attorney Marini raises and additional objection, alleging that the counsel is testifying for the witness and he should rather ask the questions he intends to ask. He also states that based on the questions asked and the testimony, he renews the objection as to relevance. The court states that, at this time, it is going to overrule the objection, but subject to the alleged debtors establishing the relevance, the court will give more time to make questions to pose the relevance because the document was prepared in September

10, 2014, and based on the statement of Attorney Lugo there was a shut down on operations in 2016. The court asks which operations were shut down on 2016 and Attorney Lugo states that the Betterecycling operations were shut down and that Betteroads continues storing and warehousing material in the Guayanilla terminal. Attorney Lugo explains that Betterecycling ceased operations as an asphalt and paving company. However, there are certain plants and facilities which were operated by Betterecycling and were leased to other parties, which is part of the theory of the petitioning creditors trying to justify transfers of properties. Attorney Marini objects because the attorney is characterizing and is assuming facts. The court clarifies that it is an argument and allows Attorney Lugo to continue questioning the witness.

Attorney Lugo directs the witness to page 2 of 3 of the document. Attorney Lugo asks the witness which assets were to be disposed in line with the requirement of the loan agreements. The witness states that there was an airplane and a helicopter and although not stated there, a milestone for amortization was the Guayanilla terminal, be of sale or lease, any way the borrower could monetize the asset for the benefit of the borrower. The document was admitted into evidence.

Attorney Lugo continues to exhibit 84.8. The witness states that he prepared the document on April 27, 2015, to request additional authorization from the credit committee to obtain waiver of several covenants in the loan agreement signed in 2014. The credit agreement included all the agreements within the syndicated structure. Attorney Marini objects to the questions as the document is not admitted into evidence, and further objects to the relevance of the questions and the document. The court requests a proffer from Attorney Lugo. Attorney Lugo states that he is trying to see how the loan developed up to September 2016 and that he is trying to be as quick as possible and trying to establish the history before the other events that trigger the filing of the petitions. That is the intention with the witness, as he was the principal officer who signed most of the documents. Attorney Marini states that the proffer articulates no basis for relevance, and they are going on a fishing expedition to see what they find. The court clarifies that considering the amounts of the loans involved in this case and a revolving line of credit of $25,000,000.00, he understands that reports are going to be made at intervals in order to exercise due management of the loans for the benefit of the bank and to update what is going on, in order to take measures, such as the disposition of assets to monetize for the benefit of the borrower. But how does the management of the loan for a substantial amount and the recommendations tie in with the filing of an involuntary petition for an improper purpose? That is the key to accept or continue the line of questioning. Where does it tie? Attorney Lugo clarifies that one of the elements in that same decision has to do with the purpose to use the bankruptcy court as a collection agency. The court clarifies that the documents presented include recommendations, and steps to be taken which go to a committee which is an internal process. Attorney Lugo clarifies that what he means with the court's decision, as to the list of items, such as intent and the purpose of using the bankruptcy court to collect when they had the opportunity in state court. The alleged debtors never had an interest to come to the bankruptcy court. It is a matter of "why are we here?" Why, if they could have dealt with everything outside the bankruptcy court. The Attorney further states that they believe that they need to establish that, and it is not a simple task to present the intent, and that he needs to give a background, before entering to the state court matter. The most important part is the purpose since day one and with other documents they can show what was behind and that the main interest in this whole process was to get management out of the equation in order to monetize. Attorney Marini renews the objection stating that the proffer does not show what facts he intends to get form the testimony

particularly when Mr. Santiago left the bank prior to the filing of the petition and that the case was transferred before the state court actions. The court requests to Attorney Lugo to specifically state what part of the opinion requests the alleged debtor to prove the steps or factors. Attorney Lugo refers to docket 432 and the Forever Green analysis and the totality of circumstances factors and states that does are the elements they are after. Without agreeing or disagreeing with the alleged debtors' position, the court notes that it now understands what Attorney Lugo is stating. The court clarifies that the totality of circumstances and the factors are key to find that bad faith was an element to determine to dismiss either a voluntary or an involuntary bankruptcy petition. The key is factors to show improper purpose. Attorney Marini states that, other than reciting from the case law, Attorney Lugo has not articulated what evidence of facts he expects to elicit from the witness that are relevant to an improper conduct for the legal allegation that they are submitting. Attorney Gonzalez joins the objection and states that the witness can only testify about how the loans were given and that he left the bank 7 months prior to the filing of the petition and took no part in the decision of the filing. The court allows a limited time and avers to Attorney Lugo the impossibility go back to review every single detail as to the process leading to the granting, servicing and reports on the loans. There needs to be a connection to the key elements. The court notes that the alleged debtors stated that they were presenting their case in three days and they can be cutting into their time. It must lean in to the relevant issues, and the court is aware that the alleged debtors requested continuance of the hearing, but the court is not going to force a continuance by hearing testimony which is not directly relevant to the positions taken by the involuntary debtors. Yet, the court will give Attorney Lugo some leeway.

A recess of 15 minutes is granted to Attorney Lugo, to review exhibits and the presentation, to reach the key issues.

Attorney Lugo presents exhibit 84.22. The witness states that the document is an email that he prepared to the bank officers of the Economic Development Bank because they were inquiring about the status of a forbearance agreement that was going to be made at that time and the reasons why it hadn't been closed yet. The forbearance was not signed because the client was requesting some changes to the terms and conditions that were proposed and one bank wanted to change some of the terms on the structure. Attorney Lugo moves to admit the document as evidence, on terms of motive or preliminary statement as to why the company ended as it ended. Attorney Marini objects on relevance to the issue of improper purpose or any of the allegations. The court clarifies that the document is prepared by Mr. Santiago at the request of the Economic Development Bank, that was inquiring about the forbearance agreement. The court allows the attorney to continue questioning the witness. Attorney Lugo asks if one of the reasons that the forbearance was not signed was because the banks were requesting that the restrictions on selling or transferring the notes be released. The witness testifies that one of the reasons that the borrowers were refusing to sign the forbearance was that the banks were amending one of the terms, which put certain conditions on the sale of the notes. He does not remember exactly what the amendment was, he knows that the banks were looking for a clean exit strategy. He explains that a clean exit strategy is when any commercial credit bank manages a distress loan, it is common practice that, if the primary source of repayment which was the operation of the corporations, does not comply, exit strategies are assessed. In this case, there was a term in the current structure that specifically stated that if the bank sold the note, then "x" happened. Commonly, if a borrower is not performing the bank can sell a loan but, in this case, if the bank sold the loan there was a release of certain assets

14

and they try to amend it so that no collateral was released if the sale of the note took place. Attorney Lugo moves for the admission of the document, which is objected by Attorney Marini due to relevance. The court admits the document and states that it will give it the weight it deems appropriate, as Exhibit 84.22.

Mr. Santiago clarifies that he managed the loan until September 2016, but he left the bank in 2017. He declares that every morning, he would call the client and regarding the account they managed, including what were the expected collections during the day. If the collections were enough to cover the overdraft, the bank proceeded to satisfy the overdrafts. All of this was an exception, to continue the operations during 2016.

Mr. Santiago acknowledges that there was a notice of foreclosure of account receivables, he does not remember the exact date, however, it was during 2016. The witness states that some of the recipients of the notices questioned the amounts that were owed. He also states that in agreement with the borrowers, the involuntary debtors could collect the account receivables to be deposited in their accounts and, with those collections, they continued to make the exception to make payroll payments and supplier payments, until some point of September 2016. The witness believes that the determination of stopping all funding of the operations of the involuntary debtors was made by all the syndicate banks. Mr. Santiago does not recall if after September 2016 there were payments to employees, vendors or suppliers. The witness states that he remained as a relationship officer until September 2016, when the first state court complaint was filed. The loan was transferred to the late stage division, within the special loans' division. The loan was assigned to Rosimari León as relationship officer and team leader Linette Bigio. As to the chain of command to which the witness reports or works for, Mr. Santiago explains that there was a financial analyst, Enidseri Gonzalez, that his immediate supervisor was Eric Lopez and Francisco Pericás, and the chain goes up to Eli Sepulveda. The witness states that he did not participate in any discussion, analysis or dealing or assisted in the preparation of the filing of the petitions. Attorney Lugo asks the witness if Betteroads or Betterecycling informed him as to the need of the filing of a bankruptcy petition on behalf of there companies and the witness states that the client mentioned that "over his dead body", in so many words.

Attorney Lugo refers to exhibit 26, which is and email written by the witness on September 9, 2016, sent to the borrowers' legal counsel at the time, and copying Eric Lopez, Francisco Pericás and Jorge L. Diaz. The witness confirms that on that date the bank informed the borrowers that the funds will not be available for the operation. The document is moved in to evidence, which is objected by Attorney Marini due to relevance. Additionally, Attorney Marini states an objection as to the translation of the document, because it refers to "bank receiver" and it should refer to "bank syndicate". The court acknowledges that it is a "bank syndicate" and overrules the objection accepting exhibit 26 into evidence as a communication by Banco Popular of its decision not to approve use of funds deposited at Banco Popular, dated September 9, 2016.

Attorney Lugo refers to exhibit 25. The witness explains that the document is an email from Marisel Rivera, from the corporations, with her projections for the next couple of weeks of the operations, expenses and collections, bases on the day to day management of the account and operations. The email is addressed to the witness, with copy to Jorge L. Diaz, Francisco Pericás, Eric Lopez and Roberto Corretjer. The email is dated September 7, 2016. The email covers the

operations from September 8 until October 7, 2016. Mr. Santiago assumes that this is the petition that was denied on exhibit 26. Attorney Lugo moves for the admission, which is objected by Attorney Marini due to relevance. Exhibit 25 is admitted into evidence.

Attorney Lugo states he has no further questions to the witness.

On cross-examination, Attorney Marini reviews the witness' testimony as to the exit strategy when an asset is in distress and that one of the exit strategies was the potential sale of a loan. The witness states that the potential sale is a general strategy considered in most cases and that it is atypical to have a restriction to sell a loan. Attorney Marini refers the witness to exhibit 26 dated September 9, 2016. The witness states that at the time the communication was sent, the borrowers were not complying with their obligations under the credit agreement and there was a payment default of almost a year, at that time, without paying their facilities along with other services and covenants that were included in the loan agreements.

Attorney Lugo, in redirect examination, reviews the answer of the witness to Attorney Marini's first question and the witness restates that the sale of assets is typical in the case of distressed loans. The witness states that a restriction of the sale of the loans is not typical. He does not recall any other case that includes restrictions to sell of the loans. Mr. Santiago states that when he refers to payment delays, he meant as to interest and principal amounts. He declares that there was no moratorium or release of payments during that period, to his recollection.

Attorney Lugo addresses "housekeeping matters". He informs that the deposition to the corporate representative of Sargeant Trading and Sargeant Marine is confirmed for next Tuesday and the deposition for Mr. Francisco Pascual was confirmed with both attorneys for July 9 at 2:00 P.M. Attorney Lugo requests a recess, as he has no other witnesses ready for the day. The court clarifies the witnesses left, which are: Mr. Luis Diaz Irizarry, corporate representative for the two involuntary debtors, Mr. Francisco Pericás, from Banco Popular and Ms. Marisel Rivera finance manager who worked for the alleged debtors. The Attorney will start with Mr. Francisco Pericás, continue with Ms. Marisel Rivera and finish with Mr. Diaz. Attorney Marini states that Mr. Diaz is present in the courthouse and can be called to testify. Attorney Lugo informs that he has not prepared the witness and does not have the exhibits to proceed with the witness. The court continues the hearing to July 15, 2019, at 9:30 am.

Attorney Betancourt addresses the court to state an objection on the record as to the court's ruling of the applicability of Rule 26, as per Federal Rule of Bankruptcy Proceeding 9014. Attorney Betancourt states that the applicable Rule is 1018, which states the applicability of Rule 26. Attorney Marini states that the argument had already been raised and if they are going to move for reconsideration they should put in writing. Attorney Betancourt clarifies that they want to preserve the objection in the record. The court clarifies that when it ruled upon the application of Rule 26, there was no mention of Rule 1018 and candidly admits that it did not consider it when it made the decision in the morning. The court states that, if the alleged debtors want to move for reconsideration on the ruling, it must be made in writing allowing time for an opposition by the lenders. The court qualifies that the reconsideration must take into consideration the status of the case right now, the agreements for the taking of the depositions and the balancing required of an expedited resolution as required by Rule 1013.

Attorney Marini argues that Rule 1018 provides that "except as otherwise prescribed in Part I of these rules, the following rules in Part VII apply to all proceedings contesting an involuntary petition". He states that the hint is in "except as otherwise prescribed" considering that Rule 1017(f) states that Rule 9014 governs a proceeding to dismiss or suspend a case. So first, Rule 1018 provides a caveat: "except as otherwise prescribed in Part I of these rules", and rule 1017(f) prescribes that Rule 9014 applies in proceedings to dismiss or suspend a case. Attorney Marini refers to the In Re Reyes Colon, 2008 WL 8664716 decision from the First Circuit Bankruptcy Appellate Panel where the court stated, "bankruptcy rule 1017 applies in the context of a motion to dismiss an involuntary petition". Attorney Marini also quotes from the decision in In Re Brown 21 B.R. 701 at page 703 a decision from the Bankruptcy Appellate Panel on 1982, where the court applied Rule 9014 to a Motion to Dismiss an involuntary bankruptcy petition. He also refers to In Re Lever Development LLC, 2012 WL 5053441, decision from the Bankruptcy Court of Massachusetts where the court, in the context of a motion to dismiss a petition filed by the alleged debtors ruled that 9014(c) applied. Attorney Marini also refers to a decision of Judge Brian Tester In Re Pipeliners 2014 WL 2467578 where the court determined that a motion to dismiss an involuntary petition was a contested matter. All the decisions are from courts of the First Circuit and have held that Rule 1017 applies in the context of a motion to dismiss. The attorney further state that the record is clear, and the parties filed discovery schedules, Docket no. 325, Docket no. 80, the record has been clear that they are moving in an expedited matter and if they wanted to articulate that other rules apply, they should've done so in their motions to suppress evidence. Attorney Marini states that nowhere in their papers they cite Rule 1018 and states that the argument (1) has been waved and (2) is not based in any case law or in any foundation for the court to reconsider. Attorney Marini requests the court not to delay the matter and no further motion need be filed as there is no basis on law to reconsider the court's ruling and that Rule 1018 doesn't apply and 9014 governs this contested matter.

Attorney Betancourt reinstates that he consigns the objection on the record, considering the schedule that has been agreed by the parties for the upcoming hearings, they will comply with the scheduling but they believe that regardless if 9014 applies, it may have to be read together with 1018 and they reserve the right to reconsider if that is proper, but that this are interlocutory determinations and, considering the upcoming hearings they will move forward, preserving their rights as to the objection. The court states that considering the oral reply by the petitioning lenders, and in reading rule 1017(f)(1), it specifically states that rule 9014 governs a proceeding to dismiss or convert a case except under section 706(a), 1112(a), 1208(a) or (b), or 1307(a) or (b) and none of those sections are the ones applicable in this case. For those reasons, the oral request for reconsideration is denied by the court.

Attorney Ruiz Olmo, on behalf of Puerto Rico Asphalt states for the record that this morning she addressed Rule 1018 and that the court determined that Puerto Rico Asphalt has no standing. The court sates that it may have not heard the allegation clearly but that the ruling as to standing stands.

The court recesses and will reconvene On July 15, 2019.

**Minute Entry**

*Hearing Information:*

Debtors: Betteroads Asphalt, LLC. (17-04156) and Betterecycling Corporation (17-04157)

Date/Time/Room: 07/15/2019/09:57:06 am
Bankruptcy Judge: Enrique S. Lamoutte
Deputy Clerk: Darhma Zayas/ Dennis Rodriguez
Reporter/ECR: Graciela Muñiz

*Matters:*

Evidentiary hearing on the alleged debtor's motion to dismiss on the grounds of bad faith.

*Appearances:*

Wigberto Lugo Mender, on behalf of the alleged debtors
Luis Marini and Carolina Velaz, on behalf of Banco Popular, Banco Santander, Firstbank and Banco de Desarrollo Económico
Rafael Gonzalez Valiente, on behalf of Firstbank as an individual creditor separate from the syndicated loans
Sonia Colon, on behalf of Sargeant Marine Inc. and Sargeant Trading LTD
Jordi Guso, co-counsel on behalf of Sargeant Marine Inc. and Sargeant Trading LTD
Myrna Ruiz Olmos, on behalf of Puerto Rico Asphalt as party in interest
Alexis Fuentes Hernandez, on behalf of unsecured petitioning creditors
Alexis Betancourt, joining Mr. Lugo Mender, attorneys for the alleged debtors

*Proceedings:*

The court addresses two matters. First, due to the special and critical moment Puerto Rico is facing, there are public manifestations in Old San Juan where the court is located. The court acknowledges that a message was sent informing that the court would be closed but arrangements were made to continue with the scheduled hearing. The hearing will continue in Old San Juan if it is secure to do so. However, the U.S. District Court made available the Hato Rey courthouse, in case the venue needs rearrangement due to the public manifestations.

Second, the reason the court began a little late is because a motion was filed on Sunday in which the alleged debtors inform the court of certain facts and notify the court that USIC is the bonding company of the alleged debtors, which could present an issue for the court. The alleged debtors are not requesting the recusal of the Judge. However, the court advances that the Judge recuses himself from any contested matter related with USIC and, to the extent the contested matter is critical to the case, Judge Lamoutte recuses himself from the case. Back in May 2018, the Judge recused from a related proceeding, 18-00054, because USIC was directly related to the adversary proceeding. Judge Lamoutte states that the recusal hinges in how and to what extent will USIC be affected favorably or adversely by a holding of the court that the petitions should not be dismissed

1

on the grounds of bad faith. The Judge notes that this issue should be addressed as promptly as possible and, therefore, allow the parties to state their arguments.

Attorney Lugo states that, while preparing for the case and going over the lists of projects pending and the receivables foreclosed, collected or transferred by Banco Popular de Puerto Rico, he identified two instances in which USIC's participation may be important, on one side or the other. The documents regarding one contract were included in the motion to explain how the contract ended up elsewhere although it did not constitute an illegal transfer. The participation of USIC relates to the bonding of the projects and the possibility of being the entity responsible, in the event of default, to cover the projects. This hinges directly on the part of the transfers, if the transfers are considered as part of the grounds to enter the order of relief, based on the allegations of the lenders. Attorney Lugo states that this also has to do with the right to the receivables, who is entitled to the funds and why the lender filed the petition instead of continuing proceedings in state court. USIC is not part of the bankruptcy, it has not filed a proof of claim, but the alleged debtors have the default letters notifying the defaulted amounts and that is part of the evidence to be submitted today.

The Judge clarifies that the principal owners of USIC are his first cousins and that he will not entertain any contested action having a direct relation with USIC and he will avoid any appearance of impropriety, which is important for the court. But the Judge also has a responsibility to dispose of the cases assigned to him and cannot recuse just for convenience. That is why it is important for the court to determine how will USIC be adversely or favorably affected regarding, at this juncture, the pending motion to dismiss. Attorney Lugo clarifies that the alleged debtors didn't request the recusal as they don't have grounds for it but that those are the facts in terms of the evidence, which establishes the relations between the companies and the banks, and what will be the claims in favor or against USIC be, regarding the involuntary petition. Attorney Lugo states that, in the event the orders for relief are entered, USIC may become a part of the involuntary proceedings as a creditor, being the bonding company of the involuntary debtors.

Attorney Marini argues that the allegations made in the Motion to Inform are not relevant to the matters pending and are an attempt to delay the resolution of the case. The parties submitted pretrial reports where their respective allegations were included, and the word USIC is not mentioned anywhere in the alleged debtors' Pretrial Report and was just brought up yesterday. Additionally, the alleged debtors announced their witnesses during the last hearing and USIC was not announced as a witness. If there are any issues related to the propriety of transfers and whether they are avoidable or not, it will not be an issue to determine in this hearing. If the court enters an order for relief, and if the court determines that the petition was filed in good faith, then during avoidance actions, the issue of USIC may become relevant.

Attorney Lugo clarifies that the matter of "transfers" as a reason or valid foundation to file the involuntary petitions has been brought several times. When the attorney reviewed the expert report of the lenders, which was submitted after the alleged debtors submitted their preliminary Pretrial Report, he finally understood what the lenders are after, in terms of the allegations. Additionally, USIC is the bonding company for all the projects dealt with during the relevant timeframe, and Mr. Jorge Luis Diaz will testify to that effect. He explains that a rebuttal witness from USIC may

need to be called, depending on the testimony of Mr. Francisco Pericás. The parties are going to talk about transfers one way or the other. Mr. Diaz will testify as to which projects are not bonded.

The court states that it will not need to decide as to the alleged transfers at this juncture. Attorney Lugo argues that, depending on the evidence presented, the court may need to decide on the effect of the transfers on the filing of these petitions. He states that the rights of each party will hinge in a determination of correctness in the decision made by USIC to assign the contracts to third parties, which will go against the allegations of the lenders that the transfers were incorrect.

The court inquires if Attorney Lugo is stating that USIC transferred the bonding contracts to another party. Attorney Lugo replies that construction contracts can be transferred and that USIC is in the process of transferring the bond to another party and such transfers are being called illegal transfers by the lenders because Puerto Rico Asphalt is the company that is going to complete the project in agreement with USIC. As to the project PR15, the exit plan has been arranged by USIC and Puerto Rico Asphalt in order to have the project transferred to Puerto Rico Asphalt for it to complete the project on the same terms and conditions, to avoid a default. That will be Mr. Diaz's testimony regarding what happened to the PR15 project. Attorney Lugo states that if Banco Popular goes back to the Bayamón Superior Court, they will be facing USIC's claims, in addition to the alleged debtors' claims, regarding the contracts that the lenders alleged were transferred or that they foreclosed back in June 2016. Attorney Lugo argues that the reason it is necessary to determine if USIC's participation will have any effect in this case is that one of the main reasons they are here today is because Banco Popular does not want to hear the cases in the Bayamón Court. They want to close the companies, have a Trustee appointed and dispose of the assets through a carveout agreement, such as the agreements with the small petitioning creditors.

Attorney Marini responds, stating that with the intent to keep delaying the hearing, the alleged debtors keep changing the story. The alleged debtors state that they now understood that the lenders filed the petition for the alleged transfers. However, since the filing of the Motion to Appoint a Trustee the lenders stated that they filed the involuntary petition to avoid the depletion of assets and detailed several transfers. Since then, the lenders have submitted throughout the case information of the transfers known, and the ones discovered during the process. Attorney Marini further states that this is not a trial on an avoidance action, or to determine whether transfers are avoidable or made in violation of the Bankruptcy Code, the issue now is if the petition was filed in good faith or bad faith. Whether USIC has defenses to the alleged transfers, or the alleged debtors have defenses to the alleged transfers, is a matter to be decided later when the court enters an order for relief and avoidance actions are filed. However, the matter before the court now is the reasons why lenders filed, and USIC is irrelevant to this decision and the alleged debtors so recognize it when they did not list USIC in their pretrial nor listed it as a witness, nor included any evidence related to USIC in the pretrial. They did that yesterday to delay the resolution of the case. Attorney Marini requests the court to deny the alleged debtors petition.

Attorney Lugo clarifies that, although the question of depletion of assets has been around since the inception of these cases, to an asset to be depleted the court must first determine if it is an asset or a liability, and that this PR15 contract is an example of that contested issue. In order to determine if assets are being depleted, first it must be determined what the assets are, and then, that the assets were transferred. Attorney Lugo states that this a totality of the circumstances test. The court must

determine several factors to conclude if there are grounds for dismissal or not. The alleged debtors are advancing that the issue of the transfers, as alleged, hinges on whether the funds are of the debtors, the banks or of USIC. Attorney Marin reinstates his position and requests to continue the hearing.

Attorney Gonzalez clarifies that there is no allegation from the banks that the alleged debtors transferred illegally any projects to USIC. He states that the alleged debtors are arguing that USIC sent letters of default as a bonding company, which it has the right to do, and that, as a bonding company, it can ask another company to finish the project. It is not a transfer of the project, it is a hiring of a third party to do a project that the debtor did not finish. It has nothing to do with illegal transfers, it has to do with the default of the debtor, and this does not affect or is affected by the allegations of improper transfer of projects, and it is irrelevant at this juncture.

The court acknowledges that the parties have different perspectives of the role of USIC at this stage of the proceedings. One thing is clear, the Judge will not entertain any action in which USIC is a party or may be adversely affected. In any contested matter, as stated in the order on the adversary proceeding, if the contested matter is relevant or key to the disposition of a case in chief, the judge will recuse himself. However, the court is concerned on timing and ethical issues. These cases where filed in June 2017, over two years ago. At least, one year ago in the Adv. Proc. 18-54 the court entered an order recusing itself from the adversary proceeding due to the intervention of USIC and the relevance of USIC to the proceeding. As a matter of ethical responsibility if there are grounds to recuse, the Judge will do it, not only if there is an actual conflict but to avoid the appearance of impropriety. But the fact that this issue is presented to the court after two years, after substantial litigation and discovery, concerns the court in regards of the delay of the proceedings. The Judge has the ethical responsibility and integrity to recuse himself but also has the responsibility to dispose of the cases that are assigned to him. In involuntary petitions the court must balance the discovery and other matters with the statutory requirement of an expedited resolution. Two years have gone by. Although the court has reviewed certain documents attached to the motion, which are signed by the individuals that may warrant the judge to recuse itself, the court still does not now what USIC's role is as to the contested matter, which is whether the petition should be dismissed on the grounds of bad faith. The court already entered an order that states that the petitioning creditors complied with the statutory provisions, but the court included a requirement that the petition must be filed in good faith, and therefore, dismissal may be warranted before entering the order for relief. The court is not clear as to the role of USIC in relation to the motion to dismiss. If the court hears testimonial evidence that shows that USIC has such a direct relation with the pending issue before the court that warrants the recusal of the judge, the court will do so. At this time, the judge is not recusing but after hearing the evidence, he may.

Attorney Lugo informs that today Mr. Jorge Luis Diaz will testify and standby is Ms. Marisel Rivera, witnesses of the alleged debtors. For Wednesday, they have scheduled the testimony of Mr. Francisco Pericás from Banco Popular. There were two pending depositions. The deposition of Francisco Pascual was completed last Tuesday, and the transcript was received on Saturday. It will be sent by electronic mail to both attorneys for Firstbank and the alleged debtors intend to settle some testimony with the lenders. Attorney Lugo states that, after hearing the position of Firstbank, evidence should go into the record in terms of their motivation, not only as participant of the syndicate lenders, but as to the separate loan or credit facility. As to the deposition to Mr.

Ginter of Sargeant Marine and Sargeant Trading, the deposition took place in July 2, 2019. The transcript of the deposition was sent to Sargeant and comments to the deposition were received on Friday, but Attorney Lugo hasn't been able to review the comments. He expects to agree with the attorney as to a statement or proffer about the witness's testimony to submit it to the court. The testimony is important to support the case. If the parties do not agree on a proffer, they will request to call the witness within the timeframe allowed by the court. Attorney Lugo requests authorization to present the expert witness the last day scheduled by the court, which will be July 24, 2019.

Attorney Marini states that he was just notified in the morning of Attorney Lugo's request to call Mr. Francisco Pascual and Mr. Ginter and clarifies that the persons were not named as witnesses at the hearing that concluded last week. Additionally, the alleged debtors didn't notify, after the deposition, the intention of using Mr. Pascual as a witness. Attorney Marini states that he will do his best, but he hasn't even checked if the witness is available. Finally, Attorney Marini claims that the alleged debtors are talking about additional days to schedule witness testimony but that was not what the parties agreed to. The parties had agreed to three days for the presentation of the alleged debtors' evidence and then the lenders would present their evidence. The case in chief cannot be scheduled after a rebuttal. Additionally, the alleged debtors have not presented an expert report. Attorney Marini states that he will make his best effort to make Firstbank available but objects to the effort to continue to take all the days of trial, without allowing the lenders to have time to present their case.

Attorney Guso states that they delivered the errata sheet to the alleged debtors last Friday. Mr. Ginter has not been subpoenaed for trial. They will endeavor to work through a stipulation with Attorney Lugo tomorrow, but preserve their objection to the calling of Mr. Ginter as a witness.

Mr. Gonzalez joins Attorney Marini's objection to calling Mr. Pascual at this time, as he was not announced. He states that the court repeatedly ask the alleged debtors who the witnesses were going to be, and Mr. Pascual was not mentioned. Additionally, Attorney Gonzalez states that if the alleged debtors are going to have an expert witness it should be presented when they finish their evidence and not after the petitioning creditors present their part of the case. He states that it is not the lenders fault that the alleged debtors are not ready, they new of the hearing for months and have no reason to delay their expert report.

The court states that it has tried to accommodate the needs and schedules of the parties, to the extent possible, and acknowledges the propositions of the parties that they have been working on the issues. However, when it came to the evidentiary hearing, there was not a clear agreement, so the court scheduled the hearing based on its calendar as it is inherent to its responsibility. The court understood that the involuntary debtors needed three days to conclude the presentation of the evidence and three days to petitioning creditors to contest. It was not clear to the court, and still may not be so clear, as to what is the evidence that he alleged debtors will be presenting. Therefore, the court will hold the parties to the schedule and will continue with the hearing presenting evidence that the petitions were filed in bad faith.

Attorney Lugo calls Mr. Jorge Luis Diaz. Mr. Diaz is sworn in. The full name of the witness is Jorge Luis Diaz Irizarry. He is the President of Betteroads and Betterecycling. Betteroads was founded by his father in 1946 and manufactured pavement asphalt. Since 1946 the business was

5

an asphalt pavement manufacturing plant. Then, in 1983, they bought the Guayanilla terminal. The terminal included tanks to hold different type of liquids. When the terminal was owned by PPG, it held chemicals. The tanks were modified to hold liquid asphalt. At that time, there was a monopoly of liquid asphalt control by PLACO, which was a Shell subsidiary. Since 1983, Betteroads Asphalt company expanded and increased its production thanks to the acquisition of the Guayanilla terminal, which allowed them to bring its own liquid asphalt at a much lower cost that the PLACO price. The company grew and, at this moment, it has 11 asphalt plants and the Guayanilla terminal.

The witness testifies that when he brought the idea of recycling asphalt, they created Betterecycling. The company began recycling asphalt based on specifications of the Federal Highway. Since 1997, Betterecycling, a subsidiary of Betteroads, started to produce recycled asphalt.

Mr. Diaz testifies that his father, Arturo Diaz Marquez and his mother, Judith Irizarry Morales, were the stockholders of Betteroads Asphalt. Since, 2012, the estate of his parents is the stockholder which is controlled by an Executor.

He explains that he is here today because the consortium formed by Banco Popular, Firstbank, Banco Santander and the Economic Development Bank filed an involuntary bankruptcy of their companies in bad faith. He states that in 2012, a financing was done with the consortium. After that, his parents died and he came to control the operation of the companies. Since the 2012 financing, officers of Banco Popular insisted and tried to convince his father to sell the Guayanilla terminal to PUMA. PUMA was originally in the filing of the involuntary petition, and when his attorneys requested the information of the stocks and the stockholders, they withdrew. Attorney Marini moves to strike the testimony as hearsay and for lack of personal knowledge. The objection was overruled by the court.

In year 2013, although the alleged debtors were up to date in the payment of principal and interests of the loans, Popular made an approach again to make some changes to the loans, which were made. Then on year 2014, they signed an additional restructuring document, again, wanting to force them to sell the terminal, to reduce the number of plants operating, and to close the operation of several plants. Attorney Marini requests to strike the testimony as hearsay and for lack of personal knowledge. The objection was overruled.

The witness states that they held many meetings with the bank, and that there are emails, correspondence, documents where the banks, not only requested them to do what he stated before, but that they included something that they had verbally agreed upon with Don Arturo. This agreement was to name a financial advisor to be in the company and paid by the company, but who reported to the banks and would be the liaison to provide information and keep the banks informed of what was happening in Betteroads. The name of that person was Amilcar Jordan. On March 2012, the financing was signed, and Amilcar Jordán came to the company at that same time. He was an ex-employee of Banco Popular and he was chosen by the lenders. Eventually, Mr. Jordan left to work for Triple S, but he brought Luis Abreu as a substitute, which continued in the position until 2016. This is officially documented in the 2014 agreement.

Attorney Lugo shows the witness exhibit number 1. The witness states that this is the contract, negotiated since 2011, and signed on March 2012. He states that on section 9.11 of the contract "Assignment or Participation of Loans" there is a limitation to sell participations of the contract except to institutions described in the document, which worked in conjunction with a pledge agreement of the stocks of the company. The documents were signed concurrently. This was signed by his father, Banco Popular, the consortium of Popular, Firstbank, Santander and the Development Bank. Attorney Lugo requests the document to be admitted into evidence. The document is admitted as exhibit 1.

Attorney Lugo provides exhibit 2 to the witness. The witness states that the documents were signed at the same time in the offices of the O'Neill & Borges law firm. The document was signed by Arturo Diaz, Banco Popular represented by Jorge Aldarondo, and in representation of the consortium. The witness reads section 23 of the document, which conditions the transfer of the loans. The document is admitted as exhibit 2.

The witness declares that in 2014 there was a restructuring, the contract was renewed, and some parts were modified. Attorney Lugo shows the witness exhibit 5. The witness confirms that the document is the 2014 agreement and that he signed the document. The document is titled "Amended and Restated Agreement". He testifies that there were several changes, one was the financial assistant mentioned before. Section 9.11 of the previous contract was not modified. On this document, the bank requested the sale of the Guayanilla terminal. Attorney Lugo references section 5.20 "Sale of Guayanilla Property". In this document, the alleged debtors were required to sell the Guayanilla property on or before February 28, 2015. The witness refers to section 5.21 "sale of airplane and helicopter". He explains that his father had bought a jet and a helicopter. Both, the airplane and the helicopter were sold. The document is admitted as the alleged debtor's exhibit 5.

Attorney Lugo shows the witness exhibit 6. The debtor identifies the document as the "Amended and Restated Ratification of Stock Pledge and Security Agreement" and states that section 23 remained the same. The document is admitted as exhibit 6.

Attorney Lugo presents to the witness exhibits 40 and 41, which are the involuntary petitions for Betteroads and Betterecycling, respectively. The witness is asked to identify which parties of the involuntary filing relate to the documents previously reviewed. He enumerates the following: Banco Santander, Firstbank, the Economic Development Bank and Banco Popular. The documents are admitted as evidence.

Mr. Diaz states that during 2015 to 2016, Puerto Rico went through its lowest in relation to asphalt sales, and it sold less than $0.50 of the $1.00 that it usually sold. The market was less than half of what it had ever been during the history of Puerto Rico. He explains how the asphalt market behaves: its highest point is on election year, or the point of more sales, and its lowest point the year after elections. Then it starts to increase the second year, the third, and again, on election year to its highest point. It is a cycle and it has been like that for 70 years. When the sales decreased, although the company continued to pay the loan, principal and interests, they started to receive pressure, specifically from Banco Popular, which is the leading bank of the consortium. He testifies that the pressures came in different ways. When the company had funds that had not yet cleared,

the bank began to deny them the ability to make checks and make payments, although the funds were in the bank. He states that there is a document, in the discovery documents, from a bank official which states that this should be done to put pressure on them, so that Betteroads would do what they wanted it to do. Attorney Marini requires the testimony to be stricken for hearsay and the objection is overruled.

Attorney Lugo requests exhibit 9 to be shown to the witness. Attorney Marini poses an objection to the document, as it is an email exchange between officials of Banco Popular, whom are not testifying today, therefore, it constitutes hearsay and because it is in Spanish. Attorney Lugo replies stating that the email was provided by counselor during discovery and, to that extent, the document is authentic. The court states that, assuming that relevance and authenticity are stablished, the court may accept it, subject to be translated within ten (10) days. Attorney Marini clarifies that his objection is not about authenticity, it is as to relevance, and because it contains statements of bank officers that are not present in court. Attorney Lugo clarifies that it may be considered as an admission of the party.

The witness testifies that he has seen the document before as part of the discovery proceedings. He explains that it is an email from Francisco Pericás Alfaro to Eli Sepulveda. Explaining his relationship with Mr. Pericás, the witness states that José Santiago Ramos was the day to day liaison, whose bosses were Pericás and Eric López, and Eli Sepulveda was the boss of all of them. The email came from Jorge Aldarondo Pérez and is copying Francisco Pericás Alfaro, Eric López and Eli Sepulveda. He reads "yesterday afternoon the operations manager of Puma Americas called to inform that they will be suing Betteroads for collection, with respect to some material owed. He wanted us to be informed." Elí Sepulveda responded: "Betteroads is a case full of contradictory stories. Gogo [the witness, called by his nickname] alleges that he owes Puma money, a little over a million, but that they are in conversations for a claim they have against them. Puma and Betteroads had a meeting to allegedly talk about an agreement for storage and distribution. Now Puma informs them of a possible complaint. Let's meet with Gogo as soon as possible". Attorney Marini objects for the reading of a document which is not in evidence. The court sustains the objection. Mr. Diaz declares that the document confirms in writing that instructions are given between officials Francisco Pericás and Eli Sepulveda to start to seek alternatives, for him to feel the pressure. Attorney Lugo requests the admission of the document, which is objected by Attorney Marini for relevance. Attorney Marini further states that the document was prepared two years prior to the filing of the involuntary petition and that it does not support the witness's allegation. The court overrules the objection and states that it will give the document the weigh it deems appropriate. Exhibit 9 is admitted.

Mr. Diaz testifies that during late 2015, the company requested an extension, and the extension was approved subject to the signing of a forbearance agreement. In that forbearance agreement, the lenders attempted to change section 9.11 to be able to sell the assets of the company to whomever the banks decided to, without the authorization or consultation of the involuntary debtors. Attorney Marini objects the testimony for lack of foundation and personal knowledge. The court overrules the objection. The witness states that the fact that they had a debt with Sargeant Marine and that they were making partial payments was known to the banks. He states that the banks, through Luis Abreu, after reviewing what Marisel Rivera, the comptroller, requested, decided which checks could be paid and which couldn't. When they decided to continue partial

payments to Sargeant Marine, it was not approved by the banks. Mr. Diaz testifies that on June 2016, the bank decided to close the line of credit and justified the decision by stating that they didn't knew Sargeant Marine had sued due to the pending balance, which he alleges was not true. They also foreclosed on the account receivables, for $49 million. Attorney Marini moves to strike the testimony based on hearsay and speculation. He states that if there are written documents related to the allegations, then they should be presented. The objection is overruled.

Attorney Lugo shows the witness exhibit no. 14 and requests the witness to review it. Attorney Marini objects as to relevance and hearsay. The court holds the objection in abeyance pending the submittal by counsel of alleged debtors. The witness states that the document was sent to him by Mr. José Santiago Ramos and it is an "Indicative Term Sheet", beginning in the page that reads at the bottom "BPPR2_0002996". The document was sent to him on May 11, 2016, before the foreclosure of the account receivables. He states that this was another attempt to change the 2014 original financing by changing section 9.11, that allowed them to sell the loans. The witness references page 8, where it states, "Assignments and Participations". He states that the document was not signed considering that the banks were attempting to modify the terms, to be able to sell the assets of the corporation without their authorization or consultation. Attorney Lugo requests the document to be admitted into evidence. Attorney Marini objects as to relevance. The court overrules the objection. The document is admitted as exhibit 14.

Mr. Diaz testifies that the accounts were foreclosed on June 2016. During 2016 the banks sent the alleged debtors different versions of the forbearance. Then, every month the bank provided the alleged debtors a letter, allowing them to collect, but they would approve and control what would be paid. From August 31, 2016, since they haven't managed to change the clause, they decided to close the company's operation. They also debited money from the marginal account, on which only Banco Popular was authorized to withdraw. Attorney Marini objects to the testimony on grounds of hearsay and lack of foundation. The objection was overruled.

The witness is shown admitted exhibits no., 25 and 26. The witness states that he was copied on the emails. As to exhibit 25, Mr. Diaz describes the parties in the email and explains that it was the budget for September 8 to October 7, including collections in hand. He states that Marisel Rivera wrote the communication including the budget of payments necessary for the operation. It also included the list of the collections received in the last few days that were going to be delivered to the bank and not yet reported in the marginal account. He describes the columns included in the email. He states that this was sent after the bank had closed the company and curtailed the funds. Referencing exhibit 26, he explains that it is an email from José Santiago Ramos to Roberto Corretjer stating that the receiver had decided to maintain its position not to approve the utilization of funds for payment of Betteroads and Betterecycling expenses. Mr. Diaz testifies that no monies were advanced or transferred to the accounts of Betteroads and Betterecycling. After the denial of the funds, a situation of crisis began because all the contracts were bonded by USIC. Mr. Diaz needed to solve all the contracts that had a USIC bond in order to find someone to perform, because USIC was going to claim any cost and they will have to disburse the amounts. He testifies that the employees remained working for two weeks without getting paid, waiting for an agreement with the bank, to continue working. There was no opportunity to reach an agreement, and the employees had to be terminated. He states that 300 mothers and fathers of families were out of the street without warning and that the alleged debtors didn't had the money to pay vacation leave, the

ASUME payments, 401K, social security, income tax, and all other debt for the employees. He states that the companies were left without any employees. Mr. Diaz testifies that, while this happened, the receivables continued to be deposited in the marginal account, and Banco Popular withdrew them and kept the account at zero.

Exhibit no. 27 is shown to the witness. Mr. Diaz recognizes the document. The documents were prepared by Marisel Rivera and discussed with the witness and reflects a list of $1,789,362.59, which was the amount withdrawn by Banco Popular from the marginal account along with additional deposits received after, amounting to $1.9 million withdrawn from the marginal account. There is also a copy of the Banco Popular's statements, which reflect the withdrawals from the marginal account. Mr. Diaz was never informed how they distributed the funds. The accounts were closed, and they had no internet access to the accounts, and the bank never provided further information. The court admits the document into evidence, overruling Attorney Marini's objection based on relevance.

The court recesses until 2:00 P.M.

Mr. Diaz explains what happened with the contracts after the closing of the company. When the companies were closed, they didn't have any money to execute the contracts. Therefore, at that moment, the contracts went into default.

Attorney Lugo presents Exhibit 157 to the witness. Mr. Diaz states that the document is a "work on hand" as of September 2016, a list of the contracts with the municipalities. Marisel Rivera prepared the document and it was prepared at the time of the closing to know what was pending. Attorney Lugo requests the document to be admitted into evidence, and Attorney Marini objects based on relevance and stating that the document was filed yesterday afternoon and that there is no reason that justifies not filing the document with the Pretrial on June 20th, as it was a document prepared by the alleged debtors. Attorney Lugo states that the document was produced a long time ago, as part of the transcript of the deposition of Linette Biggio, although it was filed yesterday with the court. He states that it has been available to the other party a long time ago. As to the objection of relevance, Attorney Lugo states that the arguments of the lenders refer to the depletion of assets. The attorney states that these are the assets that were allegedly depleted. Within the assets allegedly depleted, there are contracts. Therefore, their intention is to describe what are those assets and what happened to them in order to scrutinize the petitioning creditors' foundation to file the involuntary petitions.

Attorney Marini replies and states that the fact that the attorney stated that the document was available since May as part of the deposition transcript sustains the position that there is no reason for not presenting the document by June 20th. Attorney Lugo states that they were still in discovery after the pretrial was filed and that the documents were not filed by inadvertence, but the document does not come as a surprise nor is new to the lenders. Attorney Marini alleges that these are not documents related to the depositions or the remaining discovery, the document was produced by the alleged debtors and should've been filed with the Pretrial.

The court clarifies that a few weeks ago the parties met in Chambers. The purpose of the meeting was for the parties to provide the court an idea of what was the evidence to be presented in the

evidentiary hearing scheduled to determine whether the involuntary petitions were filed in bad faith. At the meeting, and later at the initial hearing, the court asked the alleged debtors to identify with specificity and clarity what were the grounds that led the involuntary debtors to move for the dismissal on the ground of bad faith. The court asks: why present the list of contracts that were pending when the corporations were closed? An issue that the corporations were closed or remained operating was not something clearly alleged as a ground or defense for the filing of the motions. Why bring them now, stressing the point that USIC was the bonding company for those contracts? The court goes back to the beginning of the hearing, when it stated that if USIC is a party to the contested matter, the Judge will not hear the contested matter and if USIC is relevant to the outcome of the case, the Judge will recuse himself from the case. The court stated that it will make the decision after it heard the evidence. The basic question is how USIC will be affected by the court determining whether the petition was filed in bad faith or in good faith, particularly when the informative motion was filed yesterday, Sunday, and on Friday the court denied a Motion for Stay Pending Appeal in another action. The timing and the stress on the factor are relevant but it does not do away with the court's responsibility. Therefore, the court aims to be sure as to what is the intent of presenting the evidence, if it is within the scope of the hearing, or whether the alleged debtors are expanding the scope to ultimately move the Judge to recuse himself.

Attorney Lugo clarifies that the exhibit was included in the Pretrial Report as exhibit 101 (docket no. 420-18) which addresses the issue as to timeliness. The court states that it has read exhibit 101, which summarizes a list of the municipalities as of September 2016 or at the time that operations were allegedly closed. The document is part of the documents included in Docket 420 filed on June 22, 2019 and should be considered in relation to the Pretrial Report filed at docket 414. The court asks Attorney Lugo were in docket 414 is exhibit 101 referred to and for what purpose. The court clarifies that the exhibit is a list of contracts and has no mention of USIC. The court rephrases the question. Which proposed finding in the Pretrial Report refers to exhibit 101?

Attorney Lugo states candidly that at the time of the meeting in Chambers there were several motions pending regarding additional discovery and additional work that would be performed. As to that matters, the court ruled after the meeting. The plan and answers, specifically on the time allotted for purposes of presenting evidence, rested in a good part in the work of an expert, which was retained and announced on time and which purpose was to deal with the issues of the transfers. To Attorney Lugo's regret, all the issues about timing have backfired against the alleged debtors. The allegations of the banks on all the depositions undertaken is centered in the depletion of assets. None of the deponents knew which were the contracts, the projects or what happened with the assets of the companies whose principal asset is, precisely the "work on hand", including the recent deposition of Mr. Ginter. To the extent that the attorney is unable to use an expert witness who was supposed to deal with these technical issues, and to the extent they were unable to comply with the court's order, to file a Join Pretrial Report in which all the discovery issues would've been solved, the alleged debtors are dealing now with an incomplete pretrial report which has been supplemented with additional discovery. The attorney clarifies that this is his witness to present the alleged debtors' case in chief, in terms of what, if anything happened, with these transfers. Attorney Lugo states that he reviewed this evidence precisely preparing for Mr. Diaz's testimony. However, this is not a change in scope, it is a matter of how the case is being presented. As to the transfer of assets, the attorney states that he learned the allegations of the petitioning creditors through their expert report, which was filed on the 20th. He asked for a deposition of the expert,

and by email, the petitioning creditors stated that their expert is a rebuttal witness and that the alleged debtors needed to produce their witness first. The attorney clarifies he has no other way to proof that there are no transfers as alleged, which is the reason why the bankruptcy petition was filed. As to USIC, Attorney Lugo states that he realized the relationship with the contracts in preparation to Mr. Diaz's testimony, when he was shown the contracts and recalled the adversary of San Sebastian and the judge's recusal. He went over the contracts in order to prepare to demonstrate that the contracts, which were assets, are now liabilities because the contracts entered to default. Attorney Lugo states that whether USIC will have a responsibility is not a matter that may need to be solved today because there is no claim filed nor an order for relief have been entered.

Attorney Marini states that the timeframe works the same for all parties, that this process was the result of consented discovery plans and that the debtors' lack of diligence in preparing their case is no excuse for bending the rules or ignoring the court's orders. Attorney Marini replies to Mr. Lugo's mention that the alleged debtors suddenly now understand what the transfers are, and state that they don't need the petitioning creditors' expert to acknowledge what the transfers are as they are the ones that made the transfers. The petitioning creditors have put throughout the case and in multiple pleadings the transfers discovered to date. Attorney Marini further states that the alleged debtors' statement that the evidence was not available is misleading, they had the evidence available and chose not to include it in the pretrial. The inclusion of USIC as a bonding company was not relevant when they filed the pretrial and they are making it relevant now as an attempt to delay the case. Exhibit 101 is not referenced in the pretrial report and the debtors' pretrial doesn't mention the word USIC. Attorney Marini states that this exhibit along with all the exhibits submitted yesterday should be excluded.

The court asks, once more, what is the relevance of the list of contracts as of September 2016 for determining whether this case was filed in bad faith. Attorney Lugo states that there have been allegations of transfers. The court asks if the projects were transferred. Attorney Lugo affirms that the projects were transferred as the company was unable and defaulted on all these projects. The purpose of the testimony of Mr. Diaz will be what was transferred and why. The court orders Attorney Lugo to continue the examination. Attorney Marini renews its objection as to the exhibit based on relevance. The court admits exhibit 101 as a list of contracts with municipalities and ACT pending as of September 2016.

Mr. Diaz describes the document as a list of "work on hand", the name of the contracts, municipalities and/or contractor or subcontractor. He explains that, when you go to a bid of a municipality, the bid is made for one year, from July 1st to June 30th. The bid, which is bonded, states that you must supply the municipality, at any time. The asphalt pavement, 10 tons today or a 100 tomorrow, must be readily available when they pick it up. When the company closed due to the curtailing of the funds, they evaluated which of these contracts were becoming a liability or a claim against the company. It the municipalities were unable to pick up the asphalt pavement from the plants, they will be in default with the contract. Therefore, the bonding company will request the company payment of the amounts it had to pay for other company to supply the asphalt. Attorney Marini objects, as the witness is assuming facts that are not in evidence by testifying about contracts and the content of them which have not been submitted into evidence. The court sustains the objection considering the lack of specificity of the contract being described.

12

The witness testifies that the list also includes the contracts with the Puerto Rico Highway Authority (ATC). He states that they had with the municipalities two type of contracts, "pick up in plant" or "installed and compacted". In the contract with ACT, the alleged debtors were the direct contractors in charge of the project and had the responsibility of doing everything that is included in the project, not only the asphalt. In the case of Carreteras, if they defaulted, the company would never be authorized to bid in the agency on any future contract. That is exactly what happened with the PR15 from Guayama to Cayey. The alleged debtors had to default, and wrote a letter accepting the default and the bonding company, then, has a claim against the alleged debtors because they must find someone to finish the job. In his experience, when the company pays to finish the job, it is more expensive that the amount of the bid. He states that all the contracts, as soon as the company was closed, change from an asset to a liability and a claim to the company. Attorney Marini renews the objections as the witness is testifying about contracts not included as evidence. The objection is overruled.

Mr. Diaz describes the third type of contracts, when another company, such as las Piedras Construction, wins a bid and then subcontracts Betteroads and Betterecycling. In that case, there is no bond, but there is a contract that makes the alleged debtors liable.

Attorney Lugo shows the witness exhibits 184 and 185. Attorney Marini objects the testimony related to the exhibits, based on the untimeliness of the filing of the documents and that it should've been filed on June 20th, the exhibits are in Spanish and based hearsay, as it is a letter from the Government of Puerto Rico that is not there to testify. The court asks the purpose of the exhibit, which is a letter from Autoridad de Carreteras y Transportación awarding the contract. Attorney Lugo states that it is related to the project PR15 to which the witness testified. Attorney Lugo explains that exhibit 184 is the award of the contract by ACT and the order to commence is exhibit 185; then he will show the contract, which is exhibit 191 and then he will show the letter of default. The court expresses its concern as to what the documents will show. Attorney Lugo states that it will show the difference between an asset and a liability. He states that the petitioning creditors argue that alleged debtors transferred assets, and they intend to show that there were no assets to transfer as the alleged debtors were in default. The court clarifies that the petitioning creditors have not presented any evidence yet and that, at this juncture, the court is considering the evidence of the alleged debtors that the involuntary petitions were filed in bad faith or for an improper purpose. The court asks how do the documents, which are a notice and an award of contracts, show that the petitions were filed for an improper purpose, what is the relevance to tie in to the alleged debtors' allegations? Attorney Lugo states that the petitioning creditors are resting on their burden of proof to see the if they can proof their case, and the alleged debtors need to proof all the elements and need the rebut the arguments in favor of the petitioning creditors, as alleged. The attorney clarifies to the court that the proposed "finding" would be that the contracts in exhibit 101 are not assets but liabilities and that there was nothing to transfer. In addition, he clarifies that this contract is the kind that was assigned to Puerto Rico Asphalt, party in interest. The court clarifies that PR Asphalt is present, but there are not a party to this contested matter. Attorney Lugo states that PR Asphalt has been a recipient of this transfers and this is evidence of how this contract is alleged to be a liability for the alleged debtors, and asset for the petitioning creditors. The court inquires if PR Asphalt is an independent and separate corporation from the involuntary debtors. Attorney Lugo clarifies that it is totally independent.

13

Attorney Marini states that they made three arguments, and Attorney Lugo only responded to one of them. He states that he objects to providing the translations in ten days, as the petitioning creditors filed their translations on time and the alleged debtors had the opportunity to do so, as well. Additionally, the alleged debtors did not provide valid reasons why the documents were not provided by June 20th. Furthermore, in terms of relevance, the alleged debtors are trying to reply at the rebuttal of the petitioning creditors, which has not been presented and this does not address the reason of the improper conduct. Attorney Gonzalez adds that, even if they are correct, that these contracts are liabilities and not assets, how does that prove bad faith? The court clarifies that such a determination corresponds to the court. The court overrules the objection, at this juncture, as to excluding questions related to exhibits 184 and 185. The court is not admitting the documents but is not preventing questions related to the documents. The court clarifies that any document in Spanish admitted must be translated within then days.

Mr. Diaz describes exhibit 184 as an award of one of the alleged debtors' bids, as the lower bidder. The document proves that they were awarded the contract of PR 15. Attorney Lugo shows the witness exhibit 185. Attorney Marini renews his objections of untimeliness, document in Spanish and relevance. The court maintains its determination and allows the questions.

Mr. Diaz explains that the document is the order to proceed, and that the project is federally funded. He explains that the project began, but when the bank closed the accounts and the company, they had to go into a court, and had to deal with the bonding company. The also had to notify the Puerto Rico Highway Authority that they had entered in default, after 70 years of never defaulting. The witness testifies that the project has not been completed. When the project came into default, they had to negotiate with the Puerto Rico Highway Authority, to assume responsibility of the $1.9 million, approximately, left to be able to finish this project.

Attorney Lugo shows exhibits 160 and 161 to the witness. Attorney Marini preserves the same three objections for the record. The court asks the purpose of the documents. Attorney Lugo states that the purpose is to reaffirm the witness's testimony regarding the nature and effect, for purposes of this bankruptcy filing, of the default and the effect of the "alleged transfers" averred by the petitioning creditors to enter the order of relief. Attorney Marini states that it doesn't go into any of the elements for improper act or the elements for the totality of the circumstances. The court overrules the objection. Attorney Marini adds for the record that exhibit 160 is dated June 23rd, 2017, after the filing of the bankruptcy case, which relates to relevance. The court notes that the two letters in the document are dated post-petition. Attorney Lugo states that they relate to the PR15 project and its cancellation. Attorney Marini states that a document prepared after the filing has no relevance as to reason for filing the involuntary petition. Attorney Lugo clarifies that exhibit 161 is pre-petition. The court accepts exhibit 161 with the same caveats but not exhibit 160.

Mr. Diaz reviews docket 161. He explains that the document is the claim of the Puerto Rico Highway Authority for the project PR15 sent to USIC, as the bonding company, stating there was a balance on the project not finished and their responsibility to finish it. The second letter was sent to the witness by the Puerto Rico Highway Authority stating that they had not finish the project and the list of defaulted jobs. The third document is a letter sent by the witness to Mr. Duhamel Iglesias, Vice-president of USIC, declaring the default on the project and handing over the project.

As requested by Attorney Marini, the testimony of the content of the letter which is not admitted into evidence, is stricken by the court.

The witness testifies that USIC negotiated with PR Asphalt to finish the project at the same cost stated on the letters with the remaining balance to be paid by the PR Highway Authority. Attorney Marini moves to strike the testimony as hearsay, as it is a negotiation between USIC and PR Asphalt. The objection is overruled. The witness states that USIC communicated with the alleged debtors and told them that the negotiation with PR Asphalt was successful and that a claim to Betterecycling could still be possible if there was an increase in costs. Attorney Lugo moves for the admission of the three documents, exhibits 161, 184 and 185. The court admits the documents. However, the documents need to be translated and the court will give the documents whatever weight it deems appropriate. Attorney Marini renews his objections which are noted by the court.

The witness explains that on April 2016, before the accounts receivables were foreclosed, the alleged debtor had leased a plant in Arecibo to Rodriguez Asphalt and had leased another plant in Barranquitas to Professional Asphalt. He states that the leases were approved by the bank. He declares that he found companies that were willing to operate the plants in order to lease them. The two leased plants mentioned had municipality contracts of Betterecycling and Puerto Rico Highway contracts.

Exhibit 142 and 158 are shown to the witness. Attorney Marini states for the record the same objection, the documents were not filed on time and are in Spanish. The court allows the attorney to proceed. The witness explains that exhibit 142 is a contract leasing the Arecibo asphalt plant to Rodriguez Asphalt. The contract addressed important issues, such as a stipulation that Betteroads and Betterecycling will be providing the design, lap inspections and field inspections whenever the asphalt being installed was for the PR Highway Authority. The contract also stated that the had to exclusively buy the liquid asphalt from Betteroads in Guayanilla. It also had a fixed price, $65.00 per ton, in case the companies needed to buy asphalt from them, which was a great price. This was done in order to finish contracts with municipalities and Carreteras. Attorney Marini objects based on relevance and the objection is overruled. The contract was executed the 14th of April 2016. He declares that they communicated the lease to Banco Popular, the reasons for the lease, and that Banco Popular agreed.

The court clarifies that the admitting the documents and overruling the objections based on relevance, does not mean that the court finds that they are relevant to the issue of filing a petition in bad faith, but the court is assuming that it its going to be tied to other documents or testimony. Attorney Lugo requests exhibits 142 and 158 to be admitted into evidence. Attorney Marini presents the same objections. The documents were admitted with the same caveats.

The witness describes exhibit 158 as a contract between Betterecycling Corporation and Professional Asphalt LLC signed on the 1st of April, with the same conditions as the one mentioned before. This contract is for the Barranquita plant. This contract was notified to Banco Popular and approved. The witness declares that Professional Asphalt is a client of Banco Popular. Attorney Marini objects due to speculation and the objection was overruled by the court. The lease was for $4,000.00. Attorney Marini requests the court to allow a standing objection as to timeliness and

language, to all the documents presented yesterday, exhibits 152 through 191. The court notes the objection.

Mr. Diaz states that the agreements were accomplished prior to the foreclosure of the accounts receivable and before August, when the bank curtailed the funds. After the closing of the company, they leased several plants to Rodriguez Asphalt which was already leasing one plant, and they also leased another plant to Professional Asphalt LLC and one plant to Harry Melendez in Humacao. They leased the properties because if the plants were not operating, the value of the plants decreases and become "rusty iron" and unusable. The witness states that by leasing the plants to Rodriguez and Harry Melendez, they were able to serve asphalt "pick up" at plants, to some of the municipalities with that type of contract.

Document 188 is shown to the witness. Attorney Marini adds an objection as to relevance and it is noted by the court. Mr. Diaz explains that when the company was closed, except Arecibo and Barranquitas that were already leased, every other plant of Betteroads and Betterecycling was leased to PR Asphalt. They were leased because PR Asphalt hired the engineers and laboratory technicians to provide the quality control services as well as to provide the design of combination of asphalt, in combination with the fact that PR Asphalt was supplying the liquid asphalt to all the plants. Mr. Diaz explains that all the agreements are the same. Attorney Lugo request the court to admit exhibit 188. Mr. Marini adds an objection as to relevance. The document is admitted.

Mr. Diaz explains that the Guayanilla tanks are isolated all around to maintain the hot temperature to keep the liquid asphalt in them. If they are unable to obtain the diesel to maintain the burners, the liquid asphalt would solidify and harden. Then, in order to heat it, it will require a lot of diesel and a lot of time at an extremely high cost, to be able to use it again. Therefore, it was critical to keep the asphalt hot. In addition, the terminal is under the supervision of Homeland Security and has a free trade zone which contains demands and regulations that must be complied with. Due to the lack of money to pay employees, since year 2015 and with the approval of Banco Popular, PR Asphalt was leasing a storage capacity for asphalt they would bring in, store and sell. An agreement was made, and PR Asphalt pays Betteroads a certain amount per gallon in order to cover the costs of operating the terminal. In this manner, they safeguarded the operation permits required by Homeland Security and for the free trade zone and kept the terminal operating. That also ensured the contract with the Ports Authority to use the pier for the ships or barges that bring in the liquid asphalt, which is brought in at a temperature of 280-290 degrees and is discharged through some pipes that enters in the tanks hot, and are kept hot in the terminal. The banks filed a mortgage foreclosure when they realized that the were unable to force the alleged debtors to file a chapter 11 bankruptcy. Attorney Marini objects for assuming facts that are not in evidence and lack of foundation. The court overrules the objection and states that it will take it as the witness's opinion of what happened.

Exhibit 19 is shown the witness. The witness states that the document was produced by Banco Popular, document no. 0003267, and it is an email from Jose Santiago Ramos to Francisco Pascual from Fisrtbank, Ana Luisa Bustillo Ortega and Beatriz Marie Ramirez de Arellano Calderón, from Santander, Eric Alers and Eric Cortes from the Development Bank, Eric Lopez and Enidcely Gonzalez Paonessa from Popular and the subject is "Fund Transfer Approval". The last page of the exhibit is an email from Eric Alers to the parties described above. In the witness's opinion, the

document evidences the intent to cut the funds and force the companies to schedule a closing date and force the formalization of the forbearance. The document is admitted into evidence with the same caveat and noting the petitioning creditors' objections with the additional objection as to hearsay.

Exhibit 31 is shown to the witness. The witness states that the document is no. 0003441 from Banco Popular. Mr. Diaz explains that the document is an email from Francisco Pascual to Francisco Pericás saying that they were perplexed because the alleged debtors hadn't filed for bankruptcy and that they welcomed any recommendation to maximize the collection efforts. Attorney Marini moves to strike as the witness is reading from a document not admitted. The court sustains the objection. The email was sent on September 23, 2016. The document is admitted overruling Attorney Marini's standing objection and additional objection as to the inaccurate characterization of the document. The court notes that it will draw the inferences it deems appropriate.

The witness describes the state court action as an execution of the mortgages by Banco Popular on behalf of the consortium. They requested a Levy Order in the state court. He explains that the complaints were filed in San Juan. Judge Carrasquillo noticed that his son-in-law is a judge in San Juan and due to the personal relationship, the administrative judge moved the case from San Juan. It was transferred to Bayamón to Judge Rebollo. Additionally, Banco Popular exclusively, filed another complaint for a direct loan. The third case was related to an equipment which was financed by Firstbank directly to Betteroads and Betterecycling.

The motion for attachment in the Judge Rebollo case was denied. The Banco Popular's case for a direct loan was filed at the witness's son-in-law's courtroom and transferred to another judge. Banco Popular requested an attachment order which was granted. Several days later, they attached the helicopter and a yacht his father had. The alleged debtors appealed, and the court stayed the attachment and, eight months later, the court revoked it. During that time, the helicopter was sold for $950,00.00. Popular Auto had a lien on the helicopter for $550,000.00, more or less. The Popular Auto contract stated that any surplus belonged to Betteroads.

The witness states that, in the Firstbank case, and attachment order was also requested but was denied. The witness explains that, upon the sale of the helicopter the Popular Auto loan was paid in full and then they released a fleet of automobiles, trucks and equipment, which was handed over to continue operations. The attachment to the yacht was revoked on June 5, 2017. On June 9, 2017, the involuntary petition was filed. The witness states that the contentions for the attachment motions stated that, allegedly, the companies were transferring assets and that they were dilapidating the company, which, he states, was not true and could not be proven.

Mr. Diaz testifies that their attorneys filed a countersuit for $931 million in two of the three cases. He states that the attorneys of the estate requested to reopen the case of the countersuit and both judges activated the cases. The other judge denied it and it is under appeal. It is important to add that when the banks filed the mortgage foreclosure and were unsuccessful on the attachments, they notified the alleged debtors the foreclosure of the shares that are pledged to the consortium. Mr. Diaz states that Judge Rebollo revoked the attachment petition but authorized the foreclosure of the shares. However, the order was appealed.

Exhibit 29 and 32 are shown to the witness. Attorney Marini objects both exhibits on relevance grounds. He further states that pleadings from another court should be provided by certified copies, which are not included, and that the documents are in Spanish. The court clarifies that it is uncontested that the complaint was filed (exhibit 29) and that the Motion for Attachment was filed. Attorney Marini clarifies that the fact that it is uncontested doesn't make the documents admissible. The court asks Attorney Lugo as to the relevance of the documents. Attorney Lugo states that the timing is important as the timing of the filing of the petitions is the result or aftermath of all these three cases and how they resulted, as they were not managed as the lenders intended and then they pursue the bankruptcy process to collect. Attorney Marini objects and states that counselor is testifying and assuming facts. The court asks, assuming it accepts the documents, how can the witness testify as to the intent of the parties filing the complaint and the motion? Attorney Lugo answers that the witness will not go and discuss the documents. The court accepts the documents and will draw whatever inferences it deems appropriate. The parties clarify that exhibit 29 is in English and 32 is in Spanish with a translation. Attorney Lugo asks the court for the same ruling for exhibits 36, 37, 38, 39 and 92. Attorney Marini presents the same objections for the record. Attorney Betancourt clarifies, as to the hearsay objection, that these are motions and allegations and that, although the alleged debtors do not concur with them, they are presented for the fact that they were made, not for the truth. Attorney Marini states that there is a proceeding to submit into evidence documents from other courts, which is through certified copies. Attorney Betancourt states that certified copies are for self-authentication, however, they have a witness present. Attorney Marini clarifies that the witness cannot authenticate documents prepared by the lenders or the court to which he had no participation. The court asks what the documents show and what is the relevance. Attorney Lugo states that, the witness testified regarding certain events that occurred on state court. He alleges that the documents sustain their allegation that the bankruptcy was used as an alternate collection action. There were three proceedings occurring on state court and the alleged debtors believe that the lenders were forum shopping. The court notes that the automatic stay benefits the involuntary debtors, and there is no stay as to the counterclaim filed by the involuntary debtors against the lenders. Attorney Lugo states that the lenders have not assumed that position in state court as shown by exhibits 174 and 175. Attorney Marini replies and states that the pleadings in the cases do not show the state of mind of the lenders nor the reasons for filing an involuntary petition.  The court accepts the documents just as documents that were filed in state court actions.

Attorney Lugo shows the witness documents 174 and 175. Attorney Marini renews his objections and additionally questions the relevance as the documents don't go to the state of mind, they are in Spanish, they constitute hearsay, are not certified copies and were filed yesterday without compliance to the court's order. The court questions the relevance of the documents, which are state court motions from Banco Popular requesting extension of time to oppose the request to reopen the cases. Attorney Lugo states that they will sustain and explain Mr. Diaz's testimony, regarding the status of the proceedings and the counterclaim, and will clarify the intent of the bank, as to the court's averment that the stay benefits the alleged debtors. He states that the motions demonstrate how the banks have been staying and trying to stall the process until the bankruptcy proceedings are solved. The court notes that the documents do not show that. The court admits the

documents just as motions praying for time to put the court in a position. Attorney Lugo withdraws the documents.

The court clarifies that, irrespective of that, it is soon to be seen if the court enters the order for relief and denies the motion to dismiss. However, that does not mean that the court will entertain the state court actions, and the court may allow the state court to continue the proceedings. Attorney Lugo avers that the question is who would entertain the actions, a Trustee or the alleged debtors. The court clarifies that it would first be required to enter the order for relief, and then address the "Trustee" issue, which requires the petitioning creditors to show the grounds for the appointment. The court notes that there are to many "ifs" in the chain of events. Therefore, the court accepts the other documents to show that they were filed, but the court believes the alleged debtors are extending the examination beyond the allegations of bad faith and, therefore, sustain the objections to exhibits 174 and 175. Attorney Betancourt makes and offer of prove and states that the documents are proposed to show the intent of the lenders to oppose the continuation of the counterclaim. The court states that it cannot speculate what the attorneys will do and the reasons to do something, so its decision stands as the documents are not relevant to the establishment of bad faith.

Mr. Diaz describes the status of the companies after the filing of the petitions. He declares as to the leased plants that they doubled the rents and the Guayanilla terminal has been able to keep up bringing liquid asphalt and Betterroads asphalt could continue to operate. The operation was a different operation, not manufacturing asphalt pavement, which allowed them to begin paying their creditors. Attorney Marini objects the testimony, as it refers to amendments to lease agreements which are not in evidence and that were not produced to the lenders. The court overrules the objection. The court states that the testimony is Mr. Diaz's opinion of how the companies are operating, as President and Executive Officer of the corporation.

Attorney Lugo states that, for today, the examination is concluded as there is only one-minute left. Attorney Marini anticipates 40 minutes to 1 hour of cross-examination.

Attorney Marini asks who the alleged debtors intend to present as witnesses on Wednesday. Attorney Lugo states that he will continue with Mr. Diaz and then present Marisel Rivera. The alleged debtors will also call Mr. Pericás. As to Mr. Pascual, he will try to reach an agreement with the representatives of Firstbank. Attorney Lugo asks to put the witness under the rules which the court does.

The court recesses and will reconvene on Wednesday July 17, 2019, at 9:30 am.

**Minute Entry**

*__Hearing Information__:*

Debtors: Betteroads Asphalt LLC: Case No. 17-04156
Betterecycling Corporation: Case No. 17-04157
Date/Time/Room: 07/17/2019/09:30 am/ osjcrt2
Bankruptcy Judge: Enrique S. Lamoutte
Deputy Clerk: Darhma Zayas/ Dennis Rodriguez
Reporter/ECR: José Romo

*__Matters:__*

Evidentiary hearing on the alleged Debtors' legal defense that the involuntary petitions were filed
in bad faith by the Petitioning Creditors.

*__Appearances:__*

Wigberto Lugo Mender and Alexis Betancourt Vincenty on behalf of the alleged Debtors
Luis Marini and Carolina Veraz on behalf of Banco Popular de Puerto Rico; Banco Santander de
Puerto Rico; FirstBank Puerto Rico and the Economic Development Bank of Puerto Rico
("Syndicate Lenders")
Sonia Colon and Jordi Guso on behalf of Sargeant Marine, Inc. and Sargeant Trading, LTD
Rafael Gonzalez Valiente on behalf of FirstBank Puerto Rico as an independent creditor
Alexis Fuentes Hernandez on behalf of Facsimil Paper Connection, Inc.; Control Force, Corp.;
Champion Petroleum, Inc.; and St. James Security, Inc.
Myrna Ruiz Olmo on behalf of Puerto Rico Asphalt, LLC

Day 3

*__Proceedings:__*

The court commenced the continuation of the evidentiary hearing by providing the proposed time
schedule for today which will be 9:45am-12:00 and then 2:00- 4:00pm. The court stated that it will
recess today at 4:00pm due to the manifestations that will occur today, and it will be more secure
for all. However, the court is conscious that this schedule has curtailed the number of hours that
would have been available to the parties to present the evidence. Thus, the court may be flexible
in extending the number of hours to present the evidence.

Attorney Alexis Betancourt for the alleged Debtors, began by informing the court that they took a
deposition of Sargeant Marine and Sargeant Trading with the allowance that the court gave the
alleged Debtors to make some discovery after the trial began. The deposition was celebrated on
July 2, 2019 and the transcripts were received last week. The errata sheet was received from
Sargeant Marine and Sargeant Trading with some clerical modifications and some substantive
proposed changes in some answers. Considering that the witness is not available in the jurisdiction
and the time issues, the parties have agreed to propose the transcripts as evidence and testimony

of this witness together with the contested errata sheet which includes the suggested substantive modifications from the deponent. The parties should be filing this tomorrow with the errata sheet, if feasible. Also, under the carve out agreements signed by Sargeant Marine and Sargeant Trading will also be stipulated as admissible evidence for both parties and the confidentiality agreement that Sargeant Marine and Sargeant Trading executed with the Lenders.

The court stated that this a two-part proposition. The first part is filing the deposition transcript with the errata sheet submitted by the parties to substitute the testimony of this witness that is representative of Sargeant Marine. The court questioned the issue of the confidentiality agreements between Sargeant Marine and the Lenders.

Attorney Jordi Guso on behalf of Sargeant Marine and Sargeant Trading clarified that the deponent is within the jurisdiction but has not been subpoenaed for trial. The parties have agreed to use his deposition in lieu of testimony before the court. The deposition would be moved into evidence by the alleged Debtors under the next number in the exhibit log together with the errata sheet.

Attorney Betancourt noted for the record that regarding the stipulation for the admissibility of the transcript that the alleged Debtors reserved any claim and objection regarding the matters that were raised by the alleged Debtors regarding the scope as to this party which the court adjudicated and limiting the alleged Debtors' scope of discovery. The alleged Debtors noted for the record that they are preserving for the record their right to object.

The court requested for the alleged Debtors' counselor to be more specific as to the preservation of the right to object or any allegations regarding a prior ruling of this court.

Attorney Betancourt replied that the Debtor attempted to perform a more extensive discovery regarding some related entities and some business endeavors of these corporations. In the ruling of this court it was determined that at this point the alleged Debtors were not allowed to make any discovery to related companies. The alleged Debtors were allowed a limited discovery regarding Sargeant Marine and Sargeant Trading and we performed a deposition. A reconsideration was also filed.

The court stated that it allowed discovery as to the alleged bad faith of filing the involuntary petitions and in this case the bad faith of the creditors signing the involuntary petitions because those are the ones who may have engaged in bad faith and that is the contested matter before the court, that is, whether or not the petitions were filed in bad faith.

Attorney Guso stated that on docket number 432, is the court's amended order relating to discovery as to Sargeant Marine and Sargeant Trading. In that order, the court narrows the scope of discovery to those two petitioning creditors and does not permit discovery to be extended to affiliates. Thus, when the court reviews the transcript of Mr. Ginter, counsel tried to go beyond what we believed to be the scope of this order and we objected it. There has been no motion to compel and the parties have agreed to the use of deposition transcript as the record that will be before the court.

2

Case:17-04156-ESL11 Doc#:494 Filed:08/22/19 Entered:08/22/19 15:01:10 Desc: Main
Document Page 3 of 16

*Continuation of Mr. Jorge Luis Diaz Irizarry Testimony*

Mr. Jorge Diaz testified that the particular equipment that is used in the asphalt paving industry that was transferred were the nuclear machines. He stated that he brought a machine as an exhibit as demonstrative evidence. He stated that this equipment is safe to be in court. This is the frame and this is a digital reader of the nuclear machine. It normally has a plaque with everything installed on it, specifically the nuclear sensor. This machine is used to determine the compaction of the asphalt when a road is paved. The Federal Highway requires that the compaction of the asphalt be recorded and certified in order to meet the Federal Highway Administration rules and regulations. This machine also has a handle with another nuclear sensor, but it is not installed here. Mr. Diaz explained that this machine is used by all companies that serve asphalt under contracts with the Federal Highway. Betteroads and Betterecycling must use this machine to render services under those contracts. When this machine is used you press a trigger which allows the machine to read the compaction through the nuclear system. This machine is obsolete.

Mr. Diaz further testified that he has seen this document which is a list of the machines that were in possession of Betteroads and Betterecycling and had to be disposed of (Exhibit #165). The memorandum/letter is drafted by Angel Cartagena who is in charge of the laboratories which includes design and lab tests, everything having to do with asphalt. Engineer Angel Cartagena used to work with Betteroads and Betterecycling until Banco Popular withdrew the funds, and shut down the corporation and all of the employees had to be dismissed. He testified that the machines were transferred to Puerto Rico Asphalt because the National Radioactive Commission ("NRC") requires as part of the license that there be a duly certified officer that has been certified by them that is in charge of the use, maintenance and storage of these machines. The NRC requires a specific design of the area in which these machines will be stored must be constructed. When the bank withdrew the funds from the companies' accounts and closed the companies, the employees had to be terminated. The person who was certified to maintain, supervise and control these machines was no longer in the company. This is a direct violation of the NRC regulations which may result in criminal accusations. The manner in which the NRC disposes of these machines when they are no longer going to be used as stated in this letter $1,200 per unit, which would add up to approximately $19,000. The position of Betteroads and Betterecycling is a critical one because it had to immediately obtain the money to decommission these machines and pay the amounts owed to NRC and we did not have the money to do so.

*Cross-examination*

Mr. Diaz stated that he recalled being deposed on May 10 of this year and that he was placed under oath and that he testified on behalf of the Debtors. (Exhibit 90 (Alleged Debtors), Docket No. 436, Case No. 17-04156 Exhibit 3- Petitioning Creditors' Certified Translation)). He referred to the 2014 agreement (pg. 53, line 6 – pg. 54, line 7) and admitted testifying that the Lenders exercised rights under the 2014 agreement and stopped providing funding to the companies to put pressure on the same (Exhibit 3, pg. 55). Mr. Diaz also stated that under the 2014 credit agreement the deadline the Debtors had to sell the terminal was February 28, 2015 and that the Debtors had until December 31, 2014 to sell or transfer the helicopter and plane (Exhibit 3, pg. 55, lines 5-25). He testified that the Debtors did not sell the helicopter prior to December 31, 2014. He also testified

that the Debtors did not sell the terminal on or prior February 28, 2015. Mr. Diaz testified that the Debtors stopped making payments on the 2014 credit agreement on August 2015 (Exhibit 3, pg. 67, line 16-22).

He testified that Puerto Rico Asphalt is an independent company from Betteroads and Betterecycling (Docket No. 413, Petitioning Creditors, Exhibit 9 of Exhibit 10- transcript).

[[The court noted that the letter dated 04/26/2017 PRA informed the transfer of the licenses from Betteroads.

Attorney Ruiz Olmo on behalf of Puerto Rico Asphalt. Attorney Ruiz stated that the objections that were raised prior to the commencement of the evidentiary hearing were filed on June 25, 2019 and this court has ruled that Puerto Rico Asphalt has no standing. However, Puerto Rico Asphalt needs to preserve for the record the objections that were already raised, including that the deposition was not timely and properly notified to Puerto Rico Asphalt and to the designee of Puerto Rico Asphalt. The objection was duly and timely raised and we need to preserve the same for the record.

The court noted the objection.

Attorney Ruiz stated that the deposition transcript that was eventually sent untimely to Puerto Rico Asphalt did not contain the exhibits that are being shown today. Thus, PRA needs to preserve for the record the objection as to the admissibility of the deposition and its exhibits.]]

Mr. Diaz stated that he had seen the document before and that the Jorge L. Diaz identified in the first paragraph was him and that that was his signature on the second page under the name of Jorge L. Diaz Irizarry.

Mr. Diaz testified that paragraph one does state that Arturo F. Diaz Irizarry and himself at that time were the only responsible officers of Puerto Rico Asphalt corporation. He stated that Arturo F. Diaz Irizarry is his brother (Docket 413-15, Exhibit 10-b, Exhibit 9). He stated that the second paragraph provides that his brother and he were selling, transferring interests in Puerto Rico Asphalt to Jorge Arturo Diaz Mayoral. He stated that Jorge Arturo Diaz Mayoral is his son.

He testified that he had seen these letters before. The first page is a letter to Marie Claire Diaz Vila and the second page is a letter to Mr. Jorge L. Diaz (Exhibit 10 to the Deposition transcript). He stated that until September 2016, his son was executive vice president of the Debtors.

*Re-direct*

Mr. Diaz testified that the helicopter was attached by Banco Popular. We requested an order of protection from the appellate court which stayed the embargo and later was reversed. As to the helicopter, the same was sold under the custody with Banco Popular in the amount of $950,000. The same was financed by Popular Auto and it had a balance of approximately $550,000, but it had a clause that any excess of the debt of the amount of due would be property of Betteroads. Therefore, we had the right to receive the difference between the $950,000 and the $550,000.

He further testified that this is the settlement agreement regarding the sale of the helicopter and the payment to Popular Auto of the debt of the helicopter and the liquidation of the remainder of the balance due to Popular Auto. The difference of $400,000 was used to settle entirely the debt of Popular Auto which included automobiles, pick up trucks and other vehicles that maintained a balance due within that financing (Docket No. 459-21, Exhibit 162).

Mr. Diaz stated that he recalls that they had conversations with Banco Popular about selling the helicopter and tried to find a client to purchase. Alleged Debtors contacted people that are in the brokerage of helicopter sales so that they could sell the same. He stated that at one point in time, Banco Popular requested that they surrender the helicopter as a payment in kind. They wanted us to relinquish the helicopter and Banco Popular would receive the totality of the amount to only payoff the balance of the helicopter and we would lose the difference of $400,000 in this transaction.

Mr. Diaz testified that he had to go back to the year 1946 when the original and largest company of asphalt was Puerto Rico Asphalt, subsidiary of Blythe Construction of North Carolina. Eventually this company was sold locally to the executive officers. In the 1980's Betteroads purchased the assets of Puerto Rico Asphalt. His father requested that his brother Arturo Francisco and himself to keep the name of Puerto Rico Asphalt registered because it was very important for his father. Thus, the corporation was registered but it never operated. His son took interest in the corporation and his brother and himself signed an agreement and transferred the corporation to his son. He stated that until that date, the corporation had not operated.

He stated that at the time of the corporate transfer agreement to his son, he was the executive vice president of Betteroads and Betterecycling. Mr. Diaz testified that he controlled the operations of Betteroads and Betterecycling (Docket 413-15, Exhibit 10-b, Exhibit 9). He stated that the only stockholders of Betteroads and Betterecycling were his father, Arturo Diaz, may he rest in peace, and his mother, may she rest in peace, Judith Irizarry de Diaz. As of today, all of the heirs accepted the inheritance of his parents to the benefit of inventory, which means that the shares, the ownership of inventory and all assets are under the possession of the executor.

[[Attorney Ruiz on behalf of Puerto Rico Asphalt stated that she is again preserving for the record the objections that were raised in the motion in *limine* filed prior to the evidentiary hearing with regards to the deposition aspect that we were not part of the discovery, including the deposition of this witness that will be providing testimony today. She stated that she did not preserve this objection with Mr. Diaz because she was present at the deposition. In this deposition, Puerto Rico Asphalt was not notified of the deposition as long as the testimony of the witness today may have come from the deposition, our client should have been made part of the deposition to make questions and inquiries to be prepared for the evidentiary hearing. Thus, Puerto Rico Asphalt restates its objections to the testimony and to the depositions, as briefed in the motion in *limine.*

The court stated that the witness that is about to testify and has not yet stated her name was the comptroller of Betteroads and Betterecycling and is being presented as a witness by the alleged Debtors in support of their motions that the involuntary petitions were filed in bad faith. The court

inquired whether attorney Ruiz had an opposition to the involuntary Debtors presenting the testimony of Mrs. Rivera.

Attorney Ruiz replied that the opposition by Puerto Rico Asphalt is that any testimony, including the testimony being presented today was part of a discovery proceeding in which Puerto Rico Asphalt was not a part of. This objection includes the alleged Debtors and Lenders. The objection is as to the discovery that was conducted.

The court clarified a question made to Mr. Diaz Irizarry as to whether or not Puerto Rico Asphalt was a separate entity or corporation from the involuntary Debtors. The court stated that it understood that the answer was that they were separate corporations.

The court notes the objection but it will allow the testimony being presented by the alleged Debtors in support of their motion.

Attorney Ruiz stated that it is a standing objection as to all the testimony.]]

*Testimony of Mrs. Marisel Rivera Torres (Presented by the Alleged Debtors)*
*Direct*

Mrs. Rivera stated that she worked for Betteroads and Betterecycling for approximately 29 years. She stated that the last position she held was as vice president of finance from the year 2007 until September 30, 2016. Mrs. Rivera testified that her position ended because after the bank withdrew the funds from the company's accounts debtors were unable to continue operations and thus, all of the employees including the administrative personnel were terminated. She stated that her place of business was located in the Empresas Diaz building in Rio Piedras. She officially worked there until September 30, 2016 but the following week she went some days to leave organized some work that was sitting on her desk. After that she did not return.

Mrs. Rivera testified that during the month of October 2016 she was out for some weeks but she received a phone call from Mr. Jorge Luis Diaz inquiring as to whether she would render her services, given that there was no personnel that had any knowledge about the accounting and financial affairs of the company. She stated that Mr. Diaz had identified certain equipment that could be sold and with that obtain funds to be able to pay the salaries of the employees who would work. She testified that she accepted the offer and indicated that she was available the last week of October because she had to complete her continued education credits to renew her CPA license. After that, the secretaries that still worked there notified me that they had relocated in an urgent manner to some facilities located next to the plant located in Carolina.

She further testified that once she arrived to the new facilities she encountered a very critical situation in which there were approximately 15 people placed in one office. There were no systems working that could provide access to the accounting records that existed on the servers. They showed her everything that they were able to move which was kept in a storage place. The storage place had the files and dozens of boxes that they were able to take with them. She stated that the work conditions were not easy. They had to see what there was and organizing all of the

documents. The people that packed all the documents focused primarily on the managerial documents and not on the accounting records.

Mrs. Rivera testified that in mid-December they were able to move to the facilities where we are now. Although they were not finished, they were able to place some desks there and some files were moved and began identifying what they pertained to. The person that was working with the systems was able to get the system up to have access to the information. However, she realized that there was much accounting information that was missing, and had to call former employees to help her and go to the Empresas Diaz building which had been closed for months and was in bad conditions so that they could pick up whatever they could from the desks of the people that had been in the accounting division which were important because we needed to verify where each one had last left things off. From there on, they began to get the accounting system up and running and update certain things.

Mrs. Rivera testified that the only information or documentation regarding accounts receivable on hand was that which was generated from October onwards because the specific billing records with all the detail were left at Empresas Diaz. Thus, they were able to produce only what they had access to at the time. The files with all the information regarding the accounts payables to suppliers and also all the documents regarding bank statements, reconciliations, all documents regarding purchase of equipment, and the bills of lading are in the Empresas Diaz building. The accounting department was run by approximately twenty people and not all of the documents were transferred to the new facilities. She stated that the bank's attorneys were also requesting information several years prior to the year 2014 and that the information was not available in the system because a conversion had been made to a new accounting system in July of 2014 and they were not able to print out the reports regarding the information requested. This information was requested by the bank's attorneys when the evidence was being collected which included quite a few years prior to the year 2016.

She further testified that she does not remember whether there was any request for the financial information that was being requested prior to June 2017. Mrs. Rivera testified that she prepared this document at the end of September to summarize the deposits that had been made in the marginal accounts and that had been transferred by the bank to another account which they had no knowledge of (Exhibit 27- Docket No. 415-27).

*Cross examination*

No cross. Lenders' attorney requested that the witness be made available if they decide to call the witness for the rebuttal case.

Attorney Ruiz stated that Puerto Rico Asphalt sustains their standing objection that they want to preserve for the record regarding the testimony and/or evidence that might be presented because Puerto Rico Asphalt was not notified of discovery proceedings.

The court notes the objection which this court has overruled before because Puerto Rico Asphalt is not a party in interest to this contested matter and particularly to the witnesses being presented by the alleged Debtors.

The court notes the objection.

*Testimony of Mr. Francisco Javier Pericas Alfaro (Presented by the Alleged Debtors)*
*Direct*

Mr. Fracisco Javier Pericas Alfaro stated that he has worked for Banco Popular de Puerto Rico since May 1999. He stated that since March 2013 until October 2013, he was the director of the special loan division and senior vice president of the bank. At that time he was transferred to the corporate banking division of which he is the director and senior vice president of the bank. He testified that he is the corporate representative for Banco Popular de Puerto Rico. He stated that he has been related with the Betteroads and Betterecycling credit facilities since September or October 2013. He stated that the case was managed at the corporate banking division and at some point some circumstances were identified and it was transferred to the special loan division. He testified that at that point, he was in the special loan division and was responsible for the management of the case. Mr. Pericas explained that there are two facilities; there is a facility under a bank syndicate and there are several facilities which are directly under Banco Popular. He stated that he worked with both. He did not work with the Popular Auto facility.

Mr. Pericas testified that Mrs. Rosimari León is an officer at Banco Popular in the special loan division and she worked at some point with the credit facilities when the case was transferred to the late stage division of special loans. She was responsible as an officer for the management of the case. He testified that he does not recall whether Mrs. Rosimari León was the person signing the involuntary petitions for both cases.

Mr. Pericas was shown the involuntary petitions and he testified that they were both signed by Mrs. Rosimari León as an officer of Banco Popular (Docket No. 415-, Exhibits 40 & 41). He stated that prior to the filing of the involuntary petitions he reviewed these documents prior to Mrs Rosimari León signing the petition. He testified that there are two separate lenders on two separate facilities.

He further testified that since September 2016, the people that worked on these facilities were: Mrs. Rosimari's analyst, Francés (does not recall last name), Rosimari's supervisor, and Lynette Bigio, manager at the special loan division. There was some involvement of the senior vice-president and director of the special loan division, Sonia Acosta and his supervisor Elí Sepúlveda, the group manager for the commercial banking group at Banco Popular.

He stated that one of the facilities is a syndicated facility. Mr. Pericas explained that a syndicated facility is a facility where several banks participate. Usually the facility has an agent and in this case the agent is Banco Popular. The decisions would go to the administrative or internal process of each bank and they would be discussed, and the decisions would follow the contractual arrangements under the credit agreement, meaning the syndicated loan. He stated that when he refers to the syndicate loan, he is referring to that particular credit agreement (document 1).

Mr. Pericas testified that prior to Mrs. Rosimari León signing the bankruptcy petition, the syndicated banks met. He does not recall the specific date. He testified that his understanding is

8

that he was present at the meeting and that he does not recall the names of all the people that were at the meeting. He stated that all the banks that form part of the syndicate, such as Banco Santander; FirstBank; and the Economic Development Bank had representatives present at the meeting. He does not recall specific names of people that were present at the meeting. During the meeting counsel were present and we would discuss the case and circumstances, and would discuss with counsel the recommendations. The banks would ask for their opinion and what were the next steps for the case. The meeting took place prior to the filing of the involuntary petition. He testified that the meeting took place close to the filing of the involuntary petitions. Maybe a few weeks or more.

Mr. Pericas stated that prior to the filing of the involuntary petition, Banco Popular, joined with other lenders, filed a state court complaint. He testified that the meeting was after the filing of the state court complaint. He stated that he recalls that the state court complaint was filed sometime around September 2015. The meetings were shortly before the filing of the involuntary petitions. There was probably not much time between the state court complaint and the filing of the involuntary petitions. It was probably a few months after the filing of the state court complaint. He stated that he does not recall the exact dates.

He further testified that the meeting regarding the consideration of the bankruptcy filing was not related to the resolution of certain attachments filed in the state court case. Mr. Pericas stated that there were two separate collection cases in state court. One was under the syndicate and the other was under Banco Popular de Puerto Rico. As part of the collection process there was a motion to attach. The two cases were under separate local court systems. One of the courts granted the motion and the other one did not. The one that was granted was the credit under the Banco Popular not the syndicate loan.

Mr. Pericas testified that all the analysis was made by counsel regarding the benefits or requirements necessary to file an involuntary petition. He stated that they had discussions with counsel. He does not recall any documents prepared internally by Banco Popular or any of the other lenders that were involved in the filing of this petition. He further stated that there are loan documents and information regarding the loans that were shared with counsel.

He stated that late in the year 2014, a credit agreement was signed with the bank. The agreement provided for the sale of several assets, including a helicopter, a plane and the Guayanilla terminal, which was an asset of Betteroads and Betterecycling. The helicopter and the plane were expected to be sold under the contract by December 31, 2014 and the terminal by February 28, 2015. The borrower made several efforts to sell those assets. However, the borrower was not able to close deals within the terms of the contract. Nevertheless, there were interested parties regarding the main asset, meaning the terminal. There were 3 or 4 transactions that the borrower discussed with Banco Popular. Specifically, there was a transaction with Puma; Blueroads; and Obeach (?). There was this other transaction which was not a sale-purchase transaction with BTB to somehow acquire additional assets. BTB is a company that also had a terminal. At some point the borrower (Betteroads) was in discussions with BTB to acquire some of their assets. This information we received from the borrower. This was approximately early 2015. The last payment received on the syndicated facilities from Betteroads was around August 2015 and probably also on the bank facility. Sometime around June 2016, BPPR learned there was a Judgment and a writ of attachment in favor of a third party against Betteroads. The banks were concerned that there could be

competing interests and risks towards the bank's collateral under the loans. Thus, the syndicate lenders foreclosed Betteroads' accounts receivables around June 2016 which were part of the collateral. At the same time, the banks were following up on the fiscal situation of the company. There was a high concentration of the accounts receivables which were past due. The sales and collection efforts of the borrower were not effective, at least to be able to support the loan.

Mr. Pericas proceeded to explain the reasons that triggered the filing of the bankruptcy petitions. He testified that around September 2016, after a year (365 days) of the bank not receiving payment for the principal or interest on the loans, which is important for banks under local banking law because after a year lapses without receiving payment, banks have to charge the full amount of the loan, regardless of the value of the collateral. Thus, the banks sat down to assess the situation, they did not want to charge the full amount of the loan but there was no progress on the sale of the terminal. Even though there were parties that were interested, and they had capital to support the transaction. There was the case of Sargeant Marine which had the writ of attachment and they did not know if there could be more cases like these. Therefore, they decided to exercise the remedies under the contract. He stated that they tried to agree on a foreclosure agreement, but that did not prosper, thus the banks went ahead and filed a collection claim around September 2016. Shortly thereafter, the banks learned through a member of the bank syndicate that some of the plants were being leased to third parties. Banco Popular was not aware of that situation. Mr. Pericas testified that they requested the borrower to allow the banks to visit some of the plants. He stated that around October 2016, a group of officers from the bank syndicate visited nine (9) plants and they learned that four (4) of the plants; Aguada; Arecibo, Manatí and Salinas were leased to a company named Transporte Rodriguez. Two of the plants in Barranquitas and Caguas were leased to Carlos Ortiz. A bank officer from Banco Popular noticed that the equipment at Caguas labeled as property of Betteroads and Betterecycling. The Carolina plant was leased to someone identified as Engineer [Purros?]. The Humacao plant, which the bank understood was not operating based on conversations with the borrower, was being leased and operated to Javi Melendez. The banks were not aware that the assets that were the banks' collateral were being leased to third parties. Their counsel at the same time wanted to know whether Betteroads and Betterecycling was doing business with the municipalities so they were looking at the Registry of the Puerto Rico Comptroller's office (Oficina del Contralor de Puerto Rico). They identified two (2) contracts that seemed to be projects awarded to Betteroads and Betterecycling and there was an attempt to transfer those contracts to a company under the name of Puerto Rico Asphalt. Around the same time, through a random google search they learned that a license under the nuclear regulatory commission that was under Betteroads' name was transferred to Puerto Rico Asphalt.

He further stated that once the accounts receivables were foreclosed, they attempted to collect payments and there was a significant discrepancy between the balance of accounts receivables as reported by the borrower to the banks and the amounts the municipalities recognized as the balance of those accounts receivables. The difference was significant. In some cases, the municipality was recognizing about 10% of the amount reported by the borrower. In addition, they were also following the local state court website to find out if there was additional litigation being filed against the borrower because that would be a concern because it could put the assets at risk in case of an adverse decision in local court. Thus, from a totality of the circumstances perspective they thought that the stay prohibition that could be obtained through bankruptcy would be beneficial

because it would allow the banks and the borrower to protect itself from the potential results of liquidation.

Mr. Pericas testified that they noticed that the assets were being used by third parties. He testified that they felt that there was a lack of transparency because most of the information regarding the licenses, the contracts, the plants, and the accounts receivables was received from third parties, not from the borrowers. The assets were being transferred and the value of the banks' collateral was being depleted because the assets were being used without the banks' knowledge and the banks were not receiving any benefit and were losing value of collateral. Mr. Pericas testified that he thought it would be beneficial and could not be obtained through the local courts to attain some type of orderly liquidation and equitable distribution of assets in a transparent process and allow for either a refinancing or restructuring of the syndicate credit facilities or the liquidation of assets under the existing credit facilities.

Mr. Pericas testified that before filing the involuntary petitions they tried unsuccessfully to consensually attain forbearance agreements with the borrower. He stated that they discussed with their attorneys who at the time were O'Neill and Borges and the restructuring law practice of Skadden and Arps in Delaware. The recommendation was to proceed with the involuntary bankruptcies.

He stated that there was a loan agreement that provided for the sale of assets that was executed in the year 2014. Mr. Pericas testified that this document is the original credit agreement that created the syndicated loan (Exhibit 1- Docket No. 415-1). He stated that in this agreement there was no clause for selling equipment or assets. He testified that he is familiar with section 9.11 (Assignments or Participations of Loans) of Exhibit 1. He testified that section 9.11(c) provided some conditions on who could acquire participation under the loan agreement. Mr. Pericas stated that section 9.11 of the Amended and Restated Credit Agreement is pretty much same, except some minor details (Exhibit 5- Docket No. 415-5) when compared with section 9.11 of the original credit agreement. He testified that section 25 (Assignment) of the Amended and Restated Ratification of Stock Pledge and Security Agreement provided some limitations in the assignment of the stock of the companies in case there was a transfer (Exhibit 6- Docket No. 415-6).

Mr. Pericas testified that he knows José Santiago and that he was the officer responsible for the credit facility starting in the year 2013. He stated that José Santiago's statement is accurate regarding that these two (2) sections were barely ever included as part of the loan documents executed by Banco Popular. He testified that he does not remember any other case in which there was a restriction as to the transferability of the loan.

He explained that the reason Banco Popular entered into these two credit facilities in the year 2014 was to refinance a loan. He stated that the condition that the terminal was to be sold by February 28, 2015 was negotiated with the borrower. It was not imposed by the bank. The agreement was signed on June 24, 2014 and the alleged Debtor had to sell the terminal by February 28, 2015. That is about eight months. These terms were discussed and agreed with the borrower, Mr. Jorge Díaz. Mr. Pericas testified that these terms were probably negotiated with José Santiago and Mr. Jorge Díaz.

11

Mr. Pericas stated that he knows Jorge Aldarondo. Mr. Aldarondo used to manage the credit facilities of Betteroads. He is the senior vice president and director of the corporate credit division. That division was responsible for the credit of Betteroads before being transferred to special loans. He testified that he is not aware whether Jorge Aldarondo brought Puma as a potential investor on the Guayanilla terminal. He further testified that he does not recall who brought Puma to the table, but he does recall that Mr. Jorge Díaz shared with the bank some letters of intent regarding the acquisition of a portion of the terminal. The transaction did not come through because they were unable to reach an agreement. Banco Popular did not have any participation in that negotiation. The borrower would occasionally share documents with the bank and that is how they became aware of conversations between the borrower and interested parties. The bank was not participating in any negotiations. Mr. Pericas testified that he recalls that Blue Roads is a company that does business with natural gas and somehow they met Jorge Díaz and discussed the terms of the transaction which he does not recall, but it was related to use or acquisition of the terminal to store natural gas. He stated that he met three (3) managers from the company in Dallas, Texas for probably one or two days. After that, as the conversations with Jorge Díaz and the Blue Roads team progressed they came to Puerto Rico and visited the bank with Jorge Díaz at least one time. Mr. Pericas testified that he does not recall the reason the transaction did not mature. He recalls that there was an interested party that required a non-disturbance agreement. It might have been Blue Roads. The non-disturbance agreement was not accepted by Banco Popular. Mr. Pericas explained that non-disturbance agreements are seldom granted by a bank because it restricts the bank's capacity to mange the assets if they need to foreclose and sell the assets. It is a limitation. He recalls that BTB had a terminal which they wanted to sell or have an agreement around that terminal with Betteroads. It was a transaction related to Betteroads it did not have to do with the sale of the terminal.

Mr. Pericas stated that Mr. Jorge Díaz approached the bank and he shared with Elí Sepúlveda and himself what he was proposing as to the transaction. He does not believe that Mr. Díaz and Elí Sepúlveda proposed a financing for that transaction. He explained that this was a transaction between Betteroads and BTB. Betteroads wanted to acquire some of the assets from BTB. Mr. Jorge Díaz presented to the bank, a memorandum of understanding and a letter of intent. An acquisition requires funds for purchase, and he shared it for the bank to see the transaction. However, the bank never proposed the financing for that transaction.

Mr. Pericas testified that Banco Popular learned of the Sargeant Marine judgment shortly before the foreclosure of the account receivables. Does not recall exact date. He stated that this is an e-mail from Francisco Pascual sent to Eric López, José Santiago (Exhibit 10, Docket No. 415-10). He explained that Francisco Pascual is the officer responsible for the loan at FirstBank. At the time he sent the e-mail, FirstBank was concerned that the financial situation of Betteroads was deteriorating and if the borrower filed for bankruptcy, there could be an issue regarding the perfection of their interests in the account receivables. Mr. Pericas further testified that Mr. Pascual suggested another topic for discussion which is the modification of the loan documents to allow for the sale of the loan. He explained that the loans could be sold. There were restrictions in terms of who the loan could be sold to. It is unusual for loans to have restrictions on who can acquire or participate in the loan. Not having that restriction provides the banks more options in terms of resolution of the credit.

Mr. Pericas stated that he has seen the carve out and settlement agreement before (Docket No. 419-5, Exhibit 63). He testified that he does not know from which funds Sargeant Marine collected the $140,026 as indicated on page 2 of the agreement. He stated that he was not aware that Sargeant was able to attach certain monies on a project regarding government accounts served by Betterecycling.

He testified that once the syndicate foreclosed on the accounts receivables they sent notices to all the parties, including the municipalities and the government agencies amongst others. They requested from the clients of Betteroads the payment of the accounts and we also requested confirmation of the amount of the receivables. The information that was provided by the clients of Betteroads to the banks regarding the amounts of the receivables was significantly different from the amount that Betteroads had previously reported to the bank.

Mr. Pericas testified that Banco Popular sent the notices on the foreclosure of the accounts receivables around June 2016. He stated that he does not recall until when Betteroads operated. He stated that the last time Banco Popular deposited funds in the marginal account of the debtor was around August 2016. There were no other funds made available to the debtors thereafter. Mr. Pericas testified that Banco Popular tried to collect several times on the accounts receivables after the same were foreclosed. He does nor recall exact dates. He testified that notices were sent at least once.

Mr. Pericas explained that their concern was more than the interest that a third party could have regarding the accounts receivables, it was more of a concern of transparency because the information that they had was significantly different from the one being confirmed by the municipalities and the government agencies. He stated that he does not recall the exact date until which Mr. José Santiago was in charge of this credit relationship. Mr. Pericas explained that once the loan was transferred to late stage of special loans, Lynnette Bigio was the manager and Rosimari León was the officer. Rosimari is peer with José Santiago. He stated that Mr. Santiago on a regular basis would be the first contact and the one to review the requests for monies made by Betteroads and Betterecycling. Sometimes José would discuss disbursements with him, other times he would not. Mr. Pericas stated that he would not review all of the disbursements requested by the borrower, only some of them. He explained that there were no limits regarding the amount of disbursements Mr. Santiago could approve or himself. It was more a matter of judgment discussion José had with him. José also had a manger, Eric López, he could talk to. Sometimes they would also talk with him. Eric López was the manager supervising José Santiago.

Mr. Pericas explained that by transparency, in terms of the account receivables, he means having accurate information. He stated that at least from the discrepancy in the information from the municipalities and Betteroads. Also, they learned from a third party as to the judgment received from Sargeant. In addition, the information regarding the leases of the different plants was provided by a third party and it was confirmed upon the site inspections and visits. As to the licenses under the nuclear regulatory commission they understand that it was understood that it was an important asset. He testified that he learned about the transfer of the licenses not through the borrower, but through a random google search. Lastly, the contracts of the municipalities of Juncos and Florida that were intended to be transferred from Betteroads to Puerto Rico Asphalt

13

we learned about through research conducted by our attorneys at the office of the Puerto Rico comptroller, not because the borrower disclosed these transfers.

He testified that this is one of the contracts that he had mentioned that was intended to be transferred (Docket No. 14-7, Exhibit 7). The agreement is dated October 26, 2016. The last transfer of funds to the Betteroads' accounts from the marginal accounts was approximately on August 2015. This contract is the municipality of Florida hiring Puerto Rico Asphalt previously known as Betterecycling Corp. to do some pavement work among other things. He testified that he does not know how Betterecycling could complete a project of this nature without funds in their operating account. Mr. Pericas testified that he did not ask Mr. Jorge Díaz why this contract was transferred to Puerto Rico Asphalt. He testified that he does not recall whether someone from the bank brought up the point. He stated that it seems that this contract was awarded by the Municipality of Juncos to Betterecycling and there was a request to subcontract Puerto Rico Asphalt, LLC (Docket No. 14-8, Exhibit 8). Mr. Pericas testified that this particular contract was then awarded to Super Asphalt Pavement Corp. because according to the document, the subcontracting of Puerto Rico Asphalt, LLC was not allowed. According to this section on page two (2), these contracts could not be transferred or assigned without the written authorization of the Municipality of Juncos. This contract was awarded to Betteroads on July 5, 2016 pursuant to the contract. Mr. Pericas testified that he does not have the detail of whether this contract was included in the accounts receivables that were foreclosed on June 2016. He testified that this is a contract awarded in July 2016 and the accounts receivables were foreclosed in June 2016, thus it would not be included. He does not know whether Banco Popular tied to collect on this account.

Mr. Pericas testified that he is aware that there was a counterclaim within the answer to the complaint filed by Betteroads and Betterecycling in state court. He stated that he does not recall the defenses raised in the counterclaim. He testified that he does not recall whether the alleged debtors were challenging the foreclosure process that the bank undertook in June 2016.

He further testified that when he refers to the transfer of the license issued by the nuclear regulatory commission, he is in fact referring to the document he found by a random google search (Docket No. 14-2, Exhibit 2). He explained that this document was referred to counsel and after that counsel followed up on any other matter related to the document. Mr. Pericas stated that he is not aware whether anybody at Banco Popular performed additional research regarding the operation of the license.

Mr. Pericas testified that he was not present in the morning and did not see the equipment that was brought in by Mr. Díaz. He stated that he is not aware of the proper disposal of that particular equipment. He stated that he is aware that this equipment is important from internal conversations and conversations with counsel for the operation. Once again, the bank under the credit agreement provides that basically all assets that could be transferred to a third party require the consent from the bank. Most of the assets under the credit agreement. First, there was an issue as to transparency. There was an issue with the equipment that was the bank's collateral. Under the terms of the contract, what is appropriate is to approach the bank to discuss the matter. Second, to best of his knowledge the asset has some importance because otherwise why would you transfer it. Third, he would have to review the document, but the language used in the document includes transfers and sale of assets to Puerto Rico Asphalt which seem to be a violation of the terms of the contract.

Mr. Pericas testified that there are several documents regarding the transfer of license. The first one is dated December 20, 2016 is an acknowledgment receipt of correspondence. There is a second document titled, safety evaluation report which is dated March 8, 2017. There is a third document which is a letter dated March 8, 2017. He testified that by this time, the bank had already filed the state court complaint. He testified that the bank had moved for foreclosure and/or garnishment of assets of Betteroads and Betterecycling as part of the state complaint. He stated that the complaint would probably include the contract language and the equipment was part of the assets that were included in the collection action in state court.

Mr. Pericas stated that he understood that most of the assets were granted as collateral to the bank. He stated that the credit agreement has a section on Asset Sale defined as, "[t]he sale, transfer or other disposition of any asset by the Borrower to any Person, other than sales of inventory in the ordinary course of business." The term "Collateral" is defined as, "[a]ll of the property (tangible and intangible) subject to or intended to be subject to the liens created by the Collateral Documents" (Docket No. 415-1, Exhibit 1). He stated that the definition of "collateral" is the same in the original credit agreement and in the amended and restated credit agreement (Docket No. 415-5, Exhibit 5). Mr. Pericas stated that he does not recall whether the debtor was able to sell other than in the ordinary course of business, any unused, idle equipment it had in the facilities. He explained that the banks had as collateral not only the account receivables. They also had stock, real estate, and there were restrictions on the transfer of assets.

Mr. Pericas stated that he does not recall having seen before the work on hand detail spreadsheet (Docket No. 420-18, Exhibit 101). He testified that the Juncos project could not be transferred to Puerto Rico Asphalt because it required the authorization of the Juncos municipality.

Mr. Pericas explained that Banco Popular notified all the parties that appeared in the accounts receivables in which it had an interest in the same. If there was an account receivable, Banco Popular notified the municipality or the party. He testified that he became aware after September 2016, that there were certain properties, asphalt plants leased to third parties. He stated that was after the filing of the state court complaint and after the officers of the bank inspected the plants.

He testified that he does not recall having seen that particular lease contract before (Docket No. 459-1, Exhibit 142). He stated that this contract was within the list of contracts he reviewed. Mr. Pericas explained that the bank learned of the lease contracts during the visits. That is precisely the point, Banco Popular had no visibility regarding the terms of the agreement because they were not aware of these lease agreements executed in April 2016. Mr. Pericas testified that he is not aware that Banco Popular knew about the agreement or authorized the same. He stated that he is not aware that José Santiago authorized or knew about the agreement. Mr. Pericas testified that he did not confer with José Santiago regarding the events that could have taken place prior to September 2016.

Mr. Pericas stated that he has not seen this document before (Docket No. 459-17, Exhibit 158). He learned about the lease during their visit in October 2016. The date of the agreement is April 1, 2016. He testified that to the best of his knowledge the bank was not aware of this lease agreement between the debtor and Mr. Ortiz.

He further stated that he does not recall, except maybe for Puma, having knowledge of any other party that was renting or leasing the Guayanilla terminal. He stated that he does not have any recollection as to Puerto Rico Asphalt storing their inventory in that terminal in the year 2015. He testified that he has seen most of the loan documents. He stated that representatives of the bank syndicate visited the plants and learned after September 2016 that the plants were being leased to third parties. He testified that he has never seen the lease agreements. Mr. Pericas testified that he does not know whether Mr. Jorge Díaz was present during the visits made by the banks' representatives. He stated that the personnel from Betteroads/Betterecycling assisted in the coordination of the visit, but he did not participate in the visits, thus he does not know whether a representative of Betteroads or if Mr. Jorge Díaz was present and joined the banks.

Mr. Pericas testified that he recalls the allegation that the value of the rental agreements was low and unreasonable was made by the banks. The point was raised in conversation with attorneys because they had no way of knowing, given we had little information if the rental of the plants was at market rate. He does not know as of today, whether the rental of the plants is at market rate. He stated that he could not answer that question. Mr. Pericas stated that he does not recall the term throughput agreement. He stated that he does not recall specifics about throughput agreements. Maybe it was discussed with Mr. Jorge Díaz at some point since you had Puma and Matcon doing dealings with Betteroads. He stated that Mr. Jorge Díaz presented Jesús Iglesias, somebody that has a deep appreciation for the Díaz family. He believes that Mr. Iglesias sold liquid asphalt and he was trying to support Betteroads. He does not recall the specific agreement they had with Betteroads, but somehow, they were providing asphalt. He testified that the conversations that they had were prior to filing the state court complaint. Matcon is a company owned by Mr. Iglesias.

Mr. Pericas clarified that as far as he knows Puma does not have any relationship with Jesús Iglesias or Matcon. As far as he knows, Jesús Iglesias is the owner or principal of Matcon.

\*\*\*

Attorney Marini inquired whether this was the Debtors' last witness. Attorney Lugo clarified that this is the last available witness that they have.

The court stated that the submission of the deposition transcript of the Sargeant Marine's representative is pending.

Attorney Lugo stated that they also have pending the deposition of Mr. Francisco Pascual from FirstBank. His deposition was taken last week and are waiting if we can do the same as we did with Sargeant's deposition. The deposition was served yesterday to their attorneys and they have not had the time to review it.

Attorney González on behalf of FirstBank clarified for the record that Mr. Francisco Pascual had not been subpoenaed to testify before the court. There is no position as to availability or unavailability at this time because Mr. Pascual has not been subpoenaed.

Court recess until tomorrow at 9:30am.

16

**Minute Entry**

_**Hearing Information**_:

Debtors: Betteroads Asphalt LLC: Case No. 17-04156
Betterecycling Corporation: Case No. 17-04157
Date/Time/Room: 07/18/2019/09:30 am/ osjcrt2
Bankruptcy Judge: Enrique S. Lamoutte
Deputy Clerk: Darhma Zayas/ Dennis Rodriguez
Reporter/ECR: Edna Sanabria

_**Matters:**_

Continuation of evidentiary hearing on the alleged Debtors' legal defense that the involuntary
petitions were filed in bad faith by the Petitioning Creditors.

_**Appearances:**_

Wigberto Lugo Mender and Alexis Betancourt Vincenty on behalf of the alleged Debtors
Luis Marini and Carolina Veraz on behalf of Banco Popular de Puerto Rico; Banco Santander de
Puerto Rico; FirstBank Puerto Rico and the Economic Development Bank of Puerto Rico
("Syndicate Lenders")
Sonia Colon and Jordi Guso on behalf of Sargeant Marine, Inc. and Sargeant Trading, LTD
Rafael Gonzalez Valiente on behalf of FirstBank Puerto Rico as an independent creditor
Alexis Fuentes Hernandez on behalf of Facsimil Paper Connection, Inc.; Control Force, Corp.;
Champion Petroleum, Inc.; and St. James Security, Inc.
Myrna Ruiz Olmo on behalf of Puerto Rico Asphalt, LLC

Day 4

_**Proceedings:**_

The court commenced the continuation of the evidentiary hearing stating that it understood that
the alleged Debtors would continue with the testimony of Mr. Francisco Pericas Alfaro. The court
stated that its intentions are to have a hearing from now until 12 and then from 2:00 to 5:00pm. If
there is any reason that we have to curtail the hearing, the court will inform the parties.

_Continuation of Testimony of Mr. Francisco Javier Pericas Alfaro (Alleged Debtors)_

Mr. Pericas stated that some of the issues that triggered the filing of the involuntary petitions had
to do with lack of transparency regarding certain transactions and matters that the debtors were
engaged in. He stated that there were plant inspections after September or October 2016. He
testified that he does not recall having seen that e-mail before (Docket 420-22, Exhibit 105, pgs. 7
& 8 only were admitted). Mr. Pericas stated that according to the e-mail dated October 17, 2016,
Rosimari León is discussing the schedule for the plant visits. This e-mail indicates that Mr. Jorge
Díaz provided access to a person named William Soto that knows the plants and would be joining

1

the officers of the banks in the plant visits. Mr. Pericas testified that after October 17, 2016, there were additional requests to visit the plants for a different purpose. He stated that his recollection was that the banks were not granted access to the plants by Betteroads or Betterecycling. Mr. Pericas testified that he believed that the banks' contact was Betteroads and Betterecycling, thus access was usually requested to Betteroads and Betterecycling. He testified that he does not recall when access was denied and by whom in particular. He testified that his understanding is that the contact was usually Jorge Díaz, but he does not recall specifics.

He further testified that they were meetings whenever significant matters needed to be discussed. After the visits, there were meetings held but he does not remember the details as to what was specifically discussed. Mr. Pericas stated that whatever was discussed would be included as part of a presentation or an e-mail from Rosimari or Lynnette to the bank syndicate.

Mr. Pericas testified that when he discussed lack of transparency in relation to the accounts receivables what he mentioned was that we received regular reporting from the borrower regarding the amount of the account receivables. After the accounts receivables were foreclosed, we contacted the clients of Betteroads and the feedback from some of them that replied to the bank would usually represent that the amount on their books was significantly lower than the amount included in the reports that the bank had received from the borrower. In terms of transparency, there was a significant difference between the amount that the bank understood was the balance of the account receivables and the amounts that the municipality had on its books.

He stated that the banks foreclosed on the receivables on June 2016. The discrepancy in the receivables started after the accounts were foreclosed in June 2016. He stated that to the best of his knowledge the bank requested several times from several parties to confirm the balance of the account receivables. He does not recall specific dates. It was after June 2016. He stated that the bank sent more letters after the involuntary petitions were filed. He testified that the letters had all the information the banks had available. If the bank did not have evidence or did not have internal documents from Betteroads they were not included. He testified that his best recollection is that they did not have some of the documents such as invoices and thus, were not included with the letter.

Mr. Pericas testified that from June 2016 to September 2016 there was a lack of transparency on the reporting of accounts receivables during that period.

This is a letter from Marisel Rivera who is part of the finance staff at Betteroads including a budget of payments necessary for operations and requesting disbursements. This was done regularly. (Docket No. 415-25, Exhibit 25). He stated that page 6 of Exhibit 25 of the report seems to be a report regarding deposits made in the accounts of Betteroads at Banco Popular. He stated that he has no reason to believe that the information regarding the collections is incorrect. The same is easy to verify because the deposits were made at Banco Popular. He stated that this information was received regularly by officers of Banco Popular and was also reviewed regularly as part of the process of disbursements.

Mr. Pericas testified that during the period of June 2016 to September 2016 there was no request for additional information regarding the account receivables that he can recall. He stated that they

would receive regularly information regarding accounts receivables because in terms of cash flow they are important. There were requests on what was pending. He testified that they would receive information pertaining to the balance of the account receivable for different parties. Mr. Pericas explained that this was an asset-based facility and the line of credit was based on the amount of account receivables. Thus, the bank had an interest in knowing the account receivables balance and the funds disbursed would be based on the amount of account receivables. The bank had to know before disbursing what was the amount reported of accounts receivables. If the amount reported was not accurate, then the bank was at risk of disbursing an incorrect amount. The bank had to request information on accounts receivable regularly. The way asset-based lines work is that the bank collects upon collection of the account receivables. Thus, for banks knowing the balance of the accounts receivables is a critical manner, specifically for asset-based lines.

Mr. Pericas clarified that he did not say that they were problems with the accounts receivables. He testified that they would receive reports regularly disclosing the amounts of accounts receivables. After the accounts were foreclosed, we learned that there were differences between the amounts reported by Betteroads and Betterecycling and the amounts recognized or acknowledged by some of the clients, including some of the municipalities.

Mr. Pericas stated that he has seen this document before because Rosimari sent an e-mail to the members of the syndicate and she has included him in the distribution list. Rosimari is informing the banks the amount of the funds that have been received; and the expenses that have been paid for appraisals and legal costs. She prepared a report or table disclosing the amount of funds that is being distributed to the members of the syndicate (Docket 420-8, Exhibit 91). Mr. Pericas stated that he does not have reason to believe that this information is incorrect.

He further stated that this document includes information regarding the balances of the account receivables. He stated that the e-mail is dated December 23, 2016 and the accounts receivable information is as of August 15, 2016. The report on collections or payments does not have a date, but there are deposits on the report until December 15, 2016.

Mr. Pericas testified that the e-mail discloses that after September 21, 2016, there was a payment made to the syndicate members in the amount of $1,494,332. He understands that the funds came from the funds deposited in the Debtors' marginal account. He stated that according to Exhibit A-Deposits of the e-mail there was an available balance in the amount of $1,303,202.06. Mr. Pericas testified that the believes that most of these funds were distributed amongst the syndicate banks and some expenses such as appraisal and legal costs were paid. He testified that he does not know if this information was shared with Marisel Rivera and/or Mr. Jorge Díaz or anyone else on behalf of Betteroads and Betterecycling.

He testified that he is not included in this e-mail, thus he is unable to tell with certainty whether he has seen this before. He stated that he has no reason to believe that the information in this e-mail is incorrect (Docket No. 459-14, Exhibit 155). Mr. Pericas testified that he would not say a general statement that Mr. Díaz was assisting Banco Popular with the collection of accounts receivables. He stated that according to the e-mail, Mr. Díaz was assisting Banco Popular with the collection of this particular check. He further testified that he does not recall any specific instance of Mr. Díaz avoiding a collection effort.

Mr. Pericas stated that he does not recall whether there was a request made to Marisel Rivera, Jorge Díaz or to any other representative of the alleged Debtors regarding information as of the collection of accounts receivable. He explained that he was the senior manager responsible for the relationship. If there were requests these would be made by Rosimari León or Lynnette and he would not necessarily be copied because it did not pertain to his function. He did not have to be informed. He stated that he does not recall whether there were requests made to Mr. Jorge Díaz regarding the accounts receivable. Mr. Pericas stated that if such written requests had existed, his understanding is that it would have been given to the alleged Debtors as part of the discovery process.

Mr. Pericas testified that he does not know specifically where the supporting documentation of the accounts receivables is. He understands the same is under the control of Betteroads and Betterecycling. He further testified that the banks through their attorneys with Betteroads' attorneys have had conversations regarding transactions. There have been several instances in which they have engaged in those discussions and part of those discussions included support to collect accounts receivables. It was evident that Betteroads and Betterecycling understood that it would be helpful for the banks to have some information that was not within control of the banks. Mr. Pericas testified that he does not recall the exact dates of these discussions. It is possible that before June 2017 they have had a conversation. However, since he does not recall the date of those conversations, he is having difficulty answering with certainty the question.

He testified that he does not recall whether more information regarding the accounts receivables was requested during the state court litigation. He stated that the two cases in the state court were in an early stage. He stated that he guesses that the cases were in an early discovery stage. He does not recall whether if at that point information had been requested regarding contracts and accounts receivables.

Mr. Pericas testified that he had stated yesterday that there were two contracts; one regarding the municipality of Juncos and the other one with the municipality of Florida that our attorneys obtained through the registry of the office of the Puerto Rico Comptroller. He also stated that he did a random google search and found information about the transfer of the license under the nuclear regulatory commission.

He further stated that the way he views transparency is that there is information should be disclosed to the lenders. If the lenders do not receive that information and it requires an effort such as random google searches to learn about information that should have been disclosed under the terms of the contract, he believes that this constitutes lack of transparency. Once this happens, and we become aware that the issue of lack of transparency exists in the mind of the lenders there is always the doubt whether there is more information that the lenders do not know about and would have to rely on occasional random efforts to obtain such information. Thus, there was a sense of concern that transparency was an important issue.

Mr. Pericas stated that a contract is a contract and obligations under the contract are still in place. From information that the Debtors' attorney shared with me yesterday regarding two lease contracts. It seems that some of these leases occur early on, even before the state claim was filed so in that sense as long as the contract is in place, the obligations remain. However, even before

the claim was filed there were transactions that were not informed to the bank that would highlight the concern of transparency.

He testified that he has seen this document before. It is a collection of monies action filed in state court by Banco Popular. This particular complaint was filed by Banco Popular by itself not as part of the bank syndicate. Mr. Pericas stated that the attorneys shared with us before filing the complaint, thus he has seen it before and is familiar with it. He testified that the complaint appears to be submitted on September 21, 2016 (Docket No. 415-30, Exhibit 30).

Mr. Pericas stated that he has seen this document before. He testified that one of the garnishment actions was granted at some point and is related to this Order dated October 11, 2016 (Docket No. 413-36, Exhibit 31). He further stated that he has seen this document before. It is a judgment dated May 25, 2017 and is related to the collection case of Banco Popular v. Betteroads. This is related to the garnishment Order that was granted and later revoked by the state appellate court (Docket No. 413-37, Exhibit 32). He testified that it would be hard to tell if the bank would have succeeded in the two garnishment motions in state court whether it would have filed the involuntary bankruptcy petitions. He further testified that regarding the syndicate banks he would be speculating. It is hard to tell. Mr. Pericas stated that the issues for which we filed have been discussed and do not necessarily have to do with these orders. Nevertheless, if this Order had not been revoked, he would need a better understanding of what it would entail. In the case of Banco Popular where it was initially granted all the assets that were collateral for the bank and if the bank were to foreclose and liquidate it would be on behalf of the bank, not the syndicate. He testified that he is not sure if with the granting of this Order the process of the bank obtaining final collection and monetizing the collateral would be completed. If this happened, and the bank would have obtained the collateral, then in in terms of the bank there would be no need for further action.

He testified that he is aware that after the state court complaints were filed, Banco Popular and the lenders engaged in negotiations with certain creditors that joined in the filing of the involuntary petitions. Mr. Pericas explained that he did not participate in the negotiations leading these creditors to join the involuntary petitions. He testified that these negotiations were conducted exclusively through their attorneys. He testified that he does not know whether anyone in Banco Popular engaged in any way in negotiations with creditors or customers through the bank seeking to join these involuntary proceedings.

Mr. Pericas testified that he has seen the carve out and settlement agreement before. He stated that St. James Security Services, LLC is one of the parties that our attorneys talked to regarding the agreement. He testified that the amounts that were offered to this claimant were based on recommendations from our attorneys (Docket No. 416-1, Exhibit 42).

Mr. Pericas testified that he is not included in this e-mail and he does not recall seeing this document before. He stated that Elí Sepúlveda is his supervisor. He has no reason to believe that the information contained in this e-mail is incorrect or false (Docket No. 416-6, Exhibit 47). He stated that he has no particular reason to believe that this document does not relate to the carve-out agreement he just reviewed. Mr. Pericas testified that he knows Mr. Guillermo L. Martínez. He stated that he believes that Guillermo Martínez is the owner of GM Group. He stated that he understands that he is related to St. James Security.

Mr. Pericas testified that he is not familiar with that offer or transaction posted by Mr. Elí Sepúlveda to St. James Security. He stated that he does not recall what was the first offer made by our attorneys to St. James. He stated that he does not recall that number.

He stated that one of the reasons that the involuntary petitions were filed was to enjoy the benefits of the automatic stay. He explained that during conversations with our attorneys and as part of the day to day management of the credit relationship we were regularly looking at the filing of claims against Betteroads and Betterecycling and noticed that the amounts of claims filed against these companies was increasing which could have consequences. He testified that they understood that the increase in the amount of litigation could be a competing interest and be adverse against the banks in their collection efforts. Thus, the banks were pursuing the stay in order to avoid adverse results that could be the consequence of the increasing amount of litigation against Betteroads and Betterecycling.

Mr. Pericas clarified that he had worked in the special loans department from October 2011 until September 2013. Then, he was transferred to his current position as director of the corporate banking division. He stated that for the most part, there might be a few cases that are managed by the corporate banking division regarding foreclosure. However, that is unusual. Generally, they are handled for the most part by the special loans division. He stated that at this point, the corporate banking division is not handling any foreclosure cases. Mr. Pericas testified that this case came to the special loans division when he was in that division and he had the case. When he was transferred to corporate banking, he kept handling the case because the husband of the group manager that supervised special loans was an employee in the finance division at Betteroads. In order to avoid a conflict, that person was not privy to the developments of this case. He testified that her name is Iliana González and her husband is Luis Abreu. Mr. Pericas stated that to the best of his understanding Mr. Abreu worked for Betteroads/Betterecycling.

Mr. Pericas testified that as far as he knows, many years ago, the bank filed an involuntary petition. He is not familiar with it. He was the director of the legal division at the time, but he was not privy to that petition.

He further testified that he does not recall any other case in which there was a restriction on the assignment or transfer of the credit facility was included. He does not recall any other credit facility that has this condition. Mr. Pericas stated that as far as he knows there was no analysis performed by him or anybody at Banco Popular regarding the effect of how the filing of an involuntary petition affects clause 9.11. He testified that all the analysis regarding the filing of the involuntary petition was based on discussions and recommendations from our attorneys. He cannot say that there was analysis related to the filing of the involuntary petition because the analysis and recommendations would come from the analysis and recommendations from the attorneys when we had the syndicate loans. He further stated that they had the same counsel that was assisting Popular in the collection case also assisted Popular in the involuntary. They had O'Neill & Borges and Skadden and Arps. They also had an expert from Loughlin. He does not recall the exact dates in why they hired Skadden and Arps and the expert. He testified that to the best of his knowledge, the only three parties involved in terms of advice regarding collection and the involuntary proceedings. Skadden and Arps is a law firm they hire for large collection cases since the year 2010 and they assist us and provide recommendations as to documents and contracts and strategies

6

in general. Mr. Pericas stated that he does not recall at what point Loughlin was hired. He does not recall whether Loughlin was hired by Popular or by O'Neill & Borges. He testified that the purpose of engaging Loughlin was to analyze Betteroads' accounts and review whether there had been transfer of assets or if there was information that was significant for the banks.

Mr. Pericas testified that Loughlin worked with the financial information provided by the borrower. He does not recall if the report includes information regarding the transfer of the licenses under the nuclear regulatory commission or if it included information about the transfer of the two contracts. He stated that he thinks the report was prepared before the filing of this petition.

Mr. Pericas was temporarily excused subject to being recalled.

\*\*\*

Attorney Lugo readdressed the issue of relevance of the evidentiary ruling by this court on the motion to dismiss subject to this evidentiary hearing as it relates to the determination of the transfers of governmental accounts receivables or contracts. He contended that he needed to start by referring to the record of the case and the standard that we are attempting to prove to attain the dismissal of this case. The standard was set forth in the November 30, 2018 opinion, the court ordered that it will consider whether there was evidence of preferential payments to certain creditors or dissipation of Debtors' assets. He stated that he tried yesterday to obtain testimony from the witness regarding particular documents on transfers of the two contracts; which are the municipality of Juncos and Florida.

Mr. Lugo stated that the Debtors started considering the allegations by the petitioning creditors which are found in the motion to appoint a trustee at docket number 14 in case no. 17-04156. Specifically, allegation 30, stating that, "[t]hrough PR Asphalt, the Debtors have diverted revenues that they would have derived from a number of contracts to PR Asphalt and, through such actions, depleted the Debtors and their estates." The alleged Debtors through their presentation of their case in chief, the alleged Debtors have attempted to rebut the existence of any of those alleged transfers.

The court stated that it may need to review the record. The court stated that its best recollection is the following: (1) that its statement holding decision was that the alleged preferential transfers were not before this court; (2) the issue of whether or not to appoint a trustee is also not before this court because the first step is to determine that the order for relief needs to be entered, then after the order for relief is entered, then the party moving for the appointment of trustee and assuming that the motion is renewed has the burden of establishing that a trustee should be appointed meeting the requirements of the applicable statutory provisions for appointment of a chapter 11 trustee. The court's ruling is that these issues are not before the court. If there are any preferential transfers at this juncture the court will not pass as to their merits because we are at the stage of determining whether the petition was filed for an improper purpose and that is the Debtors' burden as established in this court's opinion and order. The court already determined that the statutory requirements were met but the court indicated in its ruling that as with any petition, that good faith is an element. The issue was bifurcated to allow the Debtor to meet the burden of establishing that the petitions were filed in bad faith. As any fact intensive issue, it depends on the applicable totality

of the circumstances that led to the filing. The allegations of improper purpose or bad faith are the involuntary debtors' burden. If the court recollects correctly as discussed in chambers, the basic question is that the Debtors need to establish that the involuntary petitions were filed for an improper purpose. Then, the involuntary debtors would have to articulate to the court what was the improper purpose and after that improper purpose is articulated, then demonstrate the evidence that has been presented to the court establishes and supports the allegations of improper purpose because of x, y, and z. That is the court's mindset as to the ultimate conclusion as to whether or not the petitions were filed for an improper purpose.

Attorney Lugo contends that to the extent that the debtors are called to suffice their burden on proving or not that there are preferential transfers in terms of these assets. The Debtors will need to reserve their rights to present additional evidence in terms of the possibility if there is a claim from the petitioning creditors if there are or there were transfers of government contracts, then we may enter into this topic.

The court stated that it understands that the alleged Debtors may be preemptively addressing the issues that the petitioning creditors may or may not raise in their presentation of evidence to contradict or contest whatever evidence the alleged Debtors are presenting. However, at this juncture, we have heard no evidence or no statements from the petitioning creditors. There are motions and there is the applicable law. The court will have to rule on the evidence that is presented. The evidence to be presented depends on the allegations and the evidence that the involuntary debtors present. That is a judgment issue that belongs to the petitioning creditors which this court will not interfere with. At this moment, the involuntary debtors have to present a *prima facie* case of filing involuntary petitions for an improper purpose.

The court further stated, what is improper purpose? Upon what do the involuntary debtors base their allegations of improper purpose? At what juncture they alleged it? What evidence did they have at the time the allegations were made? What evidence is there after discovery was conducted? The court stated that it is aware that the alleged Debtors have made allegations that they have not had sufficient time to complete discovery. Then what pending discovery, you have not had the time to conduct, but know that exists that would support your position or allegations of improper purpose. The court stated that this is the key to this case. The court has restated its ruling and perhaps expanded on the same.

The court inquired in addition to Mr. Pericas' testimony, are there any other witnesses to be presented other than the transcripts of the depositions that may be submitted.

Attorney Lugo replied that they have the deposition of Mr. Francisco Pascual which we have not agreed whether we will use the same because it will depend on the review and acceptance of what the deposition states.

*Cross examination of Mr. Francisco Javier Pericas Alfaro*

Mr. Pericas stated that the Debtors were notified in writing of the findings that the plants were being leased to third parties. He stated that he understands that bank requested the lease agreements after the visit to the plants. Mr. Pericas testified that the agreements were not provided to the banks.

8

He stated that he understands that the bank contacted the third parties that were leasing the plants to notify them that the plants were part of the banks' collateral and to request information regarding the terms of the lease. He does not know whether any information was provided. Mr. Pericas testified that the bank did not receive any rents from these lease agreements.

Mr. Pericas testified that he found out about the Sargeant Judgment through a third party that contacted a bank employee. They found out about the other claims through the court's website or the report (boletín) that is distributed to different institutions.

Mr. Pericas testified that he recognizes the document which is the result of a search performed in the Puerto Rico's judicial system website that discloses the pending litigation in the state courts against Betterecycling (Docket No. 413, Exhibit 3-B, Exhibit 10). He stated that the exhibit has two pages and it shows eleven items of cases in which Betterecycling Corporation is the defendant. The date of the report is June 8, 2017. He further testified that he recognizes this document which is the result of a search performed in the Puerto Rico's judicial system website that discloses the pending litigation in the state courts against Betteroads Asphalt. The date of the report is June 8, 2017 (Docket No. 413, Exhibit 3-B, Exhibit 11). He stated that the exhibit shows sixty-nine complaints.

He testified that the reasons for filing the state court complaint are different that those for filing the involuntary petitions. Mr. Pericas explained that the reasons for filing the involuntary petitions were related to matters that were discovered after filing the state claim. They found information regarding differences in the amounts of accounts receivables reported to the bank by Betteroads and Betterecycling versus the information received by the different municipalities. The transfer of the license granted by the Nuclear Regulatory Commission. The leases of the plants to third parties which they learned about through a visit and the transfer of two contracts for the municipalities of Florida and Juncos which they found out through third parties after filing the state claim.

He testified that the banks could not obtain the protections sought by filing the involuntary petitions in the local court. He testified that there is the stay protection which was of relevance to the banks given the increased amount of litigation. The assets that were part of the banks' collateral was being used by third parties, thus there was the potential of a loss of value. They also felt that they did not have adequate information and that there was lack of transparency which was not being addressed under the local court claim. Lastly, they believed that in terms of orderly and equitable distribution they could not obtain the same results in the local court as in the bankruptcy court.

Mr. Pericas testified that the involuntary bankruptcy petitions were not filed because the banks were not doing well in state court litigation. He further stated that the banks did not file the involuntary bankruptcy petitions in order to amend the credit agreements to be able to sell the loans without any limitations such as the ones established in section 9.11.

*Re-direct of Mr. Francisco Javier Pericas Alfaro*

Mr. Pericas testified that his best recollection is that the bank contacted the tenants and letters were sent requesting information about the terms of the agreements. He does not recall whether the

funds were required to be brought to the bank. He testified that he thinks that the information regarding rent proceeds is part of the agreement and the bank requested information as to both matters.

Mr. Pericas stated that he does not recall if there was any request regarding the rent proceeds of the lease agreements as part of the motions for attachment filed in the state court cases. He testified that the banks would regularly check the pending litigation in the website of the state judicial system and check this information with our counsel. He testified that their counsel was also reviewing the judicial website. He stated that sometimes he would go to the cases to find out what they entailed. He stated that his main concern was that litigation was increasing and would refer those to counsel for their review.

He further stated that the number 2017 that appears in the complaint regarding the municipality of Bayamón relates to the year it was filed (Docket No. 413, Exhibit 3-B, Exhibit 10). He testified that the bank stopped advancing funds under the line of credit agreements to Betteroads and Betterecycling in August 2016. Mr. Pericas testified that in the year 2017, there were seven (7) complaints filed against Betterecycling. He stated that in terms of the filing date, if the banks stopped disbursing funds on August 2016 and the cases date from 2017, it is fair to say that the cases were filed after the banks stopped advancing funds.

Mr. Pericas testified that there are cases in which the plaintiffs are Banco Popular, FirstBank from the year 2016. He does not know which are the case numbers, but it is possible that the cases are included here. He stated that as to the first case that appears in the list which was filed in the year 1993, he does not know the status of the case or whether it was opened or not. Mr. Pericas further testified that the information they received about cases against Betteroads and Betterecycling was generated from searches of the state judicial system website and the boletín's information. Apart from these two sources of information, he does not know about any other source pertaining to litigation against Betteroads and Betterecycling. He explained that he does not know if this is a comprehensive list but this is the type of search that he would do to obtain information (Docket No. 413, Exhibit 3-B, Exhibit 11).

Mr. Pericas testified that the litigation in state court was at an early stage and he would not say whether the banks were doing good or bad. They were just starting the litigation.

***

The court inquired attorney Lugo if he rests the case regarding live witnesses, even though there are pending issue of the deposition transcripts.

Attorney Betancourt replied that there is a matter pending on the transcript and he does not know the date in which the final version approved by the deponent and declarant will be available. Maybe on Monday. He explained that the deposition transcript of the officer of Sargeant Marine that constitutes the entire testimony of the witness will probably be filed on Monday or at the end of the hearing maybe we can provide it.

Attorney Sonia Colón on behalf of Sargeant Marine informed the court that they can provide it now.

The court stated that if you have the document now the same can be scanned and submitted to the court.

Attorney Jordi Guso on behalf of Sargeat Marine informed the court that on the alleged Debtors' exhibit register which is docket entry 459, the next Exhibit would be number 192 which is the transcript of David Ginter including the errata sheet and excluding the exhibits of the deposition transcript which are alleged Debtors' exhibits 63 and 64 which have been admitted already.

Attorney Betancourt informed the court that there was another issue pending regarding a deposition of Francisco Pascual, an officer of FirstBank, that was taken on July 9, 2019. They have submitted this week the deposition transcript to FirstBank's counsel for the examination of the witness and for them to submit the final version or any modification regarding this transcript and then they have to examine the final version. Taking this into consideration, they reserve the right to call this witness on the last day of trial.

The court stated that the intent is to finish as soon as possible. The court inquired first whether they had any other witnesses and whether they rest their case. The court understood that you would be submitting the transcript of the depositions as testimony, but apparently you were not able to reach an agreement with FirstBank as to the filing of the depositions.

Attorney Betancourt replied that it is not that they have not been able to reach an agreement. He informed that since they do not have the final versions of the deposition transcripts, he cannot advance which parts he wants at this moment because that would put me in a position to advance what he has interest in. He will receive an errata sheet and modifications.

The court inquired whether he took the deposition of Mr. Pascual.

Attorney Betancourt stated that Attorney Lugo Mender deposed Francisco Pascual.

The court stated that assuming that you present Mr. Pascual as a witness, what is the proffer? What will Mr. Pascual establish in support of the allegations that the involuntary petitions were filed in bad faith?

Attorney Betancourt stated that he wants to point out and put on the record that this puts me in a position to advance what we are going to use from the deposition when the witness is reviewing that document and able to make modifications. He wants to put this on the record.

Attorney Marini argued that the case in chief is now.

The court inquired as to the argument that the other party can have opportunities to change what was said in the deposition transcript.

Attorney Betancourt replied that they can make suggestions and substantive changes pursuant to that rule.

The court inquired as to whether they could make substantive changes as to what was said.

Attorney Betancourt replied that this happened with Sargeant Marine when they received their errata sheet and their proposition of changes in some testimony. This happened with this deposition and that is why we are submitting the errata sheet.

Attorney Marini informed the court that he can proffer that they have made no changes to any of the depositions that they have taken of the Lenders. He stated that they received the transcripts on Tuesday while they were on trial. The fact of the matter is that the Debtors' case in chief is now. If they have a witness to present, which he objects due to time limitations, they should have presented him by now. They should have presented the witness and should have subpoenaed him and requested for us to bring him to the hearing. They have not. Their case in chief is today. It is not a matter of having 90% of their case in chief done now and then we present our rebuttal and then they present 10% of their case in chief next Wednesday. That is not the way it works. If they have witnesses, they should present them now and then they rest their case. Then we put forth our case.

Attorney Marini informed the court that they have not subpoenaed Francisco Pascual or requested that he bring him to court. Yesterday, the court suggested that the parties discuss these issues outside court. He has not received an e-mail, one call or one request to have Mr. Pascual appear. This game that they are playing to hold witnesses and not proffer what they are going to say is just an attempt to delay the case. Attorney Marini contended that they need to present their case in chief or rest, so that they can present theirs.

Attorney González informed the court that he has not received any requests to bring Mr. Pascual and that he has not been asked to submit a request for stipulation regarding the deposition or of the contents of the deposition have been sent to him.

Attorney Marini further stated that they have made available every witness that the Debtors have requested for a deposition from the ex-president of the bank down to all employees. Every witness that they have requested for trial, they have made available. He stated that they had never requested this one and now they are trying to play games now.

Attorney Lugo Mender replied that they have not been playing games. He stated that the court has noted that we have been under time constraints and even evidence constraints. He further stated that how was he supposed to call a witness hat he had deposed last week without having a final transcript of the deposition. He stated that the deposition would be inadmissible. He informed the court that the deposition was circulated and remitted to Mr. Marini on Monday morning. This deposition was taken last week. In addition, certain portions of the deposition need to be translated. He stated that they have not had the time to do this. Moreover, Mr. Lugo Mender informed that they do not have an agreement to use the deposition because they have not had the time to discuss the same.

Attorney Marini contends that the simple fact that they are unable to make a proffer as to the relevance of this witness shows that this is just another ploy to delay. The witness is sitting down today. If they had questions they wanted to ask, they could have sat the witness down today.

Attorney Lugo Mender stated that the need of having Mr. Pascual is that Mr. Pascual as Banco Popular has two loan; one syndicated and a direct. FirstBank also has a direct loan. He stated that he has a particular need of presenting as to FirstBank on that petitioning portion of this case to present the evidence to state his case.

Attorney Marini argued that this is not a proffer.

The court interjected and stated that it would go back to what it had said at the end of the hearing this morning. The court stated that it might have not been clear or may not have been understood. The court inquired as to when was the first time that the alleged Debtors made allegations that the involuntary petitions were filed in bad faith or for an improper bankruptcy purpose.

Attorney Lugo Mender replied that it was shortly after the petition was filed, on June 2017.

The court stated that was two (2) years ago. In order to make an allegation of bad faith whoever makes the allegation must have supporting data, documentation or testimony to make the allegation. That is what the court said that it would make a determination on this case: (i) first after determining that the involuntary debtors have made a *prima facie* case of bad faith or having filed the involuntary petition for an improper purpose and the improper purpose would have to be defined; (ii) the evidence that was available when the allegations were made; (iii) what evidence is available after discovery was conducted; and (iv) what evidence needs to be presented because it is known to support the allegations of bad faith, but for x or y reasons have not been able to be obtained. The court stated that a lot of time has lapsed since the allegations were made. The court acknowledged that it took some time to enter the decision in which this court adopted the doctrine that good faith was one of the requirements for filing an involuntary petition which is not a statutory requirement. After that decision was entered, in which the court found that the statutory requirements were satisfied, but the issue of bad faith was fact intensive, and thus a hearing was scheduled. Parties have met and have submitted twice to the court proposed time tables regarding discovery and time to hold the hearings. The court realizes that there have been issues when what and how it will happen and since it was not clear that the parties had agreed to the dates, the court set the dates of the hearings. The court further stated that yesterday, there was an opportunity to disclose this issue. However, to be still in the position of not being clear when or what. If you present the witness, what will that witness testify in support of the allegation that the petition was filed in bad faith. The court does not know whether the alleged Debtors will be questioning the good faith of FirstBank as part of the syndicated loan or FirstBank on the individual loan, or both or as part of a conspiracy. That is why the court has tried to have clear what is the improper purpose to then focus on what will be the evidence and allegations to support that fact.

Attorney Lugo Mender replied that it would be on the terms of FirstBank as an individual creditor. Most of the testimony of this week has dealt with the syndicated loan.

The court inquired as to what will the testimony of Mr. Pascual establish as to the good or bad faith of filing the involuntary petitions?

Mr. Lugo Mender responded that it will establish lack of analysis and also a lack of consideration of the factors that were discussed in this court's opinion and order of November 20. The actions that took place the week before the filing of the bankruptcy petition regarding how FirstBank on that part of the loan decided to join this involuntary petition.

Attorney Marini stated that Attorney Lugo Mender's explanation has no foundation. The Lenders have testified through Banco Popular of the analysis that they did and that it was shared among the syndicate lenders. To say that there is no analysis when FirstBank participated in everything that Mr. Pericas has mentioned is simply an unfounded allegation and an effort to delay. If they thought that they could have proven that, then they should have sat down FirstBank today or yesterday or on the 27th.

The court asked why was Mr. Pascual not summoned?

Attorney Lugo Mender responded that Mr. Pascual was not summoned to testify at this evidentiary hearing because we had discussed the possibility of using his deposition and the exhibits joined that deposition as we did with counselor for Sargeant Marine and avoid having this extra time for that purpose, but it did not happen. He stated that they had reviewed attorney Guso's errata sheet and took a risk.

The court stated that maybe the way he used an errata sheet is different from the way an errata sheet is used today. The court asked what is an errata sheet?

Attorney Guso replied that Fed. R. Civ. P. 30 (e) permit a witness to present an errata sheet identifying procedural and substantive changes to his testimony. That is what Mr. Ginter did. There are a number of procedural, typographical errors in the transcript. Mr. Guso informed that Mr. Ginter made three substantive changes. By way of example, he was asked whether Sargeant Marine, Inc. was approached by the Lenders regarding the filing of the involuntary. His testimony was no. He went back and checked some e-mails and he corrected his testimony that the Lenders approached his counsel. Mr. Guso stated that this was the type of correction that they are referring to. That is what is meant by the errata sheet.

The court stated that this type of correction is fine, but the court was confused regarding the changing of testimony for convenience purposes.

Attorney Marini replied that they should not bear the burden of the decisions of litigating this case. He informed that they have not stipulated any deposition transcript. They took the depositions of the debtors and they have not stipulated the transcripts for the debtors. They took the depositions of the Lenders and we stipulated the transcript for the Lenders so they sat the Lenders down. They should have taken measures and this is a weakness that they wanted to present. They should have subpoenaed the witness or at least ask us to bring the witness today. Their case is now. It should not be after they present their case. Attorney Marini further stated that they have not taken any

measure whatsoever to procure the testimony for today and they should not bear the burden or the prejudice for their lack of diligence in prosecuting this matter.

Attorney González stated that they have already spent an extra half day of the allotted time. He stated that he is aware that the court was lenient in granting additional time because we finished the hearings earlier on two of the days. However, they requested three days to submit their case and it is 3:00pm on the fourth day and they still have not rested.

The court requested that Attorney Lugo Mender provide a proffer with specificity as to what will the testimony of Mr. Pascual be and how it will support a finding that the petitions were filed in bad faith or for an improper bankruptcy purpose.

Mr. Lugo Mender responded that he is not in a position to do that at this time because he has not had the time to review the deposition. He stated that it would be irresponsible of his part to proffer the testimony of a witness which he interviewed but with all the things that have been going on, he is not able to do the proffer at this time. He stated that he could do it tomorrow.

Mr. Marini stated that he was appreciative of Attorney Lugo's candor. However, there is no proffer as to relevance. Either they have a witness now and we object or if they do not have a witness now, then they should rest so that they can present their case.

Attorney González stated that he just wanted to add that they started to proffer but apparently backed out of what simply would be cumulative evidence as to what Mr. Pericas already testified.

Attorney Lugo Mender stated that since the first meeting that we had in September regarding the order that they were going to file in which the alleged Debtors informed that they were in the process of having an expert testimony. He stated that they do not have that testimony as of yet. He stated that they are still completing factual discovery and have not had the time to complete the work with the expert witness. On the date the pre-trial report was filed, it was the first time that we saw the petitioning creditors' expert report. It was not filed signed until last Sunday. During the same week that we were taking Mr. Ginter and Mr. Pascual's deposition, we contacted the attorney for the petitioning creditors to coordinate some sort of deposition of their expert witness. At the time of the report, this witness was going to be used as a rebuttal witness of our expert. Apparently, that is not going to be the case. He stated that he does not know what Mr. Marini intends to present in his case in chief.

The court stated that the syndicated Lenders do not have the initial burden in this contested matter. It is the initial burden of the involuntary debtors to establish a *prima facie* case that these involuntary petitions were filed for an improper bankruptcy purpose. Once you discharge your initial burden, then the burden shifts to the petitioning creditors to rebut that evidence and show that the petitions were filed for a proper bankruptcy purpose. The court stated that you may need evidence to preempt the evidence that the petitioning creditors may present but that does not mean that you are dispensed of your initial burden of establishing bad faith. The court further stated that the issue it had with the depositions is that for this court to determine whether or not a *prima facie* case has been established, and since the transcripts of the depositions are pending the court does not have all the evidence to make that determination. The court stated that at this moment it has

doubts as to whether there is a *prima facie* case and this is why the court retroacts itself to the time when the allegations of bad faith were made two years ago. If two years after the allegation were made we still do not have the evidence to support the allegation, that is a problem for the parties that have the initial burden.

Attorney Marini stated that they were not going to present their case until they rest because they would not know what they are rebutting.

Attorney Lugo Mender stated for the record that the first deposition that was taken in this case was by the petitioning creditors and that was back in December 2017 because we spent four months dealing with Hurricane Maria. Thereafter, on November 30, 2018, the court resolved and provided guidelines as to what we were going to do. No discovery was conducted during this period. The effective time that we have had for the preparation of this case does not amount to two years, it is much less. That is the alleged Debtors' position. Mr. Lugo Mender stated that as of today we have two issues; namely: (i) Mr. Pascual's testimony and (ii) the need of an expert witness to rebut the Lenders' case in chief regarding the expert witness that they plan to present. He requested until tomorrow to put this in writing so that the court may rule. As of this moment, they do not have any other witness to present.

Attorney Marini argued that this is not their case in chief. It is their rebuttal once they rest. That is, assuming that they have met their burden and assuming that they have presented any evidence that they have to rebut. It has been two years since the allegations were made as to the bad faith filing. The allegations we made, we are ready to prove. Mr. Marini stated that they have been requesting that this hearing be held earlier than before. Each party conducts its case as it deems appropriate. Each party conducts the discovery that it thinks it needs to prove its case. The trial was set to start on June 27th. The parties agreed to the discovery. They were the ones that made the allegations. The time to prove their case is now. We have had two years. The fact that no depositions were taken in this period of time was a conscious decision made by brother counsel and his clients as well. He further stated that they have spent almost four days presenting evidence, presenting their case. It is prejudicial to the Lenders and prejudicial to the court and a waste of resources to continue delaying their presentation of the case. If there are no more witnesses, then they need to rest so that they can present their case. Attorney Marini contends that they cannot present their case until they rest because he does not know what they have shown and what to rebut, if anything. Mr. Marini requested that if they do not have any other witnesses, then that the alleged debtors rest their case and we present our case. The trial was not scheduled a month after the petitions were filed, it was scheduled two years after. That is enough time.

The court inquired as to the petitioning creditors witnesses.

Mr. Marini replied that it depends on whether they rest or not since he does not know what else they will present. He stated that he is ready to answer if the debtors are resting, but he needs to know what other evidence they have.

Attorney Lugo Mender stated that he does not have any other witnesses to present today.

16

The court stated that it will hear argument, without making the final decision that it is foreclosing the presentation of any further evidence, as to whether or not the alleged debtors have established a *prima facie* case.

Attorney Marini requested that the court keep to those orders that it has already ruled upon and which the petitioning creditors have relied on to present their case.

Attorney Lugo Mender asked about the orders he was referring to.

Mr. Marini replied that there were a number of motions filed to expand the scope of discovery (docket 468); motions to expand the scope as to Sargeant; motions for reconsideration which were denied. The court granted a limited discovery period in which depositions were taken by the debtors. He requested that these orders remain in place.

Attorney Marini stated that he is ready to make a motion under bankruptcy rule 7052(c), a motion for non-suit. Once a party has been fully heard as the alleged debtors have and have not met their burden bankruptcy rule 7052 allows the court to enter judgment. He stated that he is going to quote from a decision from the court, In re Aguiló Rodríguez, 2008 Westlaw 5099953, in which the court states that this rule allows the court, "to enter judgment at any time a party has been heard fully on an issue and the court can make an appropriate disposition on the evidence. A Rule 52(c) motion does not require he court to view the evidence in the light most favorable to the non-moving party… [i]nstead, in determining whether the motion should be granted, the court independently evaluates and weighs the evidence. Judgment on partial findings is appropriate when a party making a claim either: fails to prove one of the essential elements of its claims or presented evidence that constitutes an adverse party's defense to that claim."

Attorney Marini argued that judgment under rule 52 is appropriate here, for a number of reasons. First to put into context after the voluntary petitions were filed and after some litigation the court entered last year an opinion and order. The opinion and order made a number of determinations, including: that the petitioning creditors satisfied the three-creditor requirement to commence an involuntary petition under section 303(b); and that the alleged debtors were not paying its debts as they became due. The court through its opinion and order found that the involuntary petitions satisfied all of the statutory requirements under section 303(b). The court also through its opinion and order found that bad faith may be an independent defense to a voluntary petition. Thus, through the opinion and order, the only issue that the court scheduled for an evidentiary hearing, the only pending determination to either enter an order of relief or deny the same is whether the involuntary petitions were filed in bad faith and quoting from the opinion and order, "for improper purpose that constitutes an abuse of the bankruptcy process." That is the sole issue to be decided in this hearing. As this court is well aware, good faith is presumed. Thus, all petitioning creditors are presumed to have commenced these cases in good faith. The Debtors bear the burden of first rebutting the presumption and then establishing through a preponderance of the evidence that the involuntary petitions were filed in bad faith, that is, for an improper purpose. He contends that the debtors have not even rebutted the presumption. Second, the debtors presented no evidence, let alone evidence to meet the preponderance of the evidence standard that establishes that the petitions were filed in bad faith. To the contrary, the evidence submitted by the alleged debtors case in chief supports the petitioning creditors factual allegations in their pre-trial. First as to the

lenders. The evidence submitted shows that the lenders filed an involuntary petition to obtain the benefits of the automatic stay considering the numerous actions filed against the debtors. That the lenders filed the petitions to preserve and recover potential avoidance actions, given transfers of assets that they discovered after the filing of the state court complaint. That the lenders filed the petitions to obtain transparency as they had no access to recent, accurate financial data of the debtors. That the lenders filed to preserve their collateral and ensure an orderly process. That the lenders made a careful analysis of the filing with their lawyers then O'Neill and Borges and Skadden and Arps. This is the testimony presented by the debtors' case in chief by Mr. Francisco Pericas. No witness with the knowledge of the state of mind of the Lenders has been presented to rebut this testimony. As of now, no evidence has been presented whatsoever as to Banco Desarrollo Economico, Santander, or FirstBank. Good faith is presumed. For the small petitioning creditors, the evidence presented in the debtors' case in chief through the sworn statements presented shows that the small petitioning creditors all did their own verbal due diligence. All filed considering the transfer of assets, the lenders' liens, their inability to collect on final judgments, the surmounting litigation, to obtain the benefits of the automatic stay, an orderly distribution and the protection of the bankruptcy code. These petitioning creditors had counsel representing them and advising them throughout the decisional process. That is what the sworn statements submitted under the debtors' case in chief show. As to Sargeant through the transcript, the evidence shows that Sargeant filed under similar considerations, namely; the transfer of assets made by the debtors; the lenders' liens, inability to collect on final judgments, surmounting litigation, to obtain the benefits of the automatic stay, an orderly distribution and the protections of the bankruptcy code. Sargeant had attorneys and counsel representing and advising them throughout the decision process. That is what the transcript proposed by the debtors with the errata sheet in the wrong case in chief shows. The debtors have proven the lenders' allegations through their case in chief.

Attorney Marini further argued that the debtors sat two additional witnesses; Marisel Rivera and Jorge Luis Díaz. Incredibly through their own witnesses, the debtors seem to abandon their case in chief and focus on attempting to preempt our rebuttal. In that effort, they are not contesting that the transfers were done. They are attempting to provide a reason for them, but they are not contesting that the transfers were done. They are not contesting the lack of transparency. They are attempting to provide a reason for it. They are not contesting the Lenders' allegations. They have failed to establish through any of these witnesses an improper act by the petitioning creditors.

Mr. Marini further stated that Marisel Rivera testified as to the difficulty in accessing documents. They objected to this testimony because it is irrelevant and it shows that the debtors do not deny that the lenders were not provided with reliable and up to date financial data, but simply seek through that testimony to provide an excuse for the lack of data. The testimony is irrelevant as to the lenders' state of mind as she could not know or testify as to the decision process of each petitioning creditor. She was not there.

Attorney Marini argued that the debtors also sat Mr. Jorge Luis Díaz. Similarly, Mr. Díaz's testimony focused on trying to provide a reason as to why the transfers were done. As mentioned before, the debtors are not denying that the transfers were done, but they are focusing on attempting to justify the same. That is irrelevant. This is not a trial on an avoidance action or a trial as to whether the transfers comply with the fraudulent conveyance provisions or the preference provisions of the Bankruptcy Code. The issue is not relevant for the matters before the court. Once

avoidance actions are filed to recover the transfers, then the debtors as the recipients will have an opportunity to present their case. Further and more critical, Mr. Díaz could not present any evidence whatsoever, let alone evidence under the preponderance of the evidence standard demonstrating an improper purpose. He could not provide any evidence as to the state of mind of the petitioning creditors or the decision-making process of the petitioning creditors because he was not there. He did not provide such evidence.

Further, each petitioning creditor has in fact put forth the evidence admitted in the debtors' case in chief showing why each commenced its case. Moreover, those reasons on the debtors' case in chief are unrebutted and undisputed and have been presented as part of the debtors' case in chief.

Attorney Marini contended that at this point, there is no need to continue this case any further and spend judicial and the parties' resources. In addition, the court has a mandate to resolve involuntary proceedings at the earliest, practical time, which is now. The debtors have not met their burden and have not rebutted the presumption of good faith. They have not presented any evidence, let alone, a preponderance of the evidence to establish an improper act that constitutes bad faith. Thus, for these reasons and the substantial legal discussion that we have included in the pre-trial, we submit that the court should enter judgment today at this stage because the debtors have not met their burden. The court should enter an order for relief and deny the motions to dismiss.

Attorney González on behalf of FirstBank as an individual creditor joined the syndicate lenders' motion for nonsuit.

Attorney Guso on behalf of Sargeant Marine, Inc. and Sargeant Trading Ltd., joined the lenders' motion for judgment on partial findings pursuant to rule 7052(c) of the federal rules of civil procedure because the debtors have not met their burden before the court. Mr. Guso stated that he adopts Mr. Marini's arguments as well.

Mr. Guso stated that today the court was adjudicating the alleged debtors' motion to dismiss the petitions. As to Sargeant Marine, Inc. and Sargeant Trading Ltd., the alleged debtors' motion to dismiss contains very limited allegations which are found in paragraphs 56-59 of the motion. As to Sargeant Trading and Sargeant Marine, Inc., the allegations contained therein go to the nature of the claims. The sole allegation raised by the alleged debtors is that Sargeant Marine and Sargeant Trading hold only one claim, instead of two separate claims. That is the sole basis for contesting the claims of those creditors in the motion that the debtors request for the court to adjudicate today. However, this issue has already been adjudicated adverse to the alleged debtors by the court in the November 30, 2018 opinion and order in which the court found that the petitioning creditors satisfied the threshold test of three (3) holders of claims against each debtor whose claims are not contingent as to liability or the subject of a bona fide dispute and these include Sargeant Marine and Sargeant Trading's claims which are based on a final and unappealable judgment confirming an arbitration award rendered by the U.S. District Court for the Southern District of New York on September 3, 2015 in <u>Sargeant Trading Ltd. & Sargeant Marine, Inc. vs. Betteroads Asphalt Corp.,</u> 15 cv 04879 in which Sargeant Marine's unsecured claim is in the amount of $165,074.84 and Sargeant Trading's unsecured claim is based on the same judgment in the amount of $104,335.38.

Those claims were adjudicated and determined by the court. Those were the only allegations that were directed at Sargeant Marine and Sargeant Trading in the motion. Recently the alleged debtors changed their course and now contend that Sargeant Marine and Sargeant Trading are competitors of the alleged debtors. These allegations are contained in the proposed findings the alleged debtors submitted to the court. These are serious allegations. Mr. Díaz served as CEO and president of the alleged debtors since 2012 testified at length. Attorney Guso stated that by his account Mr. Díaz was on the stand for an excess of six hours. In his extensive testimony, he only mentioned Sargeant Trading one time. He testified that Betteroads Asphalt allegedly had a payment plan to repay the debt owed to Sargeant Trading and that the banks allegedly did not allow Betteroads Asphalt to make the payment. That is the sole reference to Sargeant Trading in Mr. Díaz's testimony. Mr. Díaz offered no other evidence. In his testimony, Mr. Díaz makes no mention at all of Sargeant Marine. He does not otherwise mention Sargeant Trading. He does not use the word competitor at all and does not describe the business of Sargeant Marine or Sargeant Trading or why either allegedly competes with the debtor. It is interesting to note that Mr. Díaz's testimony establishes that these debtors have not been operating for an excess of three years. Thus, it is they who do not compete because they have no operations. In the four and a half days of testimony that we have had in the case, Sargeant Marine and Sargeant Trading have only been mentioned four times, namely: (i) by Mr. Díaz when he was referring to the alleged payment plan; (ii) in Exhibit 63 which is in evidence and it is the carve out and settlement agreement; (iii) Exhibit 64 which is the confidentiality agreement between the lenders and Sargeant Marine and Sargeant Trading; and (iv) by Mr. Pericas in his testimony in which he explains to the court elected to foreclose on the accounts receivables of the alleged debtors based among other things that they learned from a third party about the final judgment Sargeant Marine and Sargeant Trading had obtained against the debtors. This is the only evidence the alleged debtors have offered regarding Sargeant Marine and Sargeant Trading. They have offered no evidence to show that Sargeant Marine and Sargeant Trading are their competitors or that they joined the involuntary petition for an improper purpose or that they acted out of ill will or to harass the debtor. Attorney Guso stated that the court's opinion of November 30, 2018, gave the parties clear guidance as to the issues the court would adjudicate. The issue before the court is whether there is evidence to support the alleged debtors' allegations that these involuntary petitions were filed for an improper purpose or in bad faith. The debtors have not met their burden and thus, they join the lenders' request for the entry of judgment based on partial findings or a denial of the alleged debtors' motion to dismiss the involuntary petitions and for the prompt entry of an order of relief.

Attorney Fuentes on behalf of the unsecured petitioning creditors joined the request for non-suit, particularly the arguments raised by Mr. Marini as to the lack of any evidence whatsoever against his clients' alleged bad faith.

Attorney Betancourt on behalf of the alleged debtors opposes to such petition as requested by the lenders, Sargeant Marine and the unsecured joining petitioners as it has been proffered to this court. He stated that their position is that to this date, even with the time constraint and the reservations that they have made regarding discovery to this date the alleged debtors have provided evidence and testimony to prove the *prima facie* case on the issue of bad faith. Both through documents and testimony. In the opinion and order, this court adopted the totality of the circumstances standard evaluating any way in which creditors filing an involuntary petition could have acted in bad faith and it stated that the court may consider a number of factors including

whether the creditors satisfied the statutory criteria for filing the petition. In this case, this court stated that they had, but it included other factors that will be evaluated; such as: (i) whether the involuntary petition was meritorious; (ii) whether the creditors made a reasonable inquiry into relevant facts and pertinent law before filing; (iii) whether there was evidence of preferential payments; (iv) whether the petition was motivated by ill will or desire to harass; (v) if the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; (vi) if the filing was used as a tactical advantage in pending actions; (vii) the filing was used as a substitute for customary debt collection procedures; and (viii) if the filing had a suspicious element.

Attorney Betancourt argued that in this case, the alleged debtors have proven to this court that the lenders had a particular interest and they attempted to achieve this through three simple attacks; namely: (i) through the garnishment; (ii) through impaired operations; (iii) through the state court and now with the involuntary petition. To this date, explicit documents, admissions and testimony have been provided as to the bank's motive and interest in modifying long lasting covenants to achieve two goals: the disposition of assets of the alleged debtors and the modification of the covenants regarding the sale of the loans in order for the lenders to sell without any restriction. These are the motivations that have been identified at the beginning of the case, which pre-date the filing of the state court proceeding. The alleged debtors as to this intent have brought to the court documents regarding the existence of that prohibition on the loan documents as to the sale of the loan and the modification of the lien on the stocks as a penalty for an improper transfer which can be viewed as admitted Exhibits 1, 2, 5 and 6.

Mr. Betancourt argued that the testimony of former officer José Santiago Ramos and the designated officer Francisco Pericas of Banco Popular have acknowledged that the prohibition of sale is unique in the banking industry. Mr. Betancourt contended that they have even testified as to the interest of the bank in pursuing the modification of this prohibition to achieve an exit strategy to these loans. The testimony of Mr. Pericas revealed that they were pursuing for the corporation to dispose of its assets since the year 2014 as disclosed in Exhibit 5. He argued that they have provided internal communication from the banks' officers since January 2016 explicitly outlining their interests to condition forbearance agreements to achieve the modification of the loan covenants to allow the sale of these loans as established in Exhibit 10. There is also in draft and in documents specifically conditioning the forbearance agreements in the year 2016 for the corporation to allow the sale and transfer of the loans as disclosed in Exhibit 14. Evidence has been provided that the bank's direct actions against the operations and going concern of these corporations through the garnishment of all actual funds and accounts receivables even on pending projects as viewed in Exhibits 26 & 27. This is particularly important because the lenders have now created a case with the supposed interest of protecting the corporations and their assets when initially they were being attacked. More importantly, there is communication between bank officers acknowledging that cutting the funds will stress the corporation and impair operations as established in Exhibits 9 and 26. The testimony of Mr. Pericas showed that there was no detailed analysis as to the effect on the corporations due to the sequestration of monies and assets. It is easy to pose a proposition and proffer that there is litigation and that some payments are not being made, but there is no analysis by the lenders as to what is expected from the corporations as to the management of the monies was performed. Immediately after the cash was curtailed, the bank officers' state of mind was

Attorney Betancourt that immediately after all the funding was curtailed, evidence was provided as to the bank officers describing their state of mind as perplexed because the corporations had not filed for bankruptcy after depriving them of all cash and accounts as of September 2016. Immediately after, all of the banking institutions were filing simultaneous complaints in state court such as the syndicate lenders, Banco Popular as an individual creditor, and FirstBank. In all three proceedings pursuant to documents submitted and the testimony of Mr. Jorge Luis Diaz the banks immediately requested, after garnishment, that all assets be garnished and to be controlled by them. This happened in the three cases. In these proceedings, the bank raised the same allegations of transfer; not receiving the rents, that the nuclear machines were transferred and that allegedly operations were transferred to Puerto Rico Asphalt. Those three allegations made by the Lenders upon the filing of these petitions are not new to these proceedings. They were explicitly included in the attempts of garnishment and upon the denial and reconsideration of the same. Garnishment in the syndicate case was denied by the state court. They attempted to reconsider and supplement with the same allegations posed in this court and the same was denied. In the case of Banco Popular as an individual creditor, the garnishment was granted in state court as stated by Mr. Pericas. Assets were garnished and the bank took control over the same. As stated by Mr. Jorge Luis Díaz and Mr. Pericas, the garnishment granted in the state court was revoked on May 25, 2017. Two weeks before the filing of the petitions. In the syndicate case March 29, 2017 was the initial denial of the garnishment. In this case, the lenders argue that the petitions were filed for the benefit of all creditors and to protect the corporations. One should ask, what would have happened if the garnishment in the state court would have been achieved? Mr. Betancourt stated that it is their position that even Mr. Pericas testified to the same, that the petitions would have not been filed. It is their position, that the petitions would have certainly not been filed if the banks would have obtained immediate control or the garnishments filed in those petitions. The allegations to move this court as to their supposed good faith consist in that the rent agreements were transferred, and the equipment was also transferred. However, there is no analysis as to how they expected this corporation to continue. Moreover, testimony has been provided that all of these transactions had a proper business purpose to maintain the going concern. Contracts were not transferred because they could not be and attempts to seek another provider together with the surety to complete the contract was done explicitly to avoid a penalty and to search for a party to complete the contract under the same cost as the debtor.

Attorney Betancourt argued that all of these events were created by the bank through any transfers of property which they knew about, and any alleged transfer of contract was a modification in operation prompted by the first attack of all garnishment and the second attempt to obtain all control of collateral. Thus, the allegation of an improper operation is hard to grasp, when they intended to leave no operations to the alleged debtors. Just weeks after unfavorable determinations in state court, these petitions were filed as a third attempt to pressure the debtors. These banks were also subject to counterclaims in each of the state court proceedings. The filing of the bankruptcy petitions under these circumstances of a disputed secured creditor attempting to obtain immediate control of the corporations' assets which they were unable to obtain in state court and immediately create the means to file the involuntary petitions falls squarely with this court's opinion. The filing was motivated by ill will and a desire to harass. The banks attempted to obtain immediate control of all collateral after acquiring all the cash and the funds. The petitioning creditors and the banks filed this bankruptcy to obtain a disproportionate advantage for themselves.

Since September 2016, these attacks reveal that their only interest was to obtain control of the collateral. Mr. Betancourt argued that the alleged debtors' position is that this filing was used as a tactical advantage in pending actions. The unfavorable results in state court just before the filing of the involuntary petitions attest to that and this ties in with the suspicious timing of these involuntary petitions which indicates forum shopping that would have not occurred if the attachments would have been successful in state court. Given that they were denied some of these remedies in state court, in particular attain control of all assets and not being able to stop the debtors from rearranging the operations. The bank through their attorneys developed jurisdiction in this forum by paying and providing benefits only to certain creditors through carve out agreements (Exhibits 42, 43, 44 & 59). The carve out agreements include the promise of payment of claims from collateral of the secured creditors. Unsecured petitioning creditors have attested that they are receiving direct payment of their attorneys' fees and they also receive the proffer and promise of an indemnity in case these cases go south. In the event of imposition of bad faith and damages by this court. There is no communication or evidence that could be provided to this court or the corporation that could justify these creditors joining the petition, except the interest to collect. There is no actual disclosure by the lenders to these petitioning creditors that they have been able to acquire because everything is privileged and there is no access to actual information. There is no actual disclosure or documents by the lenders that they provided these joining petitioning creditors as to the status in the state court proceedings. There is no analysis as to what this bankruptcy could entail for the corporations or other creditors. No analysis has been proffered or provided to the court that evince that such analysis took place. All that can be concluded is that they joined to obtain payment from the lenders' collateral above the rest of the unsecured creditors. Attorney Betancourt argued that this proves that the petitioners did not join the bankruptcy petition to get a fair share of the debtors' assets in comparison with other potential creditors. The filing was used to substitute a customary debt collection proceeding that was negotiated in the carve out. The creditors failed to provide the court or to the alleged debtors that they had made a reasonable inquiry regarding the facts and pertinent law before filing. The petitioning creditors that joined chose to do so to obtain an advantage by creating a preference for themselves by assuring payment even if they are unsecured creditors.

Attorney Betancourt further argued that it is their position that the alleged debtors have been able to prove a *prima facie* case that falls within the criteria detailed by this court in its opinion and order. As of this date, there is a practical consideration that is that the evidence is still being translated. In addition, they reserve the issue that they have to address as to the FirstBank deposition and also regarding the matter of the expert witness.

Attorney Marini requested permission to be heard. He proceeded to argue that it is easy to make allegations as to improper acts when there is no evidence to support it. In his presentation he laid out what the evidence presented by the debtors show as to the reasons why the lenders filed the petitions such as transfers were discovered; surmounting litigation; obtaining the benefits of the automatic stay; the lack financial transparency; and the need for an orderly liquidation. These statements are uncontested. However, their allegations as to improper acts can be summarized in three (3) points. The first point is that the lenders filed the involuntary petitions because they want to sell the debtors' assets. There is no evidence presented that the filing of the case was done to sell the assets. The only evidence that has been presented is that the 2014 credit agreement had a requirement that the debtor was going to sell a terminal and some other assets. The debtors

23

defaulted because they never sold the terminal. There are e-mails from the bank inquiring as to transactions to sell the terminal as they would inquire as to compliance with other provisions in a credit agreement. There is no evidence, other than the fact that the 2014 credit agreement had a requirement to sell the terminal which the debtors defaulted on because they still own the terminal. There is no evidence that the banks filed the bankruptcy case seeking to sell any assets. There is no evidence that there are buyers lined up. No discussions with buyers were presented because none exist.

Attorney Marini argued that the second unfounded argument that they make is that the lenders filed the bankruptcy case to modify the restriction on selling the note. First of all, filing a bankruptcy case does not modify a credit agreement. It does not modify a restriction to sell a loan. The only basis in admissible evidence is that the 2012 and 2014 credit agreements and then a document dated three (3) years prior to the filing of the case had restrictions as to the lenders' ability to sell the loans. The lenders could sell the loans. It is not a prohibition. There is a restriction as to the entity to which the lenders could sell the loan and that one of the many pieces of the lenders' collateral, the pledge of the stocks, would not transfer upon the sale of the loans. Those are the restrictions. The lenders could have sold the loans subject to these restrictions. The only evidence that they have is that as part of workout agreements and negotiations to restructure the debtors' defaults under the credit agreements the lenders requested a modification of that section. The testimony of Mr. José Santiago and Mr. Franciso Pericas evince that the lenders consider exit strategies and workouts all the time. This is common when you are working on a loan to have different scenarios such as: (i) sale of the loan: (ii) the debtors file for bankruptcy; (iii) scenario of foreclosure. This is the only evidence that they have. That somehow as a concession for waving their rights as a result of the events of default of the debtor in a workout agreement prior to the filing of the case, the lenders requested an amendment of the loan. There is no evidence that the lenders filed an involuntary petition as a result of that section. In fact, the evidence by Mr. Pericas clearly stated that they did not file as a result of that prohibition. In fact, the testimony of Mr. Santiago and Mr. Pericas has evinced that the banks have not even engaged with any buyer to sell the loans. There have not been negotiations at any time to sell the loans. Thus, jumping from the fact that there is a requirement to sell the terminal in the 2014 credit agreement to the restriction to sell the loan in the 2014 credit agreement and an attempt to amend as part of a consensual workout. Then jumping from this to alleging that years later the lenders filed the bankruptcy cases because they wanted to sell assets or modify the loan is unfounded. There is no evidence other than the banks' complete rejection of that proposition.

The third argument is that the lenders filed the bankruptcy cases because they were doing bad in the state court litigation because they did not obtain the garnishment of assets. Mr. Pericas categorically rejected that the lenders filed the involuntary petitions because of the outcome of the state court litigation. In fact, he stated that the bankruptcy cases were filed for reasons completely different from the filing of the state court case. The state court case sought collection and foreclosure and the bankruptcy case sought protection from the bankruptcy stay; protection from transfer of assets; transparency; and orderly liquidation. Protections not available in state court. This is a pre-judgment remedy. It is not that the lenders lost the case or that there is a judgment adverse to the lenders. The state court case was in the initial stages. Discovery had not even commenced. The garnishment that the alleged debtors mentioned was under reconsideration at the time the lenders filed the bankruptcy case. The state court had not ruled upon the reconsideration

of the garnishment when the lenders filed the bankruptcy cases. The same was denied later, but the lenders could have appealed it. Attorney Marini further argued that the denial the alleged debtors kept mentioning is not a denial of the attachment, it is a denial of the ex-parte nature of the attachment and what the court did was set a hearing. There is no way of knowing what would have happened at the hearing. The cases were at the beginning stages. There is no evidence and it is an unfounded jump to go and take one order from a state court on a pre-judgment matter that was under reconsideration and that could have been appealed and that really it has no major impact on the banks' ability to win on the complaint. The evidence rejects their allegation that the lenders' filed the bankruptcy cases because the garnishment was denied.

Attorney Marini further argued that the alleged debtors misconstrued Mr. Pericas' testimony. Mr. Pericas did not state that the banks would not have filed the involuntary petitions if they had won the garnishment. Mr. Pericas stated first that he did not know and that it would depend if the foreclosure and collection case had been completed. If it had been completed, the debtors would not even own the assets. They are misconstruing the testimony. Mr. Pericas' testimony was clear when he said that the banks did not file the bankruptcy case because of any relation to the state court case and the banks did not file the case to amend the loan documents which are not amended through the filing of a bankruptcy case.

He further argued that the alleged debtors stated that the banks knew of the alleged transfers but there was no evidence presented as to this matter. There were no e-mails, documents, letters to the bank that evince that the banks knew of the transfers. They were not submitted into evidence because they do not exist. To the contrary, Mr. Pericas' testimony which has not been controverted was that they did not know about the transfers and found about the same through google and through inspections and reviewing contracts at the office of the comptroller. If they knew about the transfers, then why did they not put forth the letters and e-mails from the debtors. This is an unfounded allegation.

Mr. Marini also argued that the only interest of the bank is to collect but they have not shown any evidence. He argued that no witness from the bank testified that the case was filed because they wanted to collect on the claim. No document has been presented which states that. Mr. Marini argued that they are putting documents out of context. A member of FirstBank stated that he was perplexed that the debtors had not filed for bankruptcy. They were because the evidence shown through Mr. Pericas and Mr. Santiago disclosed that there was litigation against the debtors. The debtors did not have access to funds. Other borrowers would seek to protect their assets and would seek to protect their creditors. Their fiduciary duties were not to the equity holders but to the creditors. A responsible owner would have filed for bankruptcy. It does not mean that the lenders were considering an involuntary bankruptcy at that stage. In fact, they have stated that they were not considering an involuntary bankruptcy at that stage. It was only considered once the lenders discovered the transfers. Finally, the allegation that the petitioning creditors did not make a reasonable inquiry is unfounded. Where is the evidence? The lenders testified that they did numerous inquiries, but they were done through counsel. The other petitioning creditors also testified the same. An involuntary filing is a highly technical issue, one cannot a business person to know all the intricacies of section 303(b) and whether it complies. This is why responsible businesses hire counsel. The lenders testified that they hired O'Neil & Borges and Skadden and Arps. Sargeant hired Ferraiuoli and Berger Singerman. Also petitioning creditors in their sworn

statements disclosed that they had access to counsel and that the analysis, and the reasonable diligence performed was done through counsel. Thus, the allegation that no diligence was done is unfounded and it is against the evidence presented in the debtors' case in chief. Attorney Marini argued that it is easy to throw allegations up in the air with no proof. The proof that was presented in the debtors' case in chief rejects the allegations that they are making today and is contrary to what they are stating today which has no evidentiary basis.

The court stated that it was going to ask eleven (11) questions, but before doing so, it will set the stage for the questions. At this juncture, the court has before it the rule 52(c) motion that partial findings be made declaring that alleged debtors have failed to present a *prima facie* case of having the petitioning creditors file an involuntary petition for an improper bankruptcy purpose. The discussions started around 3:20pm. The key issue is whether or not an improper legal purpose has been established. It is also important to set the stage as to where we are for the consideration of the pending request for non-suit or partial findings under rule 52(c). The debtors have, although with certain caveats, presented their evidence to establish that the involuntary petitions were filed for an improper purpose. The petitioning creditors have not presented the rebuttal evidence. The petitioning creditors have not presented their case because we are still at the stage in which the alleged debtors have to discharge their initial burden of presenting a *prima facie* case of bad faith or filing the petitions for an improper legal purpose. This is important. The court's questions are the following:

1. What is the improper bankruptcy purpose of the petitioning creditors in filing the involuntary petitions?

The court has tried to define the answer to that question with certain precision in order to be in a better position to understand the evidence that has been presented.

2. What evidence of the improper bankruptcy purpose was there at the time the request was made?

3. What evidence of an improper bankruptcy purpose was presented by the alleged debtors as of this time, including the transcript of Sargeant Marine's officer?

4. How are the provisions in the credit agreement affected by the bankruptcy filing?

The alleged debtors have cited the credit agreements and the actions taken but the court is not sure if the credit agreements are affected by the bankruptcy filing.

5. Why are active collection proceedings in either state court or the bankruptcy court an improper bankruptcy purpose?

6. Is it uncontested that the alleged debtors have not operated for three (3) years?

7. Is it uncontested that the debtors have not made any payments to Banco Popular de Puerto Rico or to the syndicated lenders for a year prior to filing?

8. Do debtors have any equity that may be distributed to unsecured creditors?

   Outside bankruptcy or in bankruptcy.

9. Are the carve out agreements illegal as to purpose under the circumstances?

10. Why are the petitioning creditors in a better position in bankruptcy than in pending actions before state courts?

11. What rights do the alleged debtors have outside bankruptcy that are foreclosed by a bankruptcy petition?

The court stated that it needed answers to these questions, irrespective of whatever answer you may have of to the oral arguments that have been made by the syndicated lenders and Sargeant Marine's counsel and joined by other creditors.

The court granted the alleged debtors until Monday to answer in writing these questions and the answer to the oral arguments presented by Mr. Marini and Mr. Guso.

Attorney Guso inquired about the second question.

The court responded that it understands that the request was made shortly after the involuntary petitions were filed. The court explained that it was making these questions because there are allegations and issues as to the expedited nature of the proceedings which have prevented adequate discovery for the alleged debtors to present their evidence.

Attorney Guso stated that the reason of his inquiry is because their theory has changed over time and wants to be clear of what the court wants.

The court clarified that timing issues may be relevant, but they have to be relevant in light of the respective responsibilities at different times because one cannot make an allegation without any basis. There has to be a basis for an allegation. One may have some basis for an allegation but not the entirety of the documents or of the evidence to support the allegations. There has to be some evidence support the allegations at the time they were made.

The court stated that it will recess until further notice since it has to resolve the key issue as to whether the alleged debtors have made a *prima facie* case. The court stated that it is granting the alleged debtors until Monday July 22 to answer the motions for non-suit, the oral arguments presented, and the questions posed by the court. The petitioning creditors were granted until next Monday, July 29th to reply.

Attorney Betancourt requested that given the petitioning creditors have seven (7) days to reply, if they could be granted seven (7) days to answer.

Attorney Marini stated that he would reply within the same amount of time as the alleged debtors.

The court ordered the petitioning creditors that they had until July 26th to reply.

Court is adjourned.